# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN HARRISON COCKBURN, | : | |
| | : | |
| v. | : | CIVIL ACTION No. 10-1407-JS |
| | : | |
| NATIONAL BOARD OF MEDICAL EXAMINERS. | : | |

## DECLARATION OF CAROLINE MEW

## <u>EXHIBITS 6-11</u>

90360695.1

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN HARRISON COCKBURN )
)
          **Plaintiff,** )
)
v, )          Civil Action No. 10-1407
)
NATIONAL BOARD OF )
MEDICAL EXAMINERS )
et al. )
)
        **Defendants** )

---

## PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

    1.    Identify all Impairments that you claim to suffer from which you believe entitle to testing Accommodations on the USMLE Step 1 examination.

    **Answer:** Reading Disorder, Written Language Disorder, Attention-Deficit/Hyperactivity Disorder – Predominantly Inattentive Type

    2.    For each Impairment identified in response to Interrogatory number 1, state when you were first diagnosed as having that Impairment by a health care professional, and identify that professional.

    **Answer:**

    <u>Reading Disorder:</u>    In June 2005, Plaintiff was diagnosed with a Reading Disorder by Dr. Dave Filipowski, licensed psychologist; in October 2009, Plaintiff was diagnosed with a Reading Disorder by Dr. Vincent Culotta, licensed psychologist and board-certified neuropsychologist.

<u>Written Language Disorder:</u>  In June 2005, Plaintiff was diagnosed as Learning Disabled in the area of Written Language by Dr. Dave Filipowski, licensed psychologist.

<u>Attention-Deficit/Hyperactivity Disorder:</u>     In October 2009, Plaintiff was diagnosed with Attention-Deficit/Hyperactivity Disorder-Predominantly Inattentive Type by Dr. Vincent Culotta, licensed psychologist and board-certified neuropsychologist.

3.       For each Impairment identified in response to Interrogatory number 1, state all functional limitations that you experience, describe the severity of those limitations, and identify the major life activity or activities that you claim are affected by those limitations.

**Answer:** Objection.  The question is vague, overly broad and unduly burdensome. Without waiving these objections, the Impairments identified in response to Interrogatory number 1 are described as follows:

<u>Reading Disorder:</u>

Functional Limitations: As defined by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision: Reading achievement substantially below age-expectations, intelligence measures and educational history; reading achievement interferes with academic achievement and activities of daily living requiring reading skills; slow oral and silent reading, with errors in comprehension; borderline reading comprehension under standard time, low-average reading comprehension given extended time.

Severity: Severe

Major Life Activity Affected: Reading, Learning.

2

Written Language Disorder:

Functional Limitations: Writing skills substantially below age-expectations, intelligence measures and educational history; writing skills sometimes interfere with academic achievements and activities of daily living requiring writing.

Severity: Moderate to Severe

Major Life Activity Affected: Writing, Learning

Attention-Deficit/Hyperactivity Disorder:

Functional Limitations: As defined by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision: Difficulty giving close attention to details; difficulty sustaining attention in tasks; Difficulty finishing work or duties, not attributable to oppositional behavior or failure to understand instructions; difficulty organizing tasks and activities; difficulty engaging in tasks requiring sustained mental effort; easily distracted by external stimuli; forgetful in daily activities; difficulty maintaining conversational turn-taking; difficulty completing tasks within time limits; difficulty with multiple-step directions; .

Severity: Severe

Major Life Activity Affected: Reading, Writing, Learning

4.    For each Impairment identified in response to Interrogatory number 1, state whether you have ever taken any medications to address the symptoms of the Impairment, the name and dosage of each such medication, whether you are currently taking any medications, and, if so, the name and dosage of the medications you are currently taking.

3

**Answer:** Plaintiff has not in the past and is not currently taking any medications for any of the Impairments identified in response to Interrogatory number 1.

5.       Identify all health care or other professionals (*e.g.*, medical doctors, psychologists, neuropsychologists, counselors, etc.) whom you have consulted regarding any Impairment identified in response to Interrogatory number 1, above, and, for each such professional state when you first consulted that professional and the date range within which you were treated or evaluated by that professional.

**Answer:** Objection. The question is vague, overly broad and unduly burdensome. Without waiving those objections, Plaintiff consulted academic skills counselor Janet Smith during his high school enrollment in the Ravenscroft School, from August 1995 through June 1999. Plaintiff has also consulted Dr. Dave Filipowski, licensed psychologist, in January 1998, April 1998, and June 2005. Plaintiff has also consulted Dr. Vincent Culotta, licensed psychologist and board-certified neuropsychologist, in September 2009 and October 2009.

6.       State the date of onset for each of your claimed Impairments, and state whether and when each such Impairment has improved or gotten worse since that date.

**Answer:** Objection. The question is vague, overly broad and unduly burdensome. Without waiving those objections, the onset of each Impairment was birth. The Impairments have not improved or gotten worse since birth, but have become more pronounced as reading and writing demands increased during Plaintiff's education and major life activities.

4

7.      Identify and describe any mitigating measures, other than medications, that you use or have used to address the functional limitations that you experience or have experienced as a result of your Impairments.

**Answer:** Objection.  The question is irrelevant, vague, overly broad and unduly burdensome.  Without waiving those objections, Plaintiff has in the past used the following mitigating measures: extra time to read and process reading assignments; flash cards; PowerPoint and One Note software; scratch paper for writing out thought processes; separate room and reduced distractions; and professional and peer tutoring.

8.      Identify all employers you have had during the past five years, and provide a description of your work duties for each employer.

**Answer:** Objection.  The question is irrelevant. Without waiving this objection, Plaintiff's employers for the past five years have been University of North Carolina Hospital, in Chapel Hill, N.C.; AAIPharma, Inc., in Wilmington, N.C.; and D&J Automotive, in Lewisburg, N.C.  Plaintiff's duties for University of North Carolina Hospital consisted of pharmaceutical assistant duties, filling carts with prescribed pharmaceuticals for individual patients and delivering those carts to the floor where the patient was receiving care; Plaintiff's duties for AAIPharma consisted of monitoring test subjects during pharmaceutical trials; and Plaintiff's duties for D&J Automotive consisted of selling cars.

9.      Identify all Accommodations that you requested from any employer identified in response to Interrogatory number 8 and, for each such employer, state when and from whom you requested such Accommodations, whether any Accommodations

were granted, and, if so, what those Accommodations were and the reason you requested such Accommodations.

     **Answer:** Objection. The question is irrelevant. Without waiving this objection, Plaintiff did not request Accommodations from any employer identified in response to Interrogatory number 8 because Plaintiff's duties did not require reading and processing written material in time-limited circumstances.

     10.    Identify all educational institutions you have attended from 1st grade to the current date.

     **Answer:** Objection. The question is overly broad and unduly burdensome. Without waiving this objection, Plaintiff attended Wake County Public School System, the Ravenscroft School, North Carolina Central University, University of North Carolina at Chapel Hill, and Howard University College of Medicine.

     11.    Identify all Accommodations that were requested by or for you from any of the educational institutions identified in response to Interrogatory number 10 and, for each such institution, state when such Accommodations were requested, whether any such Accommodations were granted and whether any Accommodations were denied, what those Accommodations were, and the reason you requested such Accommodations.

     **Answer:** Objection. The question is vague, overly broad and unduly burdensome. Without waiving those objections, Plaintiff received the Accommodation of extended time on tests and assignments starting in 1995, and requested in 1997 and received the Accommodation of extended time at the Ravenscroft School; requested in 2000 and received Accommodations of extended time and a reduced-distraction testing site from professors at North Carolina Central University; requested in 2006 and received the

Accommodation of extended time from the University of North Carolina at Chapel Hill;

and requested in 2009 and received the Accommodation of extended time (double-time)

on tests and examinations from Howard University College of Medicine.

12.    Identify all other individuals or entities from whom you have requested

Accommodations and state for each such individual and entity whether any

Accommodations were provided, when they were provided, what Accommodations were

provided, whether any Accommodations were requested but denied, and what those

Accommodations were.

**Answer:** Objection. The question is vague, duplicative, overly broad and unduly

burdensome, and irrelevant. Without waiving those objections, Plaintiff requested and

received Accommodations as detailed in response to Interrogatory number 11, above, and

in response Interrogatory number 13, below. Plaintiff has not requested or received

Accommodations from any individual or entity not detailed in response to Interrogatories

number 11 and 13.

13.    Identify all standardized tests that you have taken from high school to date

and, for each such test, state when you tested (providing all test dates if you took a test

multiple times), whether you requested any testing Accommodations, whether the request

was granted or denied, and the testing Accommodations that were granted or denied.

**Answer:** Objection. The question is overly broad and unduly burdensome.

Without waiving this objection, Plaintiff took the PSAT test in 1997, without requesting

or receiving Accommodations. Plaintiff took the ACT test in February 1998 without

requesting or receiving Accommodations. Plaintiff took the SAT test three times: in

March 1998 without requesting or receiving Accommodations; in November 1998,

requesting and receiving the Accommodations of extended time and seating in a separate

room; and again in March 1999, requesting and receiving the Accommodations of

extended time and reduced distractions. Plaintiff took the MCAT test four times: in April

2003, Plaintiff requested the Accommodations of extended time (double-time) and

seating in a separate room, which request was denied initially, denied on reconsideration

and denied on appeal; in August 2003, Plaintiff took the test without requesting or

receiving Accommodations; in August 2004, Plaintiff again took the test without

requesting or receiving Accommodations; and in April 2006, Plaintiff took the test after

requesting the Accommodations of extended time (double-time) and seating in a separate

room, and receiving the Accommodations of extended time (one and one-half) and

seating in a separate room (Plaintiff appealed, seeking double-time, and was again

granted one and one-half extended time on appeal)

    14.    Identify all volunteer organizations you have been associated with and for

each such organization, describe your involvement, including but not limited to, the

amount of time you volunteered and approximate dates of service.

    **Answer:** Objection. The question is irrelevant, vague, overly broad and unduly

burdensome. Without waiving these objections, Plaintiff has volunteered with Habitat

for Humanity to assist in construction of low-income housing. Plaintiff cannot recall the

time volunteered or dates of service. Plaintiff has also volunteered with multiple civic

groups to participate in community cleanup activities. Plaintiff cannot recall the name,

time volunteered or dates of service for these organizations.

    15.    Identify all extracurricular activities you participated in during high school

or postsecondary school and for each such activity describe your involvement, including

but not limited to, the amount of time you participated and approximate dates of
participation.

   **Answer:** Objection. The question is irrelevant, vague, overly broad and unduly
burdensome. Without waiving these objections, Plaintiff engaged in the following
extracurricular activities:

   High School: Played junior varsity and varsity football; participated in junior
varsity and varsity track team; played piano in school band; played drums in school band.

   College: Took non-graded piano classes; took non-graded Japanese classes at
Duke University; participated in martial arts class; participated in biology honors society.

   16.    Identify all experts you have consulted in connection with this case and all
experts who may be called to testify at trial.

   **Answer:** I have consulted Dr. Vincent Culotta, licensed psychologist and board-
certified neuropsychologist in connection with this case, and he may be called to testify at
trial.

   17.    Identify any other lawsuits that you have filed or threatened to file relating
to any request you have made for Accommodations.

   **Answer:** Objection. The question is irrelevant, vague, overly broad and unduly
burdensome. Without waiving these objections, Plaintiff has not filed or threatened to
file any other lawsuit relating to any request for Accommodations.

   18.    Identify all persons who prepared or assisted in the preparation of
responses to these interrogatories, as well as the interrogatories on which they assisted.

   **Answer:** Plaintiff and his counsel prepared the responses to these interrogatories.

Case 2:10-cv-01407-JS   Document 29-9   Filed 02/07/11   Page 12 of 47

Wayne Steedman, Esq.
James Silver, Esq.
Callegary and Steedman, P.A.
201 N. Charles Street, Suite 1402
Baltimore, Maryland 21201
410-576-7606
Fax: 410-576-0454
wayne@callegarysteedman.com
james@callegarysteedman.com
Counsel for Plaintiff

Dated: October 26, 2010

10

# EXHIBIT 7

COCKBURN VS. NATIONAL BOARD OF MEDICAL EXAMINERS, ET AL.

DEPOSITION OF STEPHEN H. COCKBURN

DECEMBER 14, 2010

ART MILLER & ASSOCIATES
PHONE  410-494-8300
FAX  410-385-1883
www.artmiller.com

(Pages 1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN HARRISON COCKBURN,   *

     Plaintiff,   *

     vs.   * Civil Action

NATIONAL BOARD OF MEDICAL   * No. 10-1407

EXAMINERS, et al.,   *

     Defendants.   *

    *   *   *   *   *   *   *

    Deposition of STEPHEN H. COCKBURN, a
witness herein, called for examination by counsel
for Defendants in the above-entitled matter,
pursuant to notice, the witness being duly sworn by
Robert M. Jakupciak, a Notary Public in and for the
State of Maryland, taken at the offices of Callegary
& Steedman, P.A., 201 N. Charles Street, Baltimore,
Maryland, 21201, at 9:00 a.m., on December 14, 2010,
and the proceedings being taken down by Stenotype by
Robert M. Jakupciak, RPR.

**Page 2**

1  APPEARANCES:
2  On behalf of the Plaintiff:
3    WAYNE D. STEEDMAN, ESQUIRE
4    JAMES SILVER, ESQUIRE
5    Callegary & Steedman, P.A.
6    201 N. Charles Street, Suite 1402
7    Baltimore, Maryland  21201
8    (410) 576-7606
9
10  On behalf of the Defendants:
11    ROBERT A. BURGOYNE, ESQUIRE
12    TING CHEN, ESQUIRE
13    Fulbright & Jaworski, L.L.P.
14    801 Pennsylvania Avenue, N.W.
15    Washington, D.C.  20004-2623
16    (202) 662-4729
17
18
19
20
21

**Page 3**

1      C O N T E N T S
2  THE WITNESS:  STEPHEN H. COCKBURN
3  EXAMINATION      PAGE NO.

4    By Mr. Burgoyne ......................5

5
6
7
8      E X H I B I T S
9  DEFENDANT'S EXHIBIT NUMBER    PAGE NO.

10  1  Plaintiff's Responses to Requests ....9
11    for Admissions
12  2  Plaintiff's Answers to ..............68
13    Interrogatories
14  3  Plaintiff's Responses to Document ...73
15    Requests
16  4  Records from Wake County Public .....77
17    School System
18  5  Scores from 3/23/93 .................81
19  6  Ravenscroft College Admissions ......82
20    Test Record

21

**Page 4**

1      E X H I B I T S (Cont'd.)
2  DEFENDANT'S EXHIBIT NUMBER    PAGE NO.

3  7  Declaration of Authenticity and .....84
4    NCCU Transcript
5  8  Affidavit and record from UNC .......93
6  9  AMCAS Application Report ............94
7  10  Howard University 06-07 Secondary ..112
8    Application
9  11  Letter to Application Review .......116
10    Committee Member
11  12  Howard University Applicant ........117
12    Interview Form
13  13  Howard University ..................124
14    Self-Identification of Disability
15  14  Howard University ..................125
16    Self-Identification of Disability
17  15  USMLE Applicant's Request for Test .128
18    Accommodations
19  16  Letter dated 4/22/09 ...............132

20
21

1

**Page 5**

1        P R O C E E D I N G S
2   Whereupon,
3        STEPHEN H. COCKBURN,
4   called for examination by counsel for Defendants and
5   having been duly sworn by the Notary Public, was
6   examined and testified as follows:
7       EXAMINATION BY COUNSEL FOR DEFENDANTS
8   BY MR. BURGOYNE:
9     Q   Good morning, Mr. Cockburn. I introduced
10   myself earlier. I'm Bob Burgoyne and I represent
11   the National Board of Medical Examiners. As you
12   understand, we are here for your deposition today.
13   You gave your name a moment ago for the court
14   reporter. Stephen Harrison Cockburn is your full
15   name?
16     A   Yes, sir.
17     Q   Where do you live now?
18     A   Right now I live in Silver Spring,
19   Maryland.
20     Q   Have you been deposed before?
21     A   No, sir.

**Page 6**

1     Q   Has your attorney explained the process to
2   you?
3     A   Yes, sir.
4     Q   And you understand, I hope, that you are
5   in control; any time you want to take a break, just
6   let me know, we can take a break. If I ask you any
7   questions at any point and you don't understand
8   them, will you make a point of stopping me and
9   asking me to clarify them?
10     A   Yes.
11     Q   And probably one of the most important;
12   make sure to answer with words, not head nods. It's
13   tough to remember to do that sometimes, but we want
14   to get a clear record.
15      Are you on any medications today that
16   would affect your testimony?
17     A   No, sir.
18     Q   Okay. What is your current academic
19   status?
20     A   As of right now, I am not in school.
21     Q   When were you last attending classes?

**Page 7**

1     A   That would be -- to the best of my
2   recollection, that would be after second year of
3   medical school, which would be 2009; 2009, 2010.
4     Q   So were you enrolled at the beginning part
5   of this year?
6     A   No, sir. No, sir. I finished two years
7   of medical school. I started in -- I want to make
8   sure I have got the numbers right -- 2007, and after
9   I completed two years, since I wasn't -- I hadn't
10   taken the USMLE yet.
11     Q   So you started the fall of 2007?
12     A   Uh-huh.
13     Q   And 2008, and you went 2008 to 2009, and
14   now I take it in order to go to the third year you
15   need to pass step 1?
16     A   Exactly. Yes.
17     Q   Is that a requirement of Howard?
18     A   Yes, sir.
19     Q   And Howard Medical School is where you are
20   attending?
21     A   Yes, sir.

**Page 8**

1     Q   Are you currently employed either
2   full-time or part-time?
3     A   No, sir.
4     Q   And what are you doing to occupy your
5   time?
6     A   As of right now, I wake up, study for a
7   couple hours. After that, spend most of the day
8   working out. And then I have a side project I'm
9   doing.
10     Q   Is it related in any way to going to
11   medical school?
12     A   No, sir.
13     Q   Have you ever been involved in any
14   litigation other than this lawsuit?
15     A   No. Not to my knowledge.
16     Q   Okay. All right. Let me hand you a
17   document, and one of the things I'm going to do
18   today is show you a few documents and ask you some
19   questions about them. And these are --
20     MR. BURGOYNE: I'll have the court
21   reporter mark this as Cockburn 1.

1        (Cockburn Exhibit Number 1
2        was marked for identification.)
3   BY MR. BURGOYNE:
4        Q   When you are done with them, just turn
5   them face over and he'll have them all.  This
6   document is captioned Plaintiff's Responses to
7   Defendant's First Set of Requests for Admissions.
8   Do you recognize this document?
9        A   Yes.
10       Q   Do you understand this is a document in
11  which we asked you to admit or deny certain facts,
12  and that was done with the assistance of your
13  counsel?
14       A   Yes.
15       Q   Okay.  I just want to ask you about a
16  couple of them here.  If you will turn to the page
17  that has I guess question 13?  And the question is:
18  "Plaintiff did not receive any accommodations from
19  any testing organization prior to the 10th grade."
20  And that was admitted.  Is that an accurate
21  statement?  You didn't have any testing

1   accommodations before the 10th grade on a
2   standardized test?
3        A   That would be accurate, on a standardized
4   test, yes.
5        Q   Okay.  And then 15 acknowledges that you
6   were not diagnosed with a reading disorder prior to
7   the year 2005; is that correct?  Is that the first
8   time you were diagnosed with a reading disorder;
9   2005?
10       A   Yes.  I was not formally diagnosed, yes.
11       Q   And the next one indicates that you were
12  not formally diagnosed with any attention deficit or
13  hyperactivity disorder prior to 2009; is that
14  correct?
15       A   That is correct.
16       Q   And then 17 confirms that you did not
17  formally apply for any accommodations at North
18  Carolina Central University?
19       A   That's right.  I didn't formally apply for
20  them, but I was receiving accommodations.
21       Q   Okay.  And then 18 confirms that you have

1   never received accommodations at any job or in any
2   employment context; is that correct?
3        A   That is correct.
4        Q   And then the last one on the next page,
5   the answer is that you do not believe that your
6   ability to practice medicine will be affected by any
7   of your disabilities?
8        A   That is correct.
9        Q   And is that still the case today?  Is it
10  still your belief that your ability to practice
11  medicine won't be affected in any way by either the
12  learning disability or the attention deficit that's
13  been claimed in this case?
14       A   That is correct.
15       Q   For example, do you believe you have good
16  interpersonal skills?
17       A   Yes.
18       Q   You get along well with other people?
19       A   Yes.
20       Q   Are you able to pay attention to details
21  and are you careful?

1        A   Yes.  I'm much more careful, actually.
2        Q   In your work environments do you find
3   yourself making careless mistakes?
4        MR. STEEDMAN:  Objection.  He already
5   testified he is not working, but go ahead and
6   answer.
7   BY MR. BURGOYNE:
8        Q   In your past jobs, for example, when you
9   were a lab technician, did you find yourself making
10  careless mistakes?
11       A   When I first started I made mistakes, but
12  after I got a hang of the job, I was fine, and I was
13  very careful.
14       Q   What would you attribute those early
15  mistakes to?  Just learning the job?
16       A   Just learning the job basically.
17       Q   And at medical school do you find yourself
18  making careless mistakes in your second year?
19       A   No, sir.
20       Q   When you were working say in your lab
21  technician job, are you able to stay focused on the



**Page 13**

1   job and do what you are asked to do?
2       A    I'm able to stay focused to a, for an
3   extended period of time, but there are times when I
4   do have to take a break, step back from what I'm
5   doing, get my thoughts together, and then get back
6   to work.
7       Q    And when someone is talking to you
8   directly like I am now, do you focus on that, do you
9   pay attention to the person talking to you?
10      A    I do.
11      Q    Are you reliable?
12      A    Very reliable.
13      Q    Do you follow through when you are given
14  instructions?
15      MR. STEEDMAN:  Objection to --
16  clarification of --
17  BY MR. BURGOYNE:
18      Q    In the work environment if someone gives
19  you instructions for a job, do you follow through
20  and get the job done?
21      A    Yes.

**Page 14**

1       Q    And is the same true in medical school; if
2   you are given instructions, do you follow through
3   and complete the assignment?
4       A    Yes.
5       Q    Do you find yourself in medical school
6   avoiding work that takes a lot of mental effort over
7   an extended time?
8       A    Not at all.
9       Q    Have you ever been in an emergency room
10  setting?
11      A    No, sir.
12      Q    Do you think you can stay focused in an
13  emergency room context or an emergency context?
14      MR. STEEDMAN:  Objection.
15  BY MR. BURGOYNE:
16      Q    Medical context?
17      MR. STEEDMAN:  Objection; relevance.  Go
18  ahead.
19      A    Emergency medicine definitely would not be
20  my first choice, since there is many different
21  fields I can choose from in medicine.  But I

**Page 15**

1   definitely feel I can get through the training to
2   get through emergency medicine to get my degree.
3       Q    Okay.  How about just have you interacted
4   with patients at all in your second year of medical
5   school?
6       A    I have.
7       Q    And did you find that you were able to
8   stay focused in interacting with patients?
9       A    Yes.
10      Q    And did you ever find yourself getting
11  distracted when you were talking to patients or
12  losing your train of thought?
13      A    I'm sorry.  While I'm talking to patients?
14      Q    Yeah.
15      A    No, sir.
16      Q    Okay.  How about when it came -- have you
17  had occasion yet to prepare patient notes after
18  interviewing patients?
19      A    No, sir.
20      Q    When does that come in the medical school
21  training?

**Page 16**

1       A    Third year.
2       Q    Third year?
3       A    Yes, sir.
4       Q    What area of medicine do you hope to go
5   into?
6       A    As of now, I have no idea.
7       Q    Have there been any areas in the past that
8   were of interest to you?
9       A    When I was a child I wanted to be an
10  orthopedic surgeon.  Surgery isn't for me, though.
11      Q    How about since starting medical school,
12  any particular areas that have been of interest to
13  you?
14      A    No, not yet, because the first two years
15  are basically scientific.  You are in classrooms.
16  You don't really start clinical classes until the
17  third year.  So I told myself I would keep an open
18  mind.
19      Q    What's your experience been like in
20  medical school?  Are you keeping up with the
21  academic requirements?

**Page 25**

1  parents didn't have you referred at any point for
2  psychological testing through the sixth grade?
3      A   No, sir.
4      Q   And the same is through the 9th grade; no
5  psychological testing was done?
6      A   No psychological testing was done, even
7  though in ninth grade, once again, my teachers still
8  were saying I should get tested.
9      Q   In elementary school you were in a public
10  school; correct?
11      A   Yes.
12      Q   And were you aware of people at the time
13  who were in classes, had special classes as part of
14  an IDEA Program or had a 504 Plan or anything like
15  that because of special needs or learning
16  disabilities, anything like that?
17      A   No, sir.  I was not aware.
18      Q   And you say you went to Ravenscroft for
19  four years?
20      A   Yes, sir.
21      Q   What year did you graduate?

**Page 26**

1      A   Graduated in '99.
2      Q   And you graduated on time in the four
3  years?
4      A   Yes, sir.
5      Q   What activities did you do at Ravenscroft?
6      A   I played sports, football in the fall,
7  track in the spring, and as well as I played piano.
8      Q   Was that part of the band?
9      A   Yes.  It was part of the band.
10      Q   Were you in any clubs?
11      A   I was in one club, and it was called the
12  Prism Club.
13          MR. STEEDMAN:  Prison?
14          THE WITNESS:  Prism.
15          MR. BURGOYNE:  Wow.  Scared straight.
16          THE WITNESS:  Right.
17  BY MR. BURGOYNE:
18      Q   All right.  Prism Club.  What was the
19  nature of the Prism Club?
20      A   It was basically a club that brought
21  African awareness to the school.  Once a year,

**Page 27**

1  usually in the springtime, for black history month
2  we would put on some kind of demonstration for the
3  school.
4      Q   Okay.  And was that -- is Ravenscroft an
5  academically rigorous school?
6      A   Very much so.  It's a college preparatory
7  school.
8      Q   What courses did you do best in in high
9  school?  Do you recall what your best subjects were?
10      A   My best subject was band, but aside
11  from -- yeah.  Band.
12      Q   How about academic subjects?
13      A   The subjects that I did best in would be
14  history.
15      Q   What was your worst subject?
16      A   Math and English.
17      Q   Did you take Spanish?
18      A   Yes, sir.
19      Q   How did you like that?
20      A   At first I couldn't stand it because I
21  didn't understand it, I struggled with Spanish.

**Page 28**

1      Q   All right.  You graduated in '99.  Then
2  you went on to NC Central?
3      A   Yes.
4      Q   And did you take any time off between high
5  school and college?
6      A   No, sir.
7      Q   And did you complete NC Central in four
8  years?
9      A   Yes, sir.
10      Q   And what year did you graduate from
11  Central?
12      A   2003.
13      Q   What was your major?
14      A   Biology.
15      Q   Did you have a minor?
16      A   Chemistry.
17      Q   What activities did you participate in at
18  Central?
19      A   For the most part, I was -- I was in the
20  Academic Club, TA'd for students that were
21  struggling in biology, chemistry.  Aside from

**Page 29**



1  academics, those are -- those are the two activities
2  I really focused on.
3      Q   Were you in a fraternity?
4      A   No, sir.
5      Q   Did you participate in any IM sports,
6  intramural sports?
7      A   No, sir.  I didn't have any time.
8      Q   Did you have a job at all while you were
9  in college?
10     A   No, sir.  I had a work study job, but I
11 didn't have a, you know, 9 to 5 jobs.
12     Q   Did you just get a reduction in tuition or
13 something like that?
14     A   No.  I received a stipend.  It was -- they
15 moved me around the biology department, but for the
16 most part, I was just studying.  I really can't call
17 it work.  It was more study than work.
18     Q   Okay.  You mentioned being a TA, a
19 teaching assistant?
20     A   Yes.
21     Q   Was that part of your work study or

**Page 30**

1  separate?
2      A   That was separate.  I did TA during the
3  summer.  It was my, the end of my freshman year, and
4  I basically helped with the summer program -- a
5  summer program, helping students with the classes
6  they were taking.  Biology, we had a class called
7  science odyssey.  And that was, of course, because
8  my classes during the summertime, I had less classes
9  to take.  I was taking -- I believe my freshman year
10 I was taking world history and that was it.  So...
11 I'm sorry.  World history and chemistry.
12     Q   Okay.  So that was at the end of your
13 freshman year.  So you were being a TA for other
14 freshman who were taking courses in the summer?
15     A   Yes.
16     Q   Or maybe some of them weren't freshman?
17 Do you recall whether all of them were freshman?
18     A   They could have very well have been
19 juniors, seniors from other majors.
20     Q   Any subjects other than biology and
21 chemistry that you were a TA for?

**Page 31**

1      A   No, sir.
2      Q   And were you a TA at any point other than
3  the end of your freshman year?
4      A   Not, not where I was getting -- not as a
5  job, not where I was getting paid.  A lot of times,
6  since I was doing work study and my work study jobs
7  were basically signing off in the computer room,
8  things like that.  Students would come to me and ask
9  me questions.
10     Q   Okay.  So more informal assistance for
11 other students?
12     A   Right.
13     Q   I believe you said you never formally
14 requested accommodations, but that you had received
15 some accommodations at NC Central?
16     A   Yes, sir.
17     Q   Was that primarily on your exams?
18     A   That was only on my exams; my exams and
19 quizzes.
20     Q   Okay.  Why didn't you ask for formal
21 accommodations?

**Page 32**

1      A   Senior year of high school, one of my --
2  my history teacher, told me or basically said,
3  advised me to try to not use my accommodations, not
4  try to -- see if I can get through college without
5  using my accommodations.  So I took his advice for
6  the first two weeks of my time at Central, and it
7  didn't go well at all.  It went terrible.
8          So I went back to my teachers, told them
9  that in high school I received accommodations,
10 showed them my paperwork, and I had very good
11 relationships with all my professors, so they gave
12 me my extended time on my tests and quizzes.  So
13 there was no real need to go to academic services
14 and go through the red tape.
15     Q   Okay.  But you were okay doing class work?
16 You were able to keep up in classes?  They didn't
17 give you a reader for classes, nobody was taking
18 notes for you or recording lectures or anything like
19 that?
20     A   No.
21     Q   Okay.  Do you get nervous when it comes



**Page 37**

1   be -- I was told it would be easier for me to study,
2   but it turned out it wasn't.
3       Q    Okay.  So that was a full-time job?
4       A    That was a full-time job.  The hours were
5   very irregular.  It was from -- my hours were from
6   around 5:00 to 7:00 in the morning -- 5:00 in the
7   afternoon until 7:00 in the morning.
8       Q    Tough hours.
9       A    Yeah.
10      Q    How long did you continue working at AAI?
11      A    I had that job for, to my recollection,
12  about a year.
13      Q    What were your job responsibilities there?
14      A    So AAI was a pharmaceutical company and
15  they test drugs on healthy populations.  And what
16  they were testing for was they are already FDA
17  approved drugs, but they were testing for how quick
18  the drugs would, a particular drug would absorb in
19  one's body, basically.
20          So my job description there was to watch
21  test subjects, get test subjects assembled for blood

**Page 38**

1   draws, document their blood pressure, heart rate,
2   and make sure nobody left the building, none of the
3   test subjects left the test area.
4       Q    What kind of skills would you say were
5   required for that job?
6       A    You had to stay awake, definitely.
7       Q    That's a pretty low criteria.  All right.
8           MR. STEEDMAN:  That was good.
9   BY MR. BURGOYNE:
10      Q    Beyond staying awake.
11      A    Right.  You had to be able to document
12  information, you had to be able to -- for the most
13  part, document information.
14      Q    I assume as part of that you had to do
15  that accurately?
16      A    Yes, sir.
17      Q    How about did you have any sort of
18  organizational skills?
19      A    Absolutely.  I pretty much had my own
20  little way of getting patients in, getting them down
21  in a way that I can most efficiently write down

**Page 39**

1   their heart rate and blood pressure and not take a
2   long period of time.  Sometimes I asked one of the
3   nurses to read out what is on the -- what their
4   monitor was saying in terms of blood pressure and
5   heart rate.
6       Q    Right.
7       A    That way I could just focus on what I'm
8   writing in front of me and --
9       Q    All right.  Did you get positive feedbacks
10  from your job at BBRI, positive job feedback?
11      A    When I applied to AAI?
12      Q    Well, just generally.  Did you get good
13  job reviews?  Do you think they liked the work you
14  did for them at BBRI?
15      A    I believe they did.
16      Q    You weren't terminated, nothing like that?
17      A    No, sir.  No, sir.
18      Q    And same at AAI?  Were you a good employee
19  there?
20      A    I was.
21      Q    And at neither of these jobs did you have

**Page 40**

1   any sort of accommodations?
2       A    In terms of?
3       Q    Someone helping you do your job because of
4   a learning issue or anything like that?  I mean
5   comparable to academic accommodations, but in the
6   job setting?
7       A    No.  No.
8       Q    All right.  After AAI, what happened next
9   in terms of either employment or going back to
10  school?
11      A    So after AAI I had trouble finding a job.
12  I did the shoe salesman thing, sold cars.
13      Q    Was the shoe salesman door-to-door?  One
14  of those things?
15      A    No, sir.  It was at Dillards.  And like I
16  said, sold cars.
17      Q    How did you do in those jobs?
18      A    I did pretty good.
19      Q    You got along well with people?
20      A    Yeah.  Yeah.
21      Q    Where did you sell cars?  Was that in

**Page 41**

1    North Carolina?
2        A    No.  It was in Lewisburg.  That's like
3    maybe 20 minutes outside of Raleigh.
4        Q    So it's in North Carolina, but not in
5    Raleigh?
6        A    Yeah.  Yeah.  I'm sorry.
7        Q    That's what I thought.  All right.  And
8    then when did you enroll in the program you took at
9    UNC, your academic program at UNC?
10       A    Are you referring to the biochemistry?
11       Q    Yeah.
12       A    That was -- I was still in, I was still
13   in -- in June of 2006.
14       Q    Were you still working at AAI at that
15   time?
16       A    No, sir.  I was working at -- I had a job,
17   or I got a job at the UNC Chapel Hill Hospital as a
18   pharmacy technician.
19       Q    How long did you have that job?
20       A    I had that job for about two years.  Two
21   years.

**Page 42**

1        Q    Do you recall roughly when that was?  Was
2    that 2004 to 2006?
3        A    No.
4        Q    Or 2005 to 2007?  Something like that?
5        A    No, sir.  It was -- right.  It was 2005 to
6    2007, because I -- yes.  It was 2007.  Because I
7    started medical school that summer?  That summer.
8        Q    So you were working while you were taking
9    that class at UNC?
10       A    Yes, sir.
11       Q    And working full-time?
12       A    Yes, sir.
13       Q    Why did you decide to take that class at
14   UNC?
15       A    On my transcript I had a D in
16   biochemistry, so I wanted to rectify that.
17       Q    As I recall, you had already taken the
18   MCAT for the last time in June of 2006; is that
19   correct?
20       A    Yes.  That would be correct.
21       Q    So you weren't taking that class to

**Page 43**

1    prepare for the, to help you prepare for the MCAT?
2        A    No, sir.
3        Q    What was your job at UNC, the hospital
4    there at Chapel Hill?  Pharmacy tech?
5        A    Yes, sir.
6        Q    What responsibilities did that include?
7        A    The job consisted of taking meds to the
8    floors.  Aside from that, we filled oral syringes,
9    and data entry.
10       Q    Would you say that all of those
11   responsibilities, taking meds to the floors, filling
12   oral syringes and data entry, required that you
13   perform the work accurately?
14       A    Absolutely.
15       Q    And be careful?
16       A    Absolutely.
17       Q    Did you get good job reviews in that
18   position?
19       A    Yes.  At my probationary period I had some
20   problems with data entry, getting used to the names
21   of the medications and the dosage, things like that.

**Page 44**

1    But I got a hang of it, worked hard, and I didn't
2    have any more problems after that.
3        Q    Probationary period, that was just at the
4    beginning of the job?
5        A    Yes, sir.
6        Q    Okay.
7        A    I believe I -- to the best of my
8    recollection, probationary period is about three to
9    six months.
10       Q    Okay.  Did you have any periods or any
11   instances where you were disciplined for any reason
12   in that job?
13       A    No.
14       Q    Were you admitted to any medical school
15   other than Howard?
16       A    Yes.  I also got into ECU.
17       Q    And when did you enroll in Howard?  Was
18   that fall 2007 did you say?
19       A    It was 2007, but it was more the summer of
20   2007.
21       Q    Okay.

**Page 61**

1  total would be about three hours.
2      Q   What was the purpose of the second
3  meeting?  Was that to review the results of your
4  assessments?
5      A   Yes, sir.  We talked about the results, as
6  well as he gave me recommendations to make my
7  studying go more efficiently.
8      Q   Did you tell him how much extra time you
9  wanted to get on the Step 1 exam?
10     A   No, sir.
11     Q   What did you tell him about why you were
12  coming to see him?
13     A   I told him that the USMLE had denied me
14  accommodations and my goal was for him to evaluate
15  me honestly and fairly; that way I could have not
16  just one psychologist, but two psychologists saying,
17  telling the USMLE I require accommodations for my
18  tests.
19     Q   Did anyone go with you to see Dr. Culotta?
20     A   No, sir.
21     Q   Did you take any records with you when you

**Page 62**

1  went to meet with him?
2      A   Not the first time, no, sir.
3      Q   At some subsequent point you gathered some
4  of your educational records for him?
5      A   I gathered all my educational records.
6  Dr. Filipowski didn't have my records from
7  kindergarten and 8th grade.  He only had my
8  records -- I don't think he -- come to think of it,
9  I don't think he had any of my records.  But Dr.
10  Culotta asked me specifically to bring records from
11  kindergarten to high school to him.  And that's what
12  I did.
13     Q   Where did you get those records?  Were
14  those from your own files or your parents' files?
15     A   No, sir.  I actually called Archives at
16  Wake County Public Schools.
17     Q   And did you give him a complete set of the
18  records that you received from Archives?
19     A   Yes, sir.  I gave him a complete -- yes,
20  sir.  I gave him a complete set.  Everything that
21  they gave me I gave him.

**Page 63**

1      Q   Did you give him any records from NC
2  Central?
3      A   Yes.  I gave him my AMCAS, my AMCAS
4  document.
5      Q   Your application?
6      A   Yes.  That basically has all of my grades,
7  all my history on there.
8      Q   Okay.  Did he ask you for any other
9  records other than those educational records which
10  you retrieved for him?
11     A   He also asked for Dr. Filipowski's
12  evaluation.
13     Q   Did you give him a complete set of Dr.
14  Filipowski's reports?
15     A   Yes, sir.
16     Q   Did you give him a copy of the NBME's
17  guidelines for requesting accommodations?
18     A   I'm not sure if I did.  He might have
19  looked on the Internet I believe, because they have
20  it posted on the Internet.
21     Q   You don't recall giving it to him?

**Page 64**

1      A   I don't recall giving it to him.
2      Q   Did he ask you any questions about your
3  studying for the Step 1 or any questions about the
4  exam?
5      A   In terms of?
6      Q   Anything.  Or was that just not his end of
7  it?
8      A   He didn't really -- he asked me how I was
9  preparing, how I prepared for it.  Aside from that,
10  for the most part, he asked me about how school was,
11  how medical school was the first two years, if I
12  struggled, if I had any problems, that sort of
13  thing.
14     Q   Are there any other documents that you can
15  think of that you gave to him as we sit here today,
16  other than educational records?
17     A   No.  No.  I gave him basically everything
18  that I gave -- no.  I gave him everything that I
19  gave NBME.
20     Q   So you gave him a complete set of your
21  documentation that you used to support your request?

**Page 69**

1    Q    And as we sit here today, is it your
2  belief that this document -- the information in this
3  document is accurate and complete?
4    A    Yes.  Yes.
5    Q    Okay.  We have got a summary here in
6  question two about the diagnoses you have received
7  from Dr. Filipowski and Dr. Culotta.
8    A    Uh-huh.
9    Q    Do you see that?  And there is a
10  discussion of the three impairments that you have
11  been diagnosed with at various points; a reading
12  disorder, a written language disorder, and then an
13  attention deficit disorder?
14    A    Yes.
15    Q    Let me make sure that I have this whole
16  sequence right.  In 1998 you went to see Dr.
17  Filipowski and he didn't give you a diagnosis for
18  either a learning disability or an attention
19  disorder; is that correct?
20    A    That is correct.
21    Q    Okay.  Then in 2005 Dr. Filipowski

**Page 70**

1  diagnosed you with a reading disorder and a written
2  language disorder, but no attention deficit
3  disorder; is that correct?
4    A    That is correct.
5    Q    And then in 2009 Dr. Culotta identified
6  you with a reading disorder and attention deficit
7  disorder, but no written language disorder; is that
8  correct?
9    A    That is correct.
10    Q    Okay.  On page 6, Stephen, there was a
11  question asking about the accommodations you have
12  received at various points in your educational
13  career.  And looking at the answer, it says:
14  "Plaintiff received the accommodation of extended
15  time on tests and assignments starting in 1995."  Is
16  1995 -- what happened that year?  Was that your
17  first year at Ravenscroft?
18    A    That was my first year.  '95-'96 was my
19  first year.
20    Q    Okay.
21    A    Let me make sure that's right.  Yeah.

**Page 71**

1  That's right.  '95-'96; that was my first year.
2    Q    And I believe you said at Central the
3  accommodation you got was extended time on tests and
4  quizzes?
5    A    At Central?
6    Q    At Central.
7    A    Yes.
8    Q    And then turning over on the next page,
9  there is a statement that you received the
10  accommodation of extended time from the University
11  of North Carolina at Chapel Hill?
12    A    Yes.
13    Q    Was that in that biology, chemistry class?
14    A    Biochemistry.
15    Q    Biochemistry?
16    A    Yes, sir.
17    Q    Was that, likewise, on examinations and
18  quizzes?
19    A    Yes, sir.
20    Q    Then in 2009 it says that you received the
21  accommodation of extended time, double time, on

**Page 72**

1  tests and examinations from Howard University
2  College of Medicine?
3    A    In 2009?
4    Q    Is that accurate?
5    A    No.  That's not accurate.  I received
6  double time at Howard University from the time I
7  started medical school, which was 2007.
8    Q    Okay.  In all events, while you have been
9  at Howard, the accommodation you have received is
10  extra time on tests and examinations?
11    A    Yes.
12    Q    Any other accommodations you received from
13  Howard?
14    A    Tests, quizzes and lab practicals.
15    Q    Okay.  Is lab practical a type of test or
16  assessment?
17    A    Yes, it is.
18    Q    Okay.  Anything else?
19    A    No.
20    Q    Are you still taking Japanese?
21    A    No.  No, sir.  I don't have the time to

**Page 73**

1   take it, unfortunately.
2     Q  Are you still teaching a martial arts
3   class?
4     A  No.  I don't have the time.  I tried to do
5   it the second year because I figured I would be
6   settled, but it didn't work out.  I had to stop.
7     Q  And on page 9 it says you participated in
8   a biology honors society in college?
9     A  Yes, I did.
10     Q  Do you recall when that was, what point in
11   your college career that was?  Junior year?
12     A  It was actually -- I started that in --
13   that was biology; right?
14     Q  Yeah.
15     A  Yeah.  That would be towards the -- yeah,
16   my second semester freshman year.  Yeah.
17     MR. BURGOYNE:  Okay.  Let me hand you
18   Defendant's 3.
19     (Defendant's Exhibit Number 3
20     was marked for identification.)
21

**Page 74**

1   BY MR. BURGOYNE:
2     Q  While you are looking at that, I will
3   identify it.  Defendant's 3 is Plaintiff's Responses
4   to Defendant's First Set of Document Requests.  Do
5   you recall receiving a set of document requests from
6   your lawyers asking you to produce documents to the
7   National Board of Medical Examiners?
8     A  Yes.
9     Q  And what did you do to locate documents
10   that would be responsive to that request?
11     A  I gathered all the information, all the
12   documentation that I had and I sent it to them.
13     Q  Do you have an e-mail account?
14     A  I do.
15     Q  And did you make any effort to review your
16   e-mail, old e-mails to see if there were any e-mails
17   in there that were responsive to any of our
18   requests?
19     A  I -- anything that my lawyers sent me I
20   made sure I took a look at.
21     Q  Usually in a document production I'll get

**Page 75**

1   copies of e-mails, and I didn't see any e-mails from
2   you or to you in the documents that were produced to
3   us.  Do you recall reviewing your e-mails to see if
4   you had any e-mail messages that would be
5   responsive?
6     I'll give you an example.  One of the
7   things we asked for was any correspondence you had
8   with any third parties relating to your requests for
9   accommodations.  For example, if you had sent an
10   e-mail to Dr. Culotta or if you had sent e-mails to
11   the National Board of Medical Examiners, those would
12   be the kinds of things we were looking for.
13     A  Oh, I see.  You sent me an e-mail and it
14   ended up in my in box.
15     Q  I wouldn't have sent it to you.  I was
16   asking you to produce to your lawyers, to print off
17   and produce to your lawyers copies of any e-mails
18   that you have that you sent to other people that
19   relate to any of the subjects in this lawsuit.  Did
20   you look through your e-mails for those types of
21   e-mails?

**Page 76**

1     A  Oh, okay.  I didn't, because I don't have
2   any, anything like that.  I guess I'm not really
3   following you.  I don't have any --
4     Q  You don't just have on your e-mail account
5   old e-mails?
6     A  I mean I do have old e-mails, but I
7   haven't e-mailed Dr. Filipowski or Dr. Culotta, so I
8   wouldn't have that.
9     Q  Okay.  How about you communicated with the
10   NBME by e-mail, didn't you?
11     A  I believe so.
12     Q  Okay.
13     A  I believe I did.
14     Q  Do you have any of those e-mail messages?
15     A  More than likely I do, yes.
16     Q  Okay.  And did you communicate with AAMC
17   when you were requesting MCAT accommodations, did
18   you communicate with them by e-mail?
19     A  For the most part it was through mail,
20   because I -- I actually had to write a statement to
21   them like saying why I need, why I feel I should get

**Page 89**

1      A   Yeah.  That's wrong.  The only --

2      Q   You are not giving me a lot of confidence

3   in this official transcript.

4      A   I'm sorry.  That's definitely wrong.  The

5   only class I took at Duke was Japanese, because it

6   wasn't offered at Central.  Right.

7      Q   All right.  There are a couple classes

8   here, science odyssey and biochemistry, which shows

9   WC, which I think is withdrew from class.  Do you

10  recall why you withdrew from those classes?

11     A   Okay.  Science odyssey is a -- basically,

12  it's a core requirement.  And it's very, very basic

13  chemistry, physics, biology.  I didn't actually

14  withdraw from it, withdrew from it.  I actually

15  challenged the course, because by that time I had

16  taken all kinds of sciences and I just challenged

17  it.

18         So that WC -- I don't know what they put.

19  But I challenged it, so I basically graded out of

20  the class.  What was the other class you were asking

21  about?

**Page 90**

1      Q   Biochemistry, it looks like fall of 2001.

2      A   Biochemistry fall of 2001.  I honestly

3   don't know why I withdrew from that class.  I

4   honestly don't know.

5      Q   Okay.  Let's look at page 3 and just

6   confirm your overall GPA.  It looks like you

7   graduated with a 3.456 cumulative GPA; is that

8   right?

9      A   That's right.

10     Q   Okay.  And then if you'll go over past the

11  transcript, you'll see an e-mail.  That's just the

12  explanation of the transcript.  Yeah.  That page.

13  Do you see it's from a John Myers to James Fuller?

14     A   Uh-huh.

15     Q   Who is John Myers?

16     A   That would be my organic chemistry

17  teacher.

18     Q   And who is Dr. Fuller?

19     A   Dr. Fuller is in charge of academic

20  services.

21     Q   Was Dr. Fuller the person who provided

**Page 91**

1   confirmation for you that you had received

2   accommodations while at Central?  Do you recall?

3      A   Yes.  Dr. Fuller -- there is a letter that

4   states that Dr. Fuller --

5      Q   He confirmed you had gotten extra time?

6      A   Yes.

7      Q   All right.  Could you read this e-mail

8   into the record, please, just the first paragraph?

9      A   Okay.  "I have received a request from

10  Stephen Cockburn, who was enrolled in Chem 3100 and

11  3120 - Organic I and II lecture courses that I

12  taught a few years ago, to provide a statement that

13  he was allowed extra time to complete tests during

14  these courses.  He was allowed extra time for these

15  tests, although I did not request documentation that

16  he qualified for the extra time."

17     Q   Do you recall communicating with Dr.

18  Myers?

19     A   I recall communicating with him --

20     Q   To make this request that he is talking

21  about here?

**Page 92**

1      A   Yeah.  I was in his class.

2      Q   Here, though, he is reporting that a few

3   years after you graduated you contacted him to ask

4   for confirmation that he had given you extra time.

5   Do you recall doing that?

6      A   Yeah.  I did.  I did.

7      Q   Did you make a similar request to any

8   other professors at NC Central?

9      A   I made similar requests to a lot of my

10  professors at Central.  I basically walked with, had

11  a -- wrote out basically a generic letter that they

12  had no problems signing, because it was the truth,

13  and I gave it to Dr. Fuller, who then wrote a letter

14  to MCAT saying that I did receive accommodations

15  while I was at Central.

16     Q   Okay.  Were there any other classes like

17  this one where you were given extra testing time

18  without the teacher asking you for any

19  documentation?

20     A   There were a few, there were a few

21  classes -- well, I had Dr. Filipowski's first

**Page 109**

1  indicates from January 1991 until the present you
2  were working roughly eight hours per week as a
3  martial arts instructor for the Kung Fu Arnis
4  Academy; correct?
5      A   Yes. Let me clarify this. I started
6  learning martial arts in '91. I wasn't an
7  instructor though. I did not become an instructor
8  until --
9      Q   2004?
10     A   Definitely not 2004. Yeah. Yeah. I'm
11  sorry. Yeah. 2004.
12     Q   I see here it says, "I have been an
13  instructor for two years now."
14     A   Yeah. Because I have my brown belt. I
15  got my brown belt in 2004, yeah, before I went off
16  to medical school.
17     Q   Was that a paid position?
18     A   No, sir, unfortunately.
19     Q   You say in the end here, "Martial arts has
20  always been important to me because it demands
21  discipline and determination." What did you mean by

**Page 110**

1  that?
2      A   I meant that being a marshal artist, you
3  have to be able to go through that kind of training,
4  you have to be disciplined and you have to be
5  determined, and it just spills over into every
6  aspect of your life.
7      Q   Does it require focus?
8      A   Yes, it does.
9      Q   How many people were you teaching at that
10  time?
11     A   In the martial arts class?
12     Q   Yeah. Would you have two or three people
13  that you worked with? How did that work?
14     A   No. Usually what we do is there is more
15  than one person, because usually we had like maybe
16  30 people, 25 people in the class. So, basically,
17  we would split the class up amongst the instructors.
18  So I would at any given time have anywhere from one
19  person to five people to teach for the most part.
20          If it was the entire class that I was
21  instructing, usually it would be some kind of -- I

**Page 111**

1  would tell everybody to get down and do push-ups or
2  run, do suicides, run up and down the school or sit
3  in a stance for a long period of time, things that,
4  you know, and things that everybody -- that
5  everybody uniformly -- and, of course, it wasn't
6  just me. Other instructors would walk around and
7  make sure everybody was doing what they were doing.
8      Q   How long would it take in a given day?
9  How much time would you spend teaching?
10     A   You usually had classes two hours on
11  Tuesday, two hours on Thursday. Yeah. Two hours,
12  two hours. That is, of course, if I had any school
13  obligations, I wasn't going to be there for class.
14     Q   Okay. Let's turn to AAMC11. This is
15  where you get to write a personal statement. Do you
16  recall writing this?
17     A   Yes.
18     Q   Why did you decide to do it in story
19  format?
20     A   Because -- I don't know. I just thought
21  it would be -- most essays are boring and I just

**Page 112**

1  figured it would be more enjoyable to whoever was
2  cursorily reading a thousand essays.
3      Q   Do you keep a diary or anything like that?
4      A   No, sir.
5      Q   Do you like to write?
6      A   I do enjoy to write when I have time. But
7  I don't keep a diary or a journal, no.
8      Q   All right. That's all for that one.
9          (Defendant's Exhibit Number 10
10         was marked for identification.)
11  BY MR. BURGOYNE:
12     Q   Would you identify Defendant's Exhibit 10
13  for us, Stephen?
14     A   This is my secondary application.
15     Q   To Howard College of Medicine?
16     A   Yes.
17     Q   And secondary, that means secondary to the
18  AMCAS application we were just looking at?
19     A   Right.
20     Q   I won't ask you if that's your picture up
21  there.

**Page 117**

1    Q   Okay.  And he said that he found your
2  questions and answers to be both intelligent and
3  well organized and that you demonstrated the ability
4  to rapidly learn difficult concepts and integrate
5  them into a broader intellectual framework.  Does
6  that sound consistent with your understanding of
7  your efforts in his class?
8    A   Yeah.  I had to get up at 4:30, 5:00
9  o'clock in the morning to study.  So I made sure I
10  knew all the information before I went to class.
11  And then I studied after class up until I had to go
12  to work.  So that was a very -- that was a very
13  one-dimensional summer.
14    Q   You ended up getting a B+ in the course?
15    A   Uh-huh.
16    Q   All right.
17        (Defendant's Exhibit Number 12
18        was marked for identification.)
19  BY MR. BURGOYNE:
20    Q   DX12 is the applicant interview form from
21  Howard University, College of Medicine.  It looks

**Page 118**

1  like it was completed by the interviewer, Dr. Karey
2  M. Lewis.
3    A   Uh-huh.
4    Q   I'm not sure if this is -- it looks like
5  they got your name wrong, too, up there.
6    A   I'm used to it.
7    Q   You are, apparently.  But you recall
8  interviewing with Dr. Lewis?
9    A   Yes.
10    Q   And it's clear to you this is relating to
11  your interview with Dr. Lewis?
12    A   Yes.
13    Q   Okay.  There is a statement in paragraph
14  eight where you had identified weaknesses in study
15  habits and the need to improve study habits.  Do you
16  recall discussing your study habits with Dr. Lewis?
17    A   I don't recall exactly what I said about
18  my study habits, but if it's there, I'm pretty sure
19  I said it.
20    Q   Okay.  Look on the next page, if you
21  would, Stephen.  There is a discussion of your

**Page 119**

1  performance on the MCAT in paragraph 21.  The
2  handwritten note says: "This candidate took the
3  MCAT four times.  He states the first three times he
4  studied on his own for two to three months prior to
5  the exam.  The forth time he took Kaplan and
6  used" --
7    A   Flash card technique.
8    Q   Flash card technique to study.
9    A   Yeah.
10    Q   Do you recall explaining your performance
11  on the MCAT to Dr. Lewis in that fashion?
12    A   Yes, I do.  I did not bring up my reading
13  or writing disability because he didn't ask.  So I
14  didn't want to disclose that.
15    Q   Is this an accurate statement, that you
16  think your having taken the Kaplan course
17  contributed to your performance on the fourth time
18  you took the MCAT?
19    A   Yes.
20    Q   Paragraph 28 on the next page states that
21  you were continuing to learn Japanese.  Why did you

**Page 120**

1  decide to take Japanese?
2    A   That's kind of stupid.  I'm a fan of
3  Japanese cartoons, so I wanted to learn it and not
4  have to read the subtitles, because the subtitles
5  move so fast.
6    Q   Is it a hard language?
7    A   For me, by the time I took it, I had
8  already taken Spanish, so it was not that hard, not
9  as hard.
10    Q   Right.  Okay.  Take a look a couple pages
11  over.  I can't read it at the top, but it says
12  basically assuring or assuming professionalism in
13  medical school applicants.  Do you see that page?
14    A   Uh-huh.
15    Q   And is Dr. Lewis a man or a woman?
16    A   Man.
17    Q   It looks like Dr. Lewis rated you above
18  average in the first category for interpersonal and
19  communication skills, and characterized you as
20  engaged, comfortable and articulate.  Leadership
21  skills, he said you were willing to take a

Page 121

1  leadership role if encouraged.  On respect for
2  others he identified you as demonstrating the
3  appropriate level of respect for the interview and
4  others.  And in tolerance and appreciation for
5  cultural and gender differences, it indicated that
6  you appear to have some experience in working with a
7  wide range of people.
8          Would you agree that those are accurate
9  descriptions of your personality?
10     A   Yes.  They are.
11     Q   All right.  The next page is a
12  supplemental information page, which it looks like
13  you completed for Howard University.  Is this your
14  handwriting?
15     A   This is.
16     Q   And again at page 2, the last sentence, it
17  looks like you again refer to the possibility of
18  opening an inner-city clinic for individuals who
19  can't afford healthcare?
20     A   Yeah.
21     Q   On number four, where there is a question

Page 122

1  asking about volunteer experience, there is a
2  reference to Habitat, which we discussed earlier?
3     A   Right.
4     Q   And then there is a reference to the
5  Concord House.  When did you do that?
6     A   Right.  So I did the Concord House, I
7  believe it was my senior year in high school.  And
8  it was basically a house for -- it was a daycare
9  center for kids whose mothers were, you know,
10  battered or run-away moms in New York City.  And we
11  did that for -- did that for a week, along with the
12  soup kitchen.  We would go to the soup kitchen.
13  Yeah.
14     Q   Is this a program that was coordinated
15  through Ravenscroft?
16     A   Yeah.
17     Q   Okay.  The next page there is question
18  nine asks you about honors, achievements, and
19  extracurricular activities, and there is a reference
20  to Glaxo scholar.  What is that?
21     A   Glaxo basically had a, gives a $500

Page 123

1  scholarship every semester, when I was there, to
2  students in the sciences who had a GPA above 3.0.
3  So I was a biology major, I filled out a small
4  application, sent it off, I got $500 a semester.
5     Q   Then number two; member of Phi Eta Sigma
6  Honor Society.  Is that the biology honor society?
7     A   Yes.
8     Q   And then you enrolled in the Honor Program
9  at Central and you graduated magna cum laude?  Is
10  that all accurate?
11     A   Yes.
12     Q   Okay.  Number 11, the question is: "How
13  did you prepare for the MCAT?  (If taken more than
14  once, describe preparation for each MCAT):"  And you
15  responded: "The first three times that I took the
16  MCAT I failed to prepare properly.  First and
17  foremost, I did not start studying until a month
18  before each test.  The fourth time I gave myself a
19  year for preparation.  I also focused more on how to
20  take the MCAT."  Were those accurate statements?
21     A   Yes.  They would be accurate.  I took the

Page 124

1  course first, and after I took the course I started
2  studying for it.
3     Q   And by the course, you mean the Kaplan?
4     A   By the course I mean the Princeton Review.
5     Q   Let's make sure we got that.  You were
6  referencing the Princeton Review course.  You took
7  that before the first time you took it?
8     A   Yes.
9     Q   And then you took the Kaplan as part of
10  the last time that you took the exam?
11     A   Yes.
12     Q   Okay.
13          (Defendant's Exhibit Number 13
14          was marked for identification.)
15  BY MR. BURGOYNE:
16     Q   DX13 is the Howard University form for
17  identifying a disability; is that correct?
18     A   Yes.
19     Q   And the disability that you identified
20  here was a learning disability?
21     A   Yeah.

**Page 133**

1 about here, there is a sentence that says, "I
2 received a second evaluation from Dr. Filipowski."
3    A   Uh-huh.
4    Q   "And was told that my reading disability
5 had gotten worse."
6    A   Right.
7    Q   "Now it takes me longer than before to run
8 through the information in my head and to get the
9 appropriate answer."
10    A   Uh-huh.
11    Q   Is it your understanding or your belief
12 that your learning disability has gotten worse?
13    A   Based on what Dr. Filipowski told me, was
14 that my reading disability is not only based on the
15 speed that I read, but my comprehension.  Because
16 when information that's thrown at me becomes more
17 complex, it takes me longer for my brain to process
18 it.  So it's not necessarily that it's gotten worse,
19 but it's that my -- the information that I'm
20 learning or the information that I'm being asked is
21 more complex --

**Page 135**

1 read and punch in A, B, C or D.
2    Q   Okay.  So you believe it's the reading
3 disorder that is what necessitates your getting
4 extra testing time for the USMLE Step 1?
5    A   In this case, yes, because there is no
6 writing.
7    Q   Okay.
8       MR. BURGOYNE:  All right.  That's all I
9 have.
10       MR. STEEDMAN:  He will read and sign.
11       (Whereupon, at 12:00 p.m., the
12       deposition of STEPHEN H. COCKBURN
13       was concluded.)
14       * * * * *
15
16
17
18
19
20
21

**Page 134**

1    Q   Okay.
2    A   -- than it was before.
3    Q   Academics are harder now in medical
4 school?  The subject matter that you are studying
5 now is harder than it was in college?
6    A   The subject matter is more complex than it
7 was in college, getting more and more complex, so it
8 takes me longer to process the information, which
9 makes my reading, which makes me slow down my
10 reading speed.
11    Q   Okay.
12       MR. BURGOYNE:  Stephen, that's all I have.
13       THE WITNESS:  Okay.
14 BY MR. BURGOYNE:
15    Q   Actually, let me ask you one more question
16 here.  You didn't reference your writing disorder in
17 this letter to NBME?
18    A   Right.  I didn't reference my writing
19 disorder, well, one, because it was in my
20 documentation.  But more importantly, because you
21 don't write anything on the USMLE.  All you do is

**Page 136**

1 CERTIFICATE FOR READING AND SIGNING
2
3    I hereby certify that I have read and
4 examined the within transcript and the same is a
5 true and accurate record of the testimony given by
6 me.
7
8    Any additions or corrections that I
9 feel are necessary I have listed on the separate
10 ERRATA SHEET enclosed, indicating the page and
11 line number of each correction.
12
13
14
15
       _____
16    NAME:
17
       _____
18    DATE:
19
20
21

# EXHIBIT 8

COCKBURN VS. NATIONAL BOARD OF MEDICAL EXAMINERS, ET AL.

DEPOSITION OF VINCENT P. CULOTTA, PH.D.

DECEMBER 14, 2010

ART MILLER & ASSOCIATES
PHONE  410-494-8300
FAX  410-385-1883
www.artmiller.com

(Pages 1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN HARRISON COCKBURN,    *

      Plaintiff,    *

      vs.    * Civil Action

NATIONAL BOARD OF MEDICAL    * No. 10-1407

EXAMINERS, et al.,    *

      Defendants.    *

   *   *   *   *   *   *   *

     Deposition of VICENT P. CULOTTA, Ph.D., a witness herein, called for examination by counsel for Defendants in the above-entitled matter, pursuant to notice, the witness being duly sworn by Robert M. Jakupciak, a Notary Public in and for the State of Maryland, taken at the offices of Callegary & Steedman, P.A., 201 N. Charles Street, Baltimore, Maryland, 21201, at 2:30 p.m., on December 14, 2010, and the proceedings being taken down by Stenotype by Robert M. Jakupciak, RPR.

**Page 2**

1   APPEARANCES:
2   On behalf of the Plaintiff:
3      WAYNE D. STEEDMAN, ESQUIRE
4      JAMES SILVER, ESQUIRE
5      Callegary & Steedman, P.A.
6      201 N. Charles Street, Suite 1402
7      Baltimore, Maryland  21201
8      (410) 576-7606
9
10  On behalf of the Defendants:
11     ROBERT A. BURGOYNE, ESQUIRE
12     TING CHEN, ESQUIRE
13     Fulbright & Jaworski, L.L.P.
14     801 Pennsylvania Avenue, N.W.
15     Washington, D.C.  20004-2623
16     (202) 662-4729
17
18
20
21

**Page 3**

1   C O N T E N T S
2   THE WITNESS:  VICENT P. CULOTTA, Ph.D.
3   EXAMINATION                    PAGE NO.
4      By Mr. Burgoyne ......................5
5
6
7
8   E X H I B I T S
9   DEFENDANT'S EXHIBIT NUMBER        PAGE NO.
10  17   Culotta CV .........................19
11  18   Article entitled Testing, Testing, ..20
12     Testing
13  19   Article entitled ...................30
14     Neuropsychological Assessment and
15     Advances in Neuroscience
16  20   Article entitled ...................35
17     Psychological/Neuropsychological
18     Testing
19
20
21

**Page 4**

1   E X H I B I T S (Cont'd.)
2   DEFENDANT'S EXHIBIT NUMBER        PAGE NO.
3   21   Article entitled After the Demise ...38
4      of the Discrepancy:  Proposed
5      Learning Disabilities Diagnostic
6      Criteria
7   22   Records from NeuroBehavioral .......110
8      Associates
9   23   Patient Registration ...............138
10  24   Letter dated 12/9/09 ...............143
11  25   Handwritten notes ..................147
12  26   Assessment Results .................150
13  27   Answer sheet for Nelson-Denny ......159
14  28   Report by Dr. Filipowski ...........162
15  29   Psychological Evaluation by Dr. ....164
16     Filipowski - 2005
17  30   Psychological Evaluation Addendum ..168
18     by Dr. Filipowski
19  31   Report by Dr. Zecker ...............173
20  32   Report by Dr. Sparks ...............173
21

**Page 5**

1  PROCEEDINGS
2  Whereupon,
3      VICENT P. CULOTTA, PH.D.,
4  called for examination by counsel for Defendants and
5  having been duly sworn by the Notary Public, was
6  examined and testified as follows:
7      EXAMINATION BY COUNSEL FOR DEFENDANTS
8  BY MR. BURGOYNE:
9      Q   Dr. Culotta, could you state your full
10  name and work address for the record, please?
11      A   Yes.  Vincent Phillip Culotta.  5565
12  Sterrett Place, Suite 320, Columbia, Maryland,
13  21044.
14      Q   Are you an owner of that practice?
15      A   Yes.
16      Q   One of the owners?
17      A   Uh-huh.
18      Q   What is the name of your practice?
19      A   NeuroBehavioral Associates.
20      Q   Have you been deposed before?
21      A   Yes.

**Page 6**

1      Q   How many times?
2      A   Maybe 25 or 30 times.
3      Q   Are you able to practice any medicine?
4  All those depositions.  Have you been deposed before
5  in any cases involving accommodations on
6  standardized tests?
7      A   No.
8      Q   Having been deposed that many times, you
9  are fully familiar with the drill here.  If you want
10  to take a break at any time, let me know.
11      A   Thank you.
12      Q   Likewise, if you have any questions at any
13  point about the manner in which I've phrased
14  something or something is unclear, will you make a
15  point of stopping me to make sure we get it
16  clarified?
17      A   Yes, I will.
18      Q   Have you been deposed in any cases
19  involving accommodations in the college setting?
20      A   No.
21      Q   Have you been deposed in any cases

**Page 7**

1  involving any type of academic accommodations?
2      A   It's probably been an issue in some cases
3  related to cognitive functions following a head
4  injury, but, no, not specifically for
5  accommodations.
6      Q   Looking at your CV, it appeared that you
7  have a fairly extensive background in, was it
8  concussive type impairments or where there has
9  actually been an injury to the brain?  Is that
10  accurate?
11      A   That's been an area of interest of mine,
12  yes.
13      Q   Okay.  Are you on any medications today?
14      A   No.
15      Q   Any other reason why your answers might
16  not be accurate and complete today?
17      A   No.
18      Q   Have you testified before in court?
19      A   Yes.
20      Q   How many times?
21      A   Probably 15 times, maybe 20 times.

**Page 8**

1      Q   Can you give me examples of the types of
2  cases in which you've testified?
3      A   Cases involving personal injury, cases
4  involving medical malpractice allegations, cases
5  involving a disability.
6      Q   And do you tend to be on the plaintiff's
7  side or the defense side or both?
8      A   Both.  Probably heavier towards plaintiff.
9      Q   And are you testifying -- you've testified
10  in those cases as an expert witness?
11      A   Yes.
12      Q   Has any Court ever refused to accept your
13  testimony?
14      A   No.
15      Q   Have you ever personally been a party in
16  any lawsuits?
17      A   No.
18      Q   Have you ever been a witness in any cases
19  in Federal Court in the Eastern District of
20  Pennsylvania?
21      A   No.



**Page 25**

1 term "helpful" is there really isn't an agreed upon
2 diagnostic segment of test for AD/HD.
3     Q    Okay.  Looking at Psychoeducational
4 Testing, and you'll see in the second paragraph
5 under this heading in the middle of the page, could
6 you read that paragraph for us?
7     A    "Psychoeducational testing is administered
8 by a clinical or a school" --
9     Q    Actually, the second paragraph.
10    A    "Psychoeducational testing is often driven
11 by what is referred to as a 'discrepancy model,'
12 which compares the level of intellectual abilities
13 to the level of achievement to determine whether or
14 not the child is learning at a rate consistent with
15 his or her capabilities.  While discrepancy scores
16 have historically been used in determining
17 eligibility for special educational services, more
18 recent studies have suggested that the discrepancy
19 models are not reliable for detecting learning
20 disorders."
21    Q    Have you performed any research relating

**Page 26**

1 to the reliability of discrepancy models?
2     A    Yes.
3     Q    What research is that?  If you need to
4 refer me back to your CV --
5     A    We've published an abstract examining the
6 relationship between verbal and performance IQ
7 scores and non-verbal learning disorders versus
8 executive functions.  I believe that was maybe in
9 2004 or 2005.  I can look back at the CV and see if
10 I can find that for you.
11    Q    Okay.
12    A    Published in the Archives of Clinical
13 neuropsychology in 2001.  It was a long time ago.
14    Q    Is that called Beware of the Verbal
15 Performance IQ Split?
16    A    Yes.
17        MR. STEEDMAN:  Which number is that?
18        THE WITNESS:  Number 14.
19    BY MR. BURGOYNE:
20    Q    Okay.  Do you recall the conclusions you
21 reached in that study?

**Page 27**

1     A    Yes.  We found that the youngsters in our
2 study that had clinically and statistically
3 significant splits between their verbal and
4 performance IQ scores showed a very high frequency
5 of executive function disorders or AD/HD and a
6 slightly lower frequency of non-verbal learning
7 disorders.  And I think the notion out there was
8 that a low performance IQ was a good marker for a
9 non-verbal learning disorder.  In our experience we
10 felt a lot of those children really looked much more
11 dis-executive than non-verbal learning, and that's
12 what the data bore out for us.
13    Q    Where did you come out on the question
14 whether or not the discrepancy model was a reliable
15 model, or did you get into that?
16    A    We discussed it in the study.  And,
17 basically, I believe in the introduction saying that
18 that's -- that model is an actuarial model that's
19 been used to define learning disabilities for some
20 time.  And as imaging studies have become more
21 sophisticated and we have been able to tie learning

**Page 28**

1 disorders to neural networks and the behavior of the
2 brain, that model is not as helpful and it's not
3 always as reliable.
4     Q    So would you agree that discrepancy models
5 are not reliable for detecting learning disorders?
6     A    I wouldn't say they are not reliable, I
7 would just say they should not be relied upon solely
8 in the determination.
9     Q    What else would you rely upon in addition
10 to a discrepancy model?
11    A    Rely on developmental histories,
12 functional histories, academic observations,
13 measures of psychometric intellectual and
14 neurocognitive functioning, genetics, family
15 history.
16    Q    Haven't all those things always been part
17 of the assessment someone in your position would
18 perform even if you have also looked at the
19 discrepancy analysis?
20    A    They have been part of the assessment, but
21 I don't know that we've always understood how much

**(Pages 37 to 40)**

**Page 37**

1  administration?

2      A   Yes.

3      Q   What are some of those factors?

4      A   Those factors could be transient illness,

5  fatigue, psychological disorder.

6      Q   I take it part of your job is to try to

7  sort through all that?

8      A   Yes.

9      Q   And reading results?  On the second page

10  of this document, bottom right, it says: "In order

11  to conduct assessments on a break-even or profitable

12  basis, one must establish efficiency and volume."

13  Who is the target audience for this document?

14      A   This was written in the Maryland

15  Psychologist specifically for other psychological

16  professionals or psychologists.

17      Q   Okay.  And what point were you making here

18  about volume being important in conducting

19  assessments?

20      A   I think if you want to get good at

21  something you have got to do a lot of it, so the

**Page 38**

1  more you do, the better you get.  And if testing is

2  simple one of those things you do once in a while in

3  your practice, it's hard to reach a degree of

4  proficiency with it.

5      Q   All right.  One more before we shift gears

6  on general background on some tests.

7          (Defendant's Exhibit Number 21

8          was marked for identification.)

9  BY MR. BURGOYNE:

10      Q   Are any of your publications

11  peer-reviewed?

12      A   Yes.

13      Q   Which ones on there are peer-reviewed?

14      A   Okay.  Number 2, number 3, number 4,

15  number 5, number 6, number 7, number 9, and --

16      Q   It tends to be the publications as opposed

17  to the --

18      A   Yeah.  Most of the publications are

19  peer-reviewed.  These couple that you have indicated

20  were where I have been requested to write a piece

21  about something or --

**Page 39**

1      Q   Okay.  Take a look at DX21, if you would,

2  please.

3      A   I have got 22 in front of me.  Is that

4  correct?

5      Q   It's probably me.  I do a poor job.

6          MR. STEEDMAN:  I have it as 21.

7      A   21.  I have it.

8      Q   All right.  21 is an article captioned

9  After the Demise of the Discrepancy:  Proposed

10  Learning Disabilities Diagnostic Criteria, from a

11  publication titled Professional Psychology:

12  Research and Practice.  Is this a publication you

13  are familiar with?

14      A   Yes.

15      Q   Do you recognize this article?

16      A   Not this article.  I know that Cecil

17  Reynolds has written about this before.  I'm

18  familiar with the topic.

19      Q   Do you recognize either of the other

20  authors?

21      A   Kamphaus, yes.  Dombrowski, no.

**Page 40**

1      Q   Okay.  Page 366 of this article, these two

2  sentences appear in the lower left.  "Unfortunately,

3  the discrepancy model represents an assessment

4  heuristic that appears to lack validity and

5  reliability.  Research indicates that it cannot

6  distinguish those who have LD from those who do not

7  in actual diagnostic practice."

8          Do you degree or disagree with those

9  statements?

10      A   I'm a little pressed to agree or disagree

11  with a single statement in an article because I

12  don't really know the context under which those

13  statements are written or the background that leads

14  up to them.  So I guess with that caveat in mind, I

15  don't even know that I want to answer that, frankly.

16  I just feel like that's too tough to pick a sentence

17  out of the middle of an article and ask me to agree

18  or disagree with it.  Can you frame the question

19  differently?

20      Q   I'll try.  In your own practice, based on

21  your own practice, would you agree that the

10



**Page 41**

1  discrepancy model often can not distinguish between
2  those who have LD from those who do not in terms of
3  your actual diagnostic practice?
4      A   I would go back to the statement I made
5  probably 20 minutes ago, that I think the
6  discrepancy model has limitations in its ability to
7  discriminate and that additional information is
8  necessary to make a valid diagnosis.
9      Q   Would you agree that the discrepancy model
10  lacks diagnostic validity?
11      A   Again, I probably would not make a blanket
12  statement like that.  I simply think it is less
13  useful as a sole diagnostic tool in determining the
14  presence or absence of a learning disability.
15      Q   Okay.  Are there professional criteria for
16  the diagnosis of learning disabilities and attention
17  deficit disorders?
18      A   There are criteria.
19      Q   What are they called?
20      A   The DSM-IV offers a set of criteria.  The
21  International Dyslexia Association offers a set of

**Page 42**

1  criteria.  I believe the World Health Organization
2  offers a set of criteria.
3      Q   What does the DSM standard for?
4      A   Diagnostic and Statistical Manual of the
5  American Psychiatric Association, Volume 4, TR.
6      Q   What does TR standard for?
7      A   Research.  The evolution of the document
8  from four to five, which is the research edition.
9      Q   It's the transitional document?
10      A   Yes.
11      Q   Who established the criteria reflected in
12  DSM-IV?
13      A   The DSM criteria are established by
14  behavioral research and agreed upon by a committee
15  of professionals and used to communicate presence or
16  absence of a certain symptom set.
17      Q   Are they published under the supervision
18  of a given organization?
19      A   Under the American Psychiatric
20  Association.
21      Q   And are the DSM-IV criteria regarded as

**Page 43**

1  the consensus guideline for the diagnosis of
2  learning disabilities and AD/HD?
3      A   No.  I wouldn't describe it as the
4  consensus guidelines.  I think they are very
5  important guidelines.  There are other organizations
6  that have guidelines as well.
7      Q   What would you look to in your practice in
8  terms of applying a set of guidelines?
9      A   I would probably rely most on the DSM,
10  though I find it less effective, particularly in the
11  areas of learning disability.
12      Q   Why do you find it less effective there?
13      A   I feel the criteria are a bit too general,
14  and may at times over or under-diagnose or fail to
15  diagnosis a learning disability.
16      Q   Let me make sure I understand.  Is it your
17  belief that they tend to over-diagnose or
18  under-diagnose or both?
19      A   It can be both.
20      Q   In your view, is there a set of consensus
21  guidelines for diagnosing learning disabilities?

**Page 44**

1      A   I wouldn't -- no, I don't believe there is
2  a definitive set of guidelines.
3      Q   In your view, is there a consensus set of
4  guidelines for diagnosing AD/HD?
5      A   Again, I think the DSM is most relied
6  upon, but I wouldn't describe it as the only
7  guidelines for making that diagnosis.
8      Q   What is the diagnostic code from DSM for a
9  reading disorder?
10      A   315.00.
11      Q   And is a reading disorder a type of a
12  learning disability?
13      A   Yes.
14      Q   Is that the same thing as dyslexia?
15      A   No.  Not necessarily.
16      Q   How do the two differ, the reading
17  disorder and dyslexia?
18      A   Dyslexia is a neurologic term.  A learning
19  disability is a broader term, a reading disability
20  is a broader term that comes from the DSM.  You
21  can -- I think that's how I would answer.

Page 53

1       Q    And performance is sometimes referred to
2   as achievement?
3       A    Yes.
4       Q    So in the discrepancy model you are
5   looking to the difference in an individual's
6   performance results in those two domains?
7       A    Yes.
8       Q    And do you need to find a significant
9   discrepancy in order to make the diagnosis?
10      A    I don't.
11      Q    How big a discrepancy do you need to find
12  in order to make the diagnosis?
13      A    It may not be relevant.  It depends on the
14  case.  In a student who has had seven years of
15  researched-based instruction following a diagnosis
16  of dyslexia, we may see no discrepancy at all, but
17  the biological basis of the disorder is still in the
18  brain.  The hereditable nature for his or her
19  children is still in the family.
20      Q    Is the concept of a significant
21  discrepancy one which is used in discussing the

Page 54

1   discrepancy model?
2       A    It is, yes.
3       Q    And is there a definition of what is
4   significant for that purpose, accepted within the
5   profession?
6       A    I think there are conventions.  I think
7   the convention is a standard deviation or two
8   standard deviations discrepancy between IQ versus
9   achievement.
10      Q    Do you often see in your patients relative
11  strengths and relative weaknesses in their
12  performance on psychoeducational testing?
13      A    Yes.
14      Q    And simply having relative strengths and
15  weaknesses is not in itself sufficient to diagnose a
16  learning disability?
17      A    Correct.
18      Q    And when you see people referring to
19  someone having an uneven profile, is that the same
20  concept?
21      A    Yes.

Page 55

1       Q    And, again, having an uneven profile
2   doesn't necessarily mean you have a learning
3   disability?
4       A    Yes.
5       Q    To what extent do you rely on self-report
6   in diagnosing AD/HD?
7       A    I think it's one modality of data that's
8   important.  I would describe it as important, no
9   more or no less than psychometric, historical or
10  developmental.
11      Q    What are the risks of self-report?
12      A    People can lie or forget.
13      Q    Just mis-remember?
14      A    Mis-remember.
15      Q    Charitably viewed?
16      A    Charitably, right.
17      Q    Do you also encounter symptom
18  exaggeration?
19      A    Sure.
20      Q    And have there also been research studies
21  done where I guess it's malingering?  Is that the

Page 56

1   term?
2       A    Yes.
3       Q    What does that mean; malingering?
4       A    Willful production of false symptoms in
5   order to achieve some secondary gain that's not
6   simply psychological in nature.
7       Q    What are examples of the secondary
8   benefits one can obtain from malingering or symptom
9   exaggeration?
10      A    Money, getting out of work or
11  responsibility.
12      Q    Money as in disability benefits?
13      A    Could be, sure.
14      Q    Getting out of work because of a diagnosed
15  impairment?
16      A    Yes.
17      Q    How about obtaining medications, Ritalin
18  or other medications?
19      A    Sure.
20      Q    Is that something that you encounter in
21  your practice?

# EXHIBIT 9

315.1   Mathematics Disorder

## Differential Diagnosis

See the "Differential Diagnosis" section for Learning Disorders (p. 51).

---

### Diagnostic criteria for 315.00 Reading Disorder

A. Reading achievement, as measured by individually administered standardized tests of reading accuracy or comprehension, is substantially below that expected given the person's chronological age, measured intelligence, and age-appropriate education.

B. The disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills.

C. If a sensory deficit is present, the reading difficulties are in excess of those usually associated with it.

**Coding note:** If a general medical (e.g., neurological) condition or sensory deficit is present, code the condition on Axis III.

---

# 315.1   Mathematics Disorder

## Diagnostic Features

The essential feature of Mathematics Disorder is mathematical ability (as measured by individually administered standardized tests of mathematical calculation or reasoning) that falls substantially below that expected for the individual's chronological age, measured intelligence, and age-appropriate education (Criterion A). The disturbance in mathematics significantly interferes with academic achievement or with activities of daily living that require mathematical skills (Criterion B). If a sensory deficit is present, the difficulties in mathematical ability are in excess of those usually associated with it (Criterion C). If a neurological or other general medical condition or sensory deficit is present, it should be coded on Axis III. A number of different skills may be impaired in Mathematics Disorder, including "linguistic" skills (e.g., understanding or naming mathematical terms, operations, or concepts, and decoding written problems into mathematical symbols), "perceptual" skills (e.g., recognizing or reading numerical symbols or arithmetic signs, and clustering objects into groups), "attention" skills (e.g., copying numbers or figures correctly, remembering to add in "carried" numbers, and observing operational signs), and "mathematical" skills (e.g., following sequences of mathematical steps, counting objects, and learning multiplication tables).

## Associated Features and Disorders

See the "Associated Features and Disorders" section for Learning Disorders (p. 50). Mathematics Disorder is commonly found in combination with Reading Disorder or Disorder of Written Expression.

# EXHIBIT 10

## Diagnostic criteria for
## Attention-Deficit/Hyperactivity Disorder

A. Either (1) or (2):

   (1) six (or more) of the following symptoms of **inattention** have persisted for at
   least 6 months to a degree that is maladaptive and inconsistent with develop-
   mental level:

   *Inattention*
   (a) often fails to give close attention to details or makes careless mistakes in
       schoolwork, work, or other activities
   (b) often has difficulty sustaining attention in tasks or play activities
   (c) often does not seem to listen when spoken to directly
   (d) often does not follow through on instructions and fails to finish school-
       work, chores, or duties in the workplace (not due to oppositional behavior
       or failure to understand instructions)
   (e) often has difficulty organizing tasks and activities
   (f) often avoids, dislikes, or is reluctant to engage in tasks that require sus-
       tained mental effort (such as schoolwork or homework)
   (g) often loses things necessary for tasks or activities (e.g., toys, school assign-
       ments, pencils, books, or tools)
   (h) is often easily distracted by extraneous stimuli
   (i) is often forgetful in daily activities

   (2) six (or more) of the following symptoms of **hyperactivity-impulsivity** have
   persisted for at least 6 months to a degree that is maladaptive and inconsistent
   with developmental level:

   *Hyperactivity*
   (a) often fidgets with hands or feet or squirms in seat
   (b) often leaves seat in classroom or in other situations in which remaining
       seated is expected
   (c) often runs about or climbs excessively in situations in which it is inappro-
       priate (in adolescents or adults, may be limited to subjective feelings of
       restlessness)
   (d) often has difficulty playing or engaging in leisure activities quietly
   (e) is often "on the go" or often acts as if "driven by a motor"
   (f) often talks excessively

   *Impulsivity*
   (g) often blurts out answers before questions have been completed
   (h) often has difficulty awaiting turn
   (i) often interrupts or intrudes on others (e.g., butts into conversations or
       games)

B. Some hyperactive-impulsive or inattentive symptoms that caused impairment were
   present before age 7 years.

C. Some impairment from the symptoms is present in two or more settings (e.g., at
   school [or work] and at home).

314.9   Attention-Deficit/Hyperactivity Disorder
Not Otherwise Specified

## Diagnostic criteria for
## Attention-Deficit/Hyperactivity Disorder (continued)

D. There must be clear evidence of clinically significant impairment in social, academic, or occupational functioning.

E. The symptoms do not occur exclusively during the course of a Pervasive Developmental Disorder, Schizophrenia, or other Psychotic Disorder and are not better accounted for by another mental disorder (e.g., Mood Disorder, Anxiety Disorder, Dissociative Disorder, or a Personality Disorder).

Code based on type:

**314.01   Attention-Deficit/Hyperactivity Disorder, Combined Type:** if both Criteria A1 and A2 are met for the past 6 months
**314.00   Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type:** if Criterion A1 is met but Criterion A2 is not met for the past 6 months
**314.01   Attention-Deficit/Hyperactivity Disorder, Predominantly Hyperactive-Impulsive Type:** if Criterion A2 is met but Criterion A1 is not met for the past 6 months

**Coding note:** For individuals (especially adolescents and adults) who currently have symptoms that no longer meet full criteria, "In Partial Remission" should be specified.

# 314.9   Attention-Deficit/Hyperactivity Disorder
# Not Otherwise Specified

This category is for disorders with prominent symptoms of inattention or hyperactivity-impulsivity that do not meet criteria for Attention-Deficit/Hyperactivity Disorder. Examples include

1. Individuals whose symptoms and impairment meet the criteria for Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type but whose age at onset is 7 years or after
2. Individuals with clinically significant impairment who present with inattention and whose symptom pattern does not meet the full criteria for the disorder but have a behavioral pattern marked by sluggishness, daydreaming, and hypoactivity

# Conduct Disorder

## Diagnostic Features

The essential feature of Conduct Disorder is a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated (Criterion A). These behaviors fall into four main groupings:

# EXHIBIT 11

# Testing, Testing, Testing!

—*Vincent P. Culotta, Ph.D., and Sarah Weden, Psy.D., NeuroBehavioral Associates*

When considering the possibility of an attention disorder, learning disability, or other behavioral health problem, people are often referred for testing of one type or another. Testing typically means the administration of measures to help further the diagnostic process, direct treatment, or measure response to an intervention.

The most common types of testing conducted by a psychologist include psychological, psychoeducational, and neuropsychological assessment, each with various strengths, limitations, and roles in assessing attention-deficit/hyperactivity disorder (AD/HD) and other behavioral health conditions. Many of these procedures are appropriate for adults as well as children, and can answer many questions about different types of skills that are important for social, educational and vocational functioning.

## Psychological Testing

Psychological testing, administered by a doctoral trained psychologist, involves intelligence testing and measures that assess social, emotional, and behavioral functioning. While it may or may not include academic or achievement testing, psychological testing is general in scope compared to psychoeducational and neuropsychological testing.

Because the testing is based upon a "bio-psycho-social" model, the psychologist conducting it will review biological, psychological, and social factors that may contribute to an individual's symptoms or problems. Relevant biological factors include a family history of mood disorder, attention disorder, or learning disability, which are hereditable. Psychological issues may include coping mechanisms, personality style, frustration tolerance, flexibility, and insight.

An individual's functioning may be influenced by certain social factors, such the quality of family relationships or financial strain, or by more general stressors like terrorism or war. The psychologist who conducts the testing will use information from the patient's self-report, in the case of an adolescent or adult, or parent reports for a child, as well as the data from the formal tests themselves, to determine strengths and weaknesses.

Psychological testing may or may not be helpful in the diagnosis of AD/HD, depending upon the actual tests used. The most helpful psychological testing in addressing AD/HD are measures of executive functioning, behavioral checklists and a continuous performance test. Psychological testing may also be helpful in determining other problems that result from difficulties with attention and self-control. Psychological testing may require two to four hours and will likely cost approximately $500–1000.

## Psychoeducational Testing

Psychoeducational testing is administered by a clinical or school psychologist and focuses on the relationship between intelligence and educational achievement, and may not include a review of social or emotional functioning. In school systems, this kind of assessment is used to determine whether or not a child qualifies for special education programs or services.

Psychoeducational testing is often driven by what is referred to as a "discrepancy model," which compares the level of intellectual ability to the level of achievement to determine whether or not the child is learning at a rate consistent with his/her capabilities. While discrepancy scores have historically been used in determining eligibility for special educational services, more recent studies have suggested that discrepancy models are not reliable for detecting learning disorders.

Psychoeducational testing often does not address cognitive issues specific to AD/HD and will not provide adequate information to determine emotional, behavioral, or social problems that may be impeding a child's or adult's academic performance—for example, impulsivity or anxiety.

Psychoeducational testing may require two to four hours and costs approximately $500 to $1000.

## Neuropsychological Testing

Neuropsychological assessments are provided by a neuropsychologist. Most neuropsychologists are doctoral-level clinical psychologists with additional training and supervision in the neurosciences. Neuropsychological testing helps to identify brain-behavior relationships and are useful in diagnosing suspected brain dysfunction and neurologically-based behavioral disorders. Based upon a "neurobehavioral" model, a neuropsychological assessment includes a comprehensive evaluation of intellect, achievement, executive functioning, attention, learning and memory, language skills, visual-spatial skills, motor-coordination, and behavioral/emotional/social functioning. Elements of a neurobehavioral model include genetics, brain development and function, behavior, and the environment.

The neuropsychological assessment is particularly helpful with multiple problems or co-occurring symptoms. For example, a child or an adult with attentional difficulties may also have mood instability, learning and social difficulties. Neuropsychological testing aids in reaching a differential diagnosis and identifying the course, prognosis, and appropriate treatment of known neurobehavioral disorders. The limited number of neuropsychologists may make access to neuropsychological testing difficult. Neuropsychological testing may require four to eight hours and costs approximately $1000 to $2000.

Information obtained from testing may be useful to your physician in determining appropriate medication. Testing may help in obtaining school services, rehabilitation services, or counseling services. Test results may identify strengths and weaknesses relevant to occupational and vocational goals.

## Helpful Hints

Here are some suggestions that will help you get the most from testing:

• Make sure you know what questions you want the testing to answer. Ask the professional who has referred you, as well as the psychologist doing the testing, what type of information you should expect to receive and how it will help in making a diagnosis and arriving at decisions about intervention.

• Expect a written report you can understand. If you are unsure about how to interpret the results of the testing, or how to implement the recommendations, be sure to ask the psychologist to arrange a separate appointment after the evaluation has been

EXHIBIT

Defendant's # 18

12-4-10   PMS

completed so that you can ask questions and receive additional information.

• Make sure the results are valid and reliable—that they truly have measured the behavior that was being tested. For example, if you or your child forgets to take the medication that you usually use to improve attention, the results of the testing may not describe how you work or learn under more typical learning conditions, and the test results would not be viewed as valid. "Reliable" means that if you had the same test administered at another time or by an equally well qualified tester, approximately the same results would be obtained. Obviously, if the test results are valid, they also are reliable, but the reverse is not always true.

• Ask your psychologist if medications for attention should be taken prior to testing because, as discussed above, making the wrong assumption could compromise the validity of the testing.

• If a child is to be tested, make sure that the practitioner has training and experience with children.

• Investigate your insurance company and the terms of your own insurance policy to determine if testing services are covered. Ask whether the psychologist is able to bill your insurance directly, or whether you will be provided with instructions for completing the claim yourself.

• Expect confidentiality and control over your written report. If you need to share the results of your evaluation with others who are working with you or with your child, you will be given an opportunity to sign a form called a "Release of Information," where you will indicate who can receive a copy of the report or even a telephone call or e-mail. Because the exchange of information about a patient without his or her knowledge and consent is a very serious breech of professional ethics, providing written authorization for members of your professional team to confer with each other is very important.

• Do not expect to be given test protocols, the printed forms that the psychologist uses to record responses to the individual items on the test. Tests require extensive sampling to develop norms; the tests, including the associated response forms, are copyright protected.

• Make sure your psychologist uses the most current test version. Tests typically are updated from time to time in order to conform to new information about the skills and abilities being tested. Different versions of the same test will be similar in many ways, but may not be directly comparable in every respect. When comparing more recent test results to previous testing, it is wise to determine whether the same versions of the test were used at each administration.

In the table below, you will find lists of tests that typically are used in psychological, psychoeducational or neuropsychological evaluations. All are considered "formal" tests, meaning that they are administered under specific conditions using specific materials, and that the items on these instruments have been tested on a large number of individuals. They are considered valid for the measurement of specific skills and abilities, as long as they are administered according to the specified criteria.

# Common Assessment Measures

## IQ Measures
Differential Ability Scales
Kaufman Brief Intelligence Test
Wechsler Adult Intelligence Scale, Third Ed.
Wechsler Intelligence Scale for Children, Third Ed.
Standford-Binet Intelligence Scales, Fifth Ed.
Test of Nonverbal Intelligence, Third Ed.

## Achievement Measures
Gates-MacGinitie Reading Tests
Gray Oral Reading Tests, Third Ed.
KeyMath Revised
Nelson-Denny Reading Test, Forms G and H
Wechsler Individual Achievement Test, Second Ed.
Wide Range Achievement Test, Third Ed.
Woodcock-Johnson Tests of Achievement, Third Ed.

## Personality Measures
Beck Anxiety Inventory
Beck Depression Inventory-II
Child Behavior Checklists
Children's Depression Inventory
House-Tree-Person Test
Kinetic Family Drawing
Minnesota Multiphasic Personality Inventory, Adolescent
Minnesota Multiphasic Personality Inventory, II
Personality Assessment Inventory,
Revised Children's Manifest Anxiety Scale
Roberts Apperception Test
Rorschach Inkblot Test
Sentence Completion Test
Thematic Apperception Test

## Neurocognitive Measures
Boston Naming Test
California Verbal Learning Test, Children's version
California Verbal Learning Test, Second Ed.
Category Fluency Test
Clock Drawing Test
Controlled Oral Association Test
Developmental Test of Visual-Motor Integration
Halstead-Reitan Neurological Test Battery
Intermediate Visual Auditory Continuous Performance Test
Judgment of Line Orientation
Kaufman Assessment Battery for Children
NEPSY: A Development Neuropsychological Assessment
Rey Complex Figure Test
Stroop Color and Word Test of Variables of Attention
Wechsler Memory Scale, Third Ed.
Wide Range Assessment of Memory and Learning
Wisconsin Card Sorting Test



*Dr. Culotta is a neuropsychologist in practice in Columbia, MD. He has made presentations to CHADD on topics related to the neurological bases of AD/HD. Dr. Weden is a recent graduate of Nova Southeastern University and currently practices with Dr. Culotta at NeuroBehavioral Associates in Columbia.*



CHADD of Greater

Hyper

Spring 2003 • Volume 7 Issue 1

Frederick, Harford, and Prince George's
Counties join the CHADD Chapters of Greater
Baltimore, Anne Arundel, and Montgomery
Counties
in publishing this issue.

A Publication of CHADD of Greater Baltimore & CHADD Chapters in Maryland Serving Children & Adults with Attention Disorders