**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEPHEN HARRISON COCKBURN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 10-cv-1407-js** |
| | ) | |
| **NATIONAL BOARD OF** | ) | |
| **MEDICAL EXAMINERS** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |

_____

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On March 30, 2010, the Plaintiff Stephen Cockburn filed the Complaint in this action.

On June 10, 2010, Plaintiff served a copy of the Complaint on the Defendant, the National Board

of Medical Examiners (hereinafter, "NBME"). On July 22, 2010, the Defendants filed its

Answer.[1] The parties convened before this Court for a Rule 16 conference on September 9,

2010. The Court issued a scheduling order on September 9, 2010. The Defendant filed a Motion

for Summary Judgment on January 31, 2011.

Pursuant to the third amended scheduling order, the Plaintiff hereby respectfully submits

his Response in Opposition to the Defendant's Motion for Summary Judgment.[2] The Defendant

has failed to show that there is no genuine dispute as to any material fact. See Fed. R. Civ. P.

56(a). Instead, the Defendant's Memorandum in Support of the Motion for Summary Judgment

---

[1] Catherine Farmer was a named Defendant in this action as originally filed. On July 22, 2010, the Answer was filed by NBME, along with a Motion to Dismiss by NBME and Ms. Farmer. The Plaintiff initially opposed the Motion to Dismiss Ms. Farmer, but the Plaintiff filed a Motion to Withdraw that Response in Opposition on August 20, 2010. The Court granted the Motion to Withdraw the Response in Opposition, and simultaneously granted the Motion to Dismiss the claim against Ms. Farmer, on August 23, 2010.

[2] The Court amended its original scheduling order to allow for deposition of a witness for the Defendant, which was rescheduled due to family illness and inclement weather. That deposition was completed on January 31, 2011.

1

(hereinafter, "NBME Memorandum") serves to illustrate the material facts which remain in dispute.

## ARGUMENT

### Summary Judgment Is Inappropriate Because There Remain Genuine Disputes As To Material Facts

Summary judgment is inappropriate if "there is [a] genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).  The Defendant clarifies, in its Memorandum, that for the purposes of the instant motion, it does not contest whether or not the Plaintiff Stephen Cockburn meets the diagnostic criteria for a Reading Disorder or an Attention-Deficit/Hyperactivity Disorder (hereinafter, "ADHD").  See NBME Memorandum at 11, n. 2.  As a result, NBME can only contest for instant purposes that there is no genuine issue of material fact as to whether those disabilities result in a "substantial limitation in the major life activities of reading or learning."  See id. at 12.

### I.   Mr. Cockburn Experienced Substantial Limitations In the Major Life Activities of Reading And Learning From Elementary School Through The Present

The Defendant alleged that Mr. Cockburn has not experienced a substantial limitation in reading or learning in the academic context.  See id. at 5-7, 14.  In fact, there much of the evidence on the record indicates that Mr. Cockburn experiences a "substantial limitation in the major life activities of reading or learning."  Mr. Cockburn struggled academically in elementary school, and succeeded because his parents and teachers worked hard to ensure that he stayed focused.  See Affidavit of Stephen H. Cockburn (hereinafter, "Cockburn Affidavit") at 1.  He reported that during elementary school his teachers had suggested that his parents seek assistance for Mr. Cockburn's inability to stay on task.  See Exhibit 7 to Mew Declaration, Transcript of the

Deposition of Stephen Harrison Cockburn dated December 14, 2010, (hereinafter, "M. Ex. 7"), at 24:16-17.[3]

### A.      Mr. Cockburn Exhibited Academic Difficulties With Reading And Attention In Middle School

Mr. Cockburn received multiple failing grades during his sixth grade year.  See id. at 22:20-23:1 ("I failed English, I failed math, fourth quarter I failed science, so those are the Fs. And the rest are Ds[.]").  He attributed those Ds and Fs to his difficulty focusing in middle school, as compared to elementary school, because "I ran into a wall so to speak, because there is a difference between dealing with one teacher who is on top of you all the time in elementary school, as opposed to middle school . . . . they are not making sure you stay on task and not daydreaming, and . . . that's why my grades fell."  See id. at 23:16-24:4.

In fact, during Mr. Cockburn's sixth grade year, his teachers referred him to a school-based team for screening for a disability.  See Exhibit 20 to Farmer Declaration (hereinafter, "F. Ex. 20") at 10-15.  In a document titled "Focus of Concern/Screening," staff members at Wake County, N.C., Public School System documented their concerns about Mr. Cockburn's academic performance.  They convened a school conference with his mother on October 5, 1992, "to discuss . . . Stephen's lack of progress."  See id. at 10.  On December 15, 1992, school staff convened a conference with Mr. Cockburn's father "to discuss . . . Stephen's lack of follow through following the conference with mom."  See id.  A note indicates that "several more conferences have taken place."  See id.

During a classroom observation in January 1993, the observer indicated that Mr. Cockburn was "easily distracted, [had] trouble finding place, disorganized work habits, careless, doesn't complete tasks . . . short attention span . . . daydreams."  See id.  The observer noted that

---

[3] The Plaintiff has concurrently filed a Motion to Strike the Declaration of Caroline Mew.  The Plaintiff's citation to the exhibits to that Declaration does not constitute a waiver of that Motion.

"Stephen was constantly distracted from the class by the Art work he was drawing." See id.  His teachers indicated that they had attempted informal interventions to address his "lack of organization" and "lack of focused attention." See id. at 12.  In spite of these efforts, one of his teachers reported that he was "consistently unprepared and without the necessary tools of learning (book, paper, etc.)" and that the intensity of his disorganization and lack of focus was "Severe." See id.  These behaviors were observed across all of Stephen's academic classes: his teachers in language arts, math, science, social studies and health all reported that he was not regularly able to complete classwork or homework. See id. at 15.  They reported that he "often seems to be off-task, unprepared, and daydreaming . . . off-task, not prepared . . . not on task, day dreams, not prepared, seems lost or confused, seems sick or like he doesn't feel well." See id.  His health teacher reported that "I have to stay on him and ask for [classwork and homework] many times," and that he was "not on task, wants to pay attention to other people."  At the end of the document, a staff member reported that Mr. Cockburn "seems to be much more capable [than] his performance shows.  He has a very difficult time organizing his work and his thoughts." See id.

Mr. Cockburn's grades from that period also indicate his academic struggles.  In sixth grade, he received Ds or Fs in Language Arts, Math, Social Studies, Science, and Physical Education. See id. at 16.  In seventh grade, he received Ds or Fs in Math, Social Studies, and Science, and received Cs in Language Arts. See id. at 18.

### B.   Mr. Cockburn Exhibited Academic Difficulties With Reading And Attention In High School And Received Accommodations

Mr. Cockburn's academics improved in high school, with his grades rising to mostly Bs and Cs. See Exhibit 5 to Farmer Declaration (hereinafter, "F. Ex. 5").  He began receiving the informal accommodation of extended time soon after high school started. See M. Ex. 7 at 70:14-

19; <u>see also</u> Cockburn Affidavit at 1.  The academic counselor referred Mr. Cockburn for

psychological testing by psychologist Dr. David Filipowski.  <u>See</u> M. Ex. 7 at 52:10-11.  Mr.

Cockburn reported that she did so "because when I started out [in high school] I began to

struggle with finishing my tests on time, my tests and quizzes."  <u>See id</u>. at 52"17-19.  His

teachers knew he knew the correct answers, "but when it came to test time, I struggled with

finishing the tests."  <u>See id</u>. at 52:20-53:1.  Soon after, Mr. Cockburn began receiving the formal

accommodation of extended time at this time.  <u>See</u> Exhibit 7 to Farmer Declaration (hereinafter,

"F. Ex. 7"); <u>see also</u> Cockburn Affidavit at 2.  He also met daily with a tutor.  <u>See id</u>.  However,

Mr. Cockburn's best grades came in the instrumental music classes, in which he regularly

received As.  <u>See</u> F. Ex. 5.  Mr. Cockburn graduated in the 5th quintile of his class – that is, in the

bottom 20 percent.  <u>See id</u>.

In 11th grade, Mr. Cockburn took the AP test without accommodations, and received a

score of 2, too low to receive credit at most colleges and universities.  <u>See</u> Exhibit 4 to Farmer

Declaration.  He took the SAT examination without accommodations in 11th grade, then took the

test with accommodations in 12th grade.  <u>See id</u>.  After receiving accommodations, his SAT score

increased by 80 points – more than 8%.  <u>See id</u>.

### C.     <u>Mr. Cockburn Exhibited Academic Difficulties With Reading And Attention In College And Received Accommodations</u>

When he entered college at North Carolina Central University, Mr. Cockburn requested

informal accommodations from all of his professors.  <u>See</u> Exhibit 8 to Farmer Declaration; <u>see</u>

<u>also</u> M. Ex. 7 at 32:10-14 and Cockburn Affidavit at 2.   As a result of these accommodations,

Mr. Cockburn was very successful in college, receiving mostly As and Bs.  <u>See</u> Exhibit 6 to

Farmer Declaration (hereinafter, "F. Ex. 6") at 1-3.

Following college, Mr. Cockburn sat for the Medical College Admission Test

(hereinafter, "MCAT") on four instances.  See id. at 4.  He only received the accommodation of

extended time on the fourth MCAT administration.  See id.  On the last administration without

that accommodation, Mr. Cockburn received a score of 14M.[4]  See id.  That score placed him in

approximately the 5th percentile.  See Exhibit A, Percentages of MCAT Examinees Achieving

Scaled Score Levels and Associated Percentile Rank Ranges by Areas of Assessment

(hereinafter, "Ex. A").  When he took the test with the accommodation of extended time, Mr.

Cockburn received a score of 24O.  See F. Ex. 6 at 4.  That scored placed him at approximately

the 40th percentile.  See Ex. A.  His increased score on the fourth administration of the MCAT

was "due in large part to the accommodation of extended time."  See Cockburn Affidavit at 2.

### D. Mr. Cockburn Has Received Accommodations Since Enrolling In Medical School And Has Only Achieved His Current Level Of Success Due To His History Of Accommodations

Based on that fourth MCAT score, achieved with accommodations, Mr. Cockburn was

admitted to medical school at the Howard University College of Medicine.  See M. Ex. 7 at

44:17-20.  Mr. Cockburn received the accommodation of extended time on tests and quizzes

throughout his enrollment at Howard.  See id. at 72:5-7; see also Exhibits 9 and 10 to Farmer

Declaration.  Dr. Scott Satterlund, the Howard College of Medicine Director of the Office of

Curriculum, reported to NBME that he had proctored Mr. Cockburn's tests, and that "he has

often used the entire extra time to complete his exams."  See Exhibit 11 to Farmer Declaration,

Letter from Dr. Scott Satterlund, dated July 13, 2009 (hereinafter, "F. Ex. 11").  Dr. Satterlund

---

[4] The MCAT consists of four sections: Physical Sciences, Verbal Reasoning, Biological Sciences, and a Writing Sample.  The Physical Sciences, Verbal Reasoning and Biological Sciences sections each have a maximum possible score of 15.  The Writing Sample is scored with 11 letter scores, J through T, with the lowest possible score being J and the highest being T.  A perfect score would be a 45T.

reported that in conversation with him, "Mr. Cockburn attests that extra time (double time) is a much needed accommodation that allows him to be successful in his medical training."  See id.

In short, Mr. Cockburn has received accommodations at every stage of his academic career from high school through medical school.  He has only achieved his current level of success by receiving the accommodation of extended time on tests and quizzes.  He has received that accommodation because multiple individuals and agencies – including his high school, his college professors, his medical school, and the independent organizations administering the SAT and the MCAT – all recognized his need for extended time.  There is no realistic academic metric to demonstrate that he is not substantially limited in the major life activities of learning and reading, because he has received accommodations in those activities for the past 15 years – since he was 14 years old.

II.     **Three Evaluations By Psychological Professionals Found Evidence That Mr. Cockburn Experienced Difficulty Performing Tasks That Require Sustained Attention and Focus, And Had Difficulty Performing Tasks That Required Him To Read Quickly And Accurately**

The Defendant alleges that Mr. Cockburn's diagnosed disabilities are not appropriately diagnosed, and that as a result, Mr. Cockburn does not actually suffer a substantial limitation on the major life activities of reading and learning.  See NBME Memorandum at 11-12.  In fact, two evaluations performed by Dr. David Filipowski and one evaluation by Dr. Vincent Culotta have found evidence that Mr. Cockburn has difficulty performing tasks that require sustained attention, and that he has difficulty performing tasks that require him to read information accurately, and comprehend that information, in a timed setting.  In 2005, Dr. Filipowski diagnosed Mr. Cockburn with a Reading Disorder based on the criteria in the Diagnostic and Statistical Manual-IV (hereinafter, "DSM-IV") and in 2009, Dr. Culotta diagnosed Mr. Cockburn with a Reading Disorder and ADHD based on the criteria in the DSM-IV-TR.

7

A.     __A 1998 Evaluation Of Mr. Cockburn Contained Data That Resulted In The__
       __Provision Of Accommodations__

Mr. Cockburn was first evaluated in 1998 by licensed psychologist Dr. David Filipowski.

See Exhibit 14 to Farmer Declaration, Psychological Evaluation by Dr. David Filipowski dated

April 7, 1998 (hereinafter, "F. Ex. 14"), at 5.  At the time he was assessed by Dr. Filipowski, Mr.

Cockburn had been receiving informal accommodations from his high school for two years.  See

M. Ex. 7 at 70:14-19.

Dr. Filipowski noted that Mr. Cockburn "has trouble completing tests in a timely

fashion," and that he "had difficulty following instructions."  See F. Ex. 14 at 1.  Mr. Cockburn's

parents reported to Dr. Filipowski that "they recall several comments over the years from

teachers regarding [Mr. Cockburn's] organizational skills."  See id.  On a test of Mr. Cockburn's

cognitive functioning, his overall intelligence score was in the average range, but there was a

wide disparity between his Verbal Comprehension score, in the High Average range, and his

Perceptual Organizational score, in the Low Average range.  See id. at 2.  Dr. Filipowski noted

that Mr. Cockburn "had the greatest difficulty with the recall of more complex auditory

presented information."  See id. at 4.  On a test of continuous performance, Dr. Filipowski noted

that Mr. Cockburn "tended to give slower responses at the end of the test [than] at the beginning

of the test indicating some difficulty sustaining attention."  See id.  He also noted that Mr.

Cockburn "gave more variable responses at the end of the test [than] at the beginning, a pattern

also suggesting some problems with sustaining attention."  See id.  Dr. Filipowski noted that

these errors "are typically not seen in the general student population."  See id.  Dr. Filipowski

recommended that, given these difficulties with attention, "continued observation and gathering

of information from teachers is clearly recommended."  See id.  As a result of that evaluation,

Mr. Cockburn received the accommodation of extended time on the November 1998 and March

1999 administrations of the SAT.  See M. Ex. 7 at 48:20-49:6.

      **B.**       **A 2005 Evaluation Of Mr. Cockburn Resulted In A Diagnosis Of A Reading Disorder Under DSM-IV Criteria**

Mr. Cockburn returned to Dr. Filipowski for an updated psychological evaluation in June

2005.  See Exhibit 15 to Farmer Declaration, Psychological Evaluation by Dr. David Filipowski,

dated June 30, 2005 (hereinafter, "F. Ex. 15").  During this evaluation, Mr. Cockburn had

achieved a "Very Superior" score on a test of his verbal cognition.  See id. at 2.  Dr. Filipowski

also administered the Woodcock-Johnson III Tests of Achievement (hereinafter, "WJ-III").  See

id. at 4.  In spite of his Very Superior Verbal IQ, Mr. Cockburn's Broad Reading score on the

WJ-III was in the Low Average range.  See id.  His score on the Reading Fluency subtest was

below average, and placed him in the 9th percentile.  See id. at 5.  Dr. Filipowski noted that Mr.

Cockburn's "overall achievement was below the expected given his IQ scores[,]" and that Mr.

Cockburn "had the greatest difficulty on the tasks comprising the academic fluency composite."

See id.  Dr. Filipowski also administered the Nelson-Denny Reading Test (hereinafter, "Nelson-

Denny").  Mr. Cockburn's score on the Nelson-Denny Comprehension subtest placed him in the

6th percentile.  See id.  The score, achieved two years after Mr. Cockburn had graduated from

college, was at the level expected of a student just beginning his 10th grade year in high school.

See id.  Mr. Cockburn's Reading Rate placed him at the 2nd percentile.  See id.  Dr. Filipowski

noted that Mr. Cockburn's Nelson-Denny Reading Rate "places him . . . clearly at a significant

disadvantage relative to his peers."  See id. at 7.  His overall score on the Nelson-Denny placed

him in the 14th percentile, and was more than one standard deviation below average.  See id. at 6.

Dr. Filipowski noted that Mr. Cockburn's "reading skills, particularly under the pressure of time

[] limits are far below the expected level both for his age as well as for his intellectual abilities."
See id. Dr. Filipowski also noted that in 1998, Mr. Cockburn "did exhibit significant difficulties on a memory screening tasks and a verbal memory task." See id. at 1.

As a result of his testing, Dr. Filipowski concluded that "a significant deficiency was noted in the area of reading with an overall score placing him far below expectations given his superior Verbal IQ score." See id. at 7. Dr. Filipowski diagnosed Mr. Cockburn with a Reading Disorder under the criteria listed in the Diagnostic and Statistical Manual-IV (hereinafter, "DSM-IV"). See id. He recommended that Mr. Cockburn receive the accommodation of "extra time on all classroom tests, assignments and also on standardized testing and evaluations." See id. Based on this evaluation, the American Association of Medical Colleges provided Mr. Cockburn with the accommodation of extended time on the March 2006 administration of the MCAT. See M. Ex. 7 at 48:6-12.

The Defendant alleges that, in a 2005 evaluation of Mr. Cockburn, "Dr. Filipowski specifically ruled out a diagnosis of ADHD." See NBME Memorandum at 9, 11 n. 3 ("Dr. Filipowski concluded in his 2005 report that Mr. Cockburn does **not** meet the diagnostic criteria for ADHD"). That is an incorrect characterization of Dr. Filipowski's conclusions in his 2005 evaluation. In his evaluation, Dr. Filipowski did not state that Mr. Cockburn did not qualify for a diagnosis of ADHD, and did not determine that such a diagnosis was specifically inappropriate. Dr. Filipowski stated in his 2005 report that Mr. Cockburn "did not meet the formal diagnostic criteria for an Attention Deficit Hyperactivity Disorder" in 1998. See F. Ex. 15 at 1. The fact that Dr. Filipowski did not diagnose Mr. Cockburn with ADHD in 2005 does not mean that Dr. Fililpowski "ruled out" an ADHD diagnosis. See Affidavit of Dr. Vincent P. Culotta (hereinafter, "Culotta Affidavit") at 3.

**C.** **A 2009 Evaluation Of Mr. Cockburn Resulted In A Diagnosis Of A Reading Disorder And ADHD Under DSM-IV-TR Criteria**

On August 31, 2009, the Defendant sent a letter to Mr. Cockburn notifying him of its first refusal to provide the accommodation of extended time on the USMLE-Step 1.  See Exhibit 18 to Farmer Declaration, Letter from Catherine Farmer dated August 31, 2009.  Following that decision by NBME, Mr. Cockburn sought an updated evaluation, to determine if he still needed the accommodation.  See Exhibit 21 to Farmer Declaration, Neuropsychological Evaluation by Dr. Vincent Culotta dated October 8, 2009 (hereinafter, "F. Ex. 21"), at 1.  He was referred to Dr. Culotta by a former patient of Dr. Culotta's.  See M. Ex. at 58:14-18.  Dr. Culotta reviewed Mr. Cockburn's school records and Dr. Filipowski's 1998 and 2005 evaluations; met with and interviewed Mr. Cockburn; and determined a battery of tests, including measures of Mr. Cockburn's cognitive, academic and neurological functioning, which were administered by Dr. Culotta's office.  See F. Ex. 21 at 1, 19.

On reviewing Mr. Cockburn's school records, Dr. Culotta noted that "there is substantial and persistent evidence to indicate significant deficits in attention, organization, work completion, and distractibility.  See id. at 2.  In his interview with Dr. Culotta, Mr. Cockburn reported that he had been "a forgetful and disorganized student in elementary school," who would "frequently forget his papers [and] his homework[.]"  See id. at 7.  Mr. Cockburn recalled that he spent "frequent nights reviewing homework with his father," and that his parents nicknamed him "Space Cadet" due to his frequent "distraction, disorganization and forgetfulness . . . at home."  See id. at 8.  When he got to high school, his grades improved primarily because he "put in substantial hours to meet academic demands."  See id.

11

During the evaluation, "Mr. Cockburn tended to work slowly, requiring three sessions to complete the evaluation.  He required multiple breaks and frequent switching of tasks in order to sustain his attention and performance.  He was easily distracted by noises within the office suite.  At times, it was necessary to repeat task directions."  See id. at 9.

On the WJ-III, Mr. Cockburn achieved a score on the Reading Fluency subtest of 82, placing him in the 12th percentile. See id. at 11.  Dr. Culotta noted that the Reading Fluency subtest measures "reading speed, rate and automaticity.  The task requires the ability to read and comprehend sentences quickly."  See id. at 12.  Similarly, Mr. Cockburn's score on the Academic Fluency Composite placed him at the 19th percentile.  See id. at 11.

Dr. Culotta also administered the Nelson-Denny test.  See id. at 12.  Mr. Cockburn achieved a score in the 3rd percentile on the Nelson-Denny Comprehension Test, equivalent to the skills expected in a student in the third month of 9th grade.  See id.  On an Extended Time Administration of the Comprehension Test, Mr. Cockburn achieved a score in the 9th percentile, equivalent to a student in the beginning of 11th grade.  See id.  Mr. Cockburn's Reading Rate on the test was in the 1st percentile.  See id.  Dr. Culotta noted that Mr. Cockburn's "reading fluency or words per minute falls far below expectations[.]" He noted that Mr. Cockburn's comprehension score was borderline "under standard time" and was in the low-average range with extended time.  See id. at 13.

Mr. Cockburn completed a Rey Complex Figure Test during his evaluation by Dr. Culotta.  See id.  Dr. Culotta reported that the test, which involves a picture of an unusual shape and requires the participant to replicate the shape, measures "visual construction skills [and] places a significant demand upon aspects of executive functioning – namely planning and organizational skills."  See id.  Mr. Cockburn's score of 79 on the Rey copying test placed him in

the 8th percentile.  His score of 81 on the Delayed Recall portion of the test placed him in the 10th

percentile.  Dr. Culotta noted that Mr. Cockburn exhibited "constructional skills [that] were quite

strong, but his planning and organization of the figure were weak[.]"  See id.  As a result, Dr.

Culotta reported that the organizational skills measured by the test fell "well below the average

range."  See id.

      The Defendant noted that Dr. Culotta did not administer "a continuous performance test,

which he has stated elsewhere is among '[t]he most helpful psychological testing in addressing

AD/HD.'"  See NBME Memorandum at 11-12, n. 3.  Dr. Culotta explained that he did not

administer a continuous performance test because Mr. Cockburn was an adult, and "I don't find

the reliability all that helpful.  Many adults can push through one of those tests.  I don't find it

diagnostically helpful."  See Exhibit 8 to Mew Declaration, Transcript of the Deposition of Dr.

Vincent P. Culotta, dated December 14, 2010, (hereinafter, "M. Ex. 7"), at 114:8-11.

      As a result of his evaluation, Dr. Culotta diagnosed Mr. Cockburn with ADHD-

Predominantly Inattentive Type.  See F. Ex. 21 at 16.  He noted that Mr. Cockburn's "symptoms

have been evident since early elementary school and have resulted in significant academic

impact or impact upon learning, a major life activity."  See id.  He also noted that Mr. Cockburn

"demonstrates significant discrepancies in . . . organizational and planning skills as measured by

the Rey Complex Figure Test[.]"  See id.  Barkley Self-Report checklists completed by Mr.

Cockburn, concerning his behaviors as a child and his current behavior, indicated that he was

currently in the 88th percentile of adults in the area of Inattention and "support[ed] clinically

significant symptoms of inattention."  See id. at 15, 16

      Dr. Culotta also diagnosed Mr. Cockburn with a Reading Disorder.  See id.  He noted that

while "Mr. Cockburn has no history of deficits in phonemic awareness and phonological

processing[,]" he did exhibit a reading fluency that "falls well below average and substantially below average, as evidenced by his reading rate on the Nelson Denny Reading Test, which fell at the 1st percentile." See id. He also noted the Mr. Cockburn "demonstrates significant discrepancies in . . . reading comprehension measured by the Nelson Denny Reading Test[.]" See id. As a result, Dr. Culotta recommended that Mr. Cockburn receive 100% extended time as an accommodation when he took the USMLE-Step 1. See id. at 17.

Dr. Culotta reiterated his diagnoses, and his recommendation that Mr. Cockburn receive 100% extended time, in a deposition on December 14, 2010. "My opinion is that he has both an attention deficit/hyperactivity disorder, predominantly inattentive, and a reading disability characterized by significant deficits in his fluency, and that those deficits impede his fair access to the USMLE, and that an appropriate accommodation would be extended time, and that given the severity of his deficit and the stability and chronicity of that deficit, a fair accommodation for extended time would be double time." See M. Ex. 8 at 87:8-17.

> **D.    Dr. Culotta Correctly Found That Mr. Cockburn Was Limited In His Ability To Read And Learn As Compared To The Average Person In The General Population**

The Defendant alleged that Mr. Cockburn "is not substantially limited in his ability to read as compared to most people." See NBME Memorandum at 13. However, Dr. Culotta found that Mr. Cockburn's disabilities limit him as compared to most people. In his deposition, Dr. Culotta reported that in the use of standardized tests such as the WJIII and the Nelson Denny, "I think it's implicit when you are using standardized scores as a comparison point and the standardized scores reflect the normal population[.]" See M. Ex. 8 at 141:15-17. In that context, Dr. Culotta noted, Mr. Cockburn's scores placed him at the 9th percentile in reading fluency on the 2005 administration of the WJ-III by Dr. Filipowski, and at the 12th percentile in reading

fluency on the 2009 administration by Dr. Culotta.  See id. at 141:18-19.  Those scores "indicate that he is performing below the normal population."  See id. at 141:20-21.  Dr. Culotta reiterated that his report of Mr. Cockburn's substantial limitations in reading and learning were "always" in comparison to "the average individual."  See id. at 146:11-12.

In fact, one of the experts employed by NBME also characterized Stephen's scores as "below average."  Dr. Steven Zecker said that, when talking about the "average person," he defines it as "below the average range of individuals of the same age from the general population presumably from the normative sample of that test . . . below the 25th percentile."  See Exhibit B, Transcript of Deposition of Dr. Steven Zecker, dated December 16, 2010 (hereinafter, "Ex. B"), at 46:4.  Dr. Zecker confirmed that Mr. Cockburn's score on the 2009 WJ-III reading fluency subtest, at the 12th percentile, placed him in the "below average range."  See id. at 47:13-16.  Mr. Cockburn's scores also fell below the 25th percentile on the Academic Fluency Composite, and the Math Fluency Subtest of the WJ-III, on the Rey Complex Figure Test, on the Trailmaking Test of executive functioning, and on the Stroop Color and Word Test of executive functioning. See F. Ex. 21 at 11, 13, 14.

### E.  Mr. Cockburn Has Experienced Significant Limitations In His Ability To Read Or Learn Outside Of The School Setting

The record reflects that Mr. Cockburn has experienced significant limitations in his ability to read or learn in settings other than school.  Mr. Cockburn's disabilities have limited the hobbies he has pursued.  Mr. Cockburn reported to Dr. Culotta that he "rarely read for pleasure as a child, preferring instead to look at comic books."  See F. Ex. 21 at 7.  He reported that he "could count on his fingers the number of books he had read for enjoyment prior to sixth grade." See id.  Dr. Culotta noted that "I don't think he really ever took much joy in reading or much interest in reading."  See M. Ex. 8 at 98:3-5.

Mr. Cockburn has reported that he is a fan of, and enjoys watching, Japanese animation. See M. Ex. 7 at 120:2-3.  However, due to his disability, he experiences difficulty reading the subtitles of the cartoons because they move off the screen so fast.  See id. at 120:3-5.  As a result, Mr. Cockburn took Japanese courses in college in an attempt to compensate for his Reading Disorder and alleviate the need for him to read the subtitles.  See id. at 119:21-120:4.

Mr. Cockburn's disabilities have also limited how he spends his free time when he is at home.  Mr. Cockburn reported to Dr. Culotta that "many of his nights were spent studying [] with his mother and father . . . at the table keeping his nose to the grindstone."  See M. Ex. 8 at 96:17-20.

Mr. Cockburn's disabilities have also limited his choices of employment.  Between graduating from college and enrolling in medical school, Mr. Cockburn took positions as a pharmaceutical technician at the Hospital of University of North Carolina-Chapel Hill, a laboratory technician for AAIPharma, a car salesman, a martial arts instructor, and a piano teacher.  See Cockburn Affidavit at 2.  The Defendant alleges that "[h]e did not request or receive accommodation in any of these work settings.  NBME Memorandum at 8.  However, Mr. Cockburn has stated that these positions "have not involved very much reading, and have not required sustained attention."  See id.  As a result, he did not require accommodations.

In short, Mr. Cockburn's disabilities have limited his ability to read or learn outside of the context of a school setting.  They have limited his ability to read or learn at home, and in the context of his choice of hobbies.  They have not limited his ability to read or learn in the employment setting, mostly because to date he has not pursued positions that require him to do much reading.

**F.      The Defendant Has Failed To Rebut Evidence That Mr. Cockburn's Diagnosed Disabilities Do Not Substantially Limit The Major Life Activities Of Reading And Learning**

In order to allege that Mr. Cockburn does not experience "a substantial limitation in the major life activities of reading or learning," the Defendant discounts Mr. Cockburn's Nelson-Denny scores obtained by Dr. Filipowski and Dr. Culotta.  The Defendant alleges that "Mr. Cockburn's scores on the Nelson Denny Reading Test were also in the average range, when compared to the proper pooled standardization sample."  See NBME Memorandum at 9.  To support that assertion, the Defendant refers to Exhibit 21 to the Declaration of Catherine Farmer. See id.  Exhibit 21 to Ms. Farmer's Declaration is Dr. Culotta's report of his evaluation.  See F. Ex. 21.  The information on the page cited by the Defendant indicates that Mr. Cockburn's reading rate is in the first percentile – that is, at a rate slower than 99 percent of the population. See id. at 12.

Presumably to support the assertion that the scores reported by Dr. Culotta were not "compared to the proper pooled standardization sample," the Defendant also cites Exhibit 23 to the Declaration of Catherine Farmer.  See NBME Memorandum at 9.  Exhibit 23 to Ms. Farmer's Declaration is a letter that she herself wrote, citing unnamed "experts."  See Defendant's Exhibit 23 to the Declaration of Catherine Farmer at 2.  In short, the Defendant's Memorandum asserts that Mr. Cockburn does not experience a substantial limitation in the major life activity of reading because the Defendant said so in a letter to the Plaintiff.

The testimony of Dr. Zecker, the Defendant's own expert witness, indicated that it was the Defendant who did not compare Mr. Cockburn to "the proper pooled standardization sample."  Dr. Zecker stated Mr. Cockburn is "close to the middle of the average range" on the Nelson-Denny only if he is compared with the entire population of individuals who have taken

17

the test, a group that even includes students as young as "high school juniors."  See Ex. B at 49:10, 49:20.  However, he noted that he defined "below average" as "below the average range of individuals of the same age from the general population[.]"  See Ex. B at 46:4.  Mr. Cockburn was 24 years old when Dr. Filipowski evaluated him in 2005, and was 28 years old when Dr. Culotta evaluated him in 2009 – not in the same age group as high school juniors or seniors.

Dr. Culotta also believed that it was appropriate to determined Mr. Cockburn's performance through comparison of individuals of the same age.  He stated that he calculated Mr. Cockburn's percentile performance on the Nelson-Denny "relative to college seniors, although I also looked relative to college freshman and 9th graders just for my own curiosity."  See M. Ex. 8 at 167:7-9.  He has stated that he disagrees with Dr. Zecker's decision to compare Mr. Cockburn's Nelson-Denny scores to a group that includes high school students.  See Culotta Affidavit at 3.

The Defendant alleged that a diagnosis of a Reading Disorder is not appropriate for Mr. Cockburn because Dr. Richard Sparks noted that "although learning disabilities are lifelong conditions typically identified in elementary school, Mr. Cockburn was not diagnosed with any disability until 2005."  See NBME Memorandum at 3.  However, Dr. Culotta stated that he frequently encountered cases where a student with a reading disability was not identified by a school system.  See Culotta Affidavit at 3.

II.     **ADA Precedents Cited By The Defendant Are Not Applicable**

The Defendant relies on several precedents to allege that, irrespective of Mr. Cockburn's diagnosed disabilities, he does not experience a "substantial limitation in the major life activities of reading or learning."  See NBME Memorandum at 11-15.  However, the decisions relied on

by the Defendant are not legally applicable, and are factually inapposite to the circumstances of this case.

**A.**     <u>**The Precedents Cited By The Plaintiff Have Been Overruled By Statutory Amendments**</u>

The Defendant states that "[t]he cases make clear that, as a matter of law, individuals who read and learn as well as or better than the average person in the general population are not disabled within the meaning of the ADA."  <u>See</u> NBME Memorandum at 12.  However, many of the cases relied on by the Defendant were based on U.S. Supreme Court decisions which have since been overruled by statutory amendments to the ADA.  In the ADA Amendments Act, passed on September 25, 2008, and effective as of January 1, 2009, Congress specifically noted its intent "to reject the Supreme Court's reasoning in <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471 (1999) . . . . [and] to reject the standards enunciate by the Supreme Court in <u>Toyota Motor Manufacturing, Kentucky, Inc. v. Williams</u>, 534 U.S. 184 (2002)" regarding the definitions of "major life activities," and the degree to which those activities are "substantially limited" by an impairment.  <u>See</u> P.L. 110-325, § 2(b).  Many of the decisions cited by the Defendant in support of their Motion relied on <u>Toyota</u>, <u>Sutton</u> or both.  <u>See, e.g.</u>, <u>Singh v. George Washington Univ. Med. Sch.</u>, 508 F.3d 1097 (D.C. Cir. 2007); <u>Hopkins v. St. Joseph's Creative Beginning</u>, 2003 U.S. Dist. LEXIS 21033 (E.D. Pa. 2003); <u>McGuinness v. Univ. of New Mexico Sch. Of Med.</u>, 170 F.3d 974 (10th Cir. 1998); and <u>Baer v. Nat'l Bd. of Med. Exam'rs</u>, 392 F.Supp.2d 42 (D. Mass 2005).

**B.**     <u>**Mr. Cockburn's Circumstances Are Inapposite To The Circumstances Of The Plaintiffs In Decisions Cited By The Defendant**</u>

The Defendant alleges that Mr. Cockburn is especially similar to the plaintiffs in <u>Hopkins</u>, <u>supra</u>.  Mr. Cockburn's circumstances are quite dissimilar to the plaintiff in <u>Hopkins</u>.

Mary Hopkins filed her claim under the ADA following termination from her employment, and had neither sought accommodations prior to her termination nor requested any in her claim.  See 2003 U.S. Dist. LEXIS 21033 at *3.  She had a Full Scale IQ of 76, putting her in the fifth percentile intellectually, and an evaluator found that she had "mildly impaired mental abilities." See id. at *3.  There was no indication that she had ever sought accommodations in any context. An evaluator recommended that her only limitation should be in avoiding "difficult college courses."  See id. at *5.  Mr. Cockburn has been diagnosed with difficulties in the areas of reading, learning, and sustaining attention.  He has requested and received accommodations in multiple instances, and this suit merely concerns the issue of whether he qualifies as "substantially impaired in a major life activity" for the purposes of testing accommodations.

The Defendant similarly compared Mr. Cockburn to the plaintiff in Brief v. Albert Einstein Coll. of Med., 2010 U.S. Dist. LEXIS 55302.  See NBME Memorandum at 13.  The plaintiff in Brief filed his claim following his dismissal from the defendant college of medicine for failing multiple examinations.  See 2010 U.S. Dist. LEXIS 55302 at *6.  He had never sought accommodations in high school or college.  See id. at *2.  Following his dismissal from the defendant medical school, he enrolled in another medical school, where he completed his education without accommodations.  See id. at *7.  His request for accommodations on the USMLE was denied, but there is no indication that he appealed that decision.  See id.  He then claimed that the actions of the defendant medical school were discriminatory or retaliatory, and sought damages.  See id. at *1.  Unlike the plaintiff in Brief, Mr. Cockburn would not have been able to achieve his current level of academic success without accommodations.  He has received accommodations since 9th grade.  Indeed, unlike the circumstances in Brief, when Mr. Cockburn requested accommodations from Howard University College of Medicine, the medical school

readily found him eligible for those accommodations.  In short, Mr. Cockburn is not like the plaintiffs in the decisions cited by the Defendant, either in his current circumstances or in his well-documented history of academic accommodations.

The Defendant also compares Mr. Cockburn to the plaintiff in <u>Baer v. Nat'l Bd. of Med. Exam'rs</u>, <u>supra</u>, when it asserts that "[t]he specific task of taking timed tests . . . is not the kind of 'major life activity' protected under the ADA."  <u>See</u> NBME Memorandum at 14.  Mr. Cockburn has not alleged that he is only substantially impaired in the activity of "taking timed tests."  He has alleged that he is substantially impaired in the activities of reading and learning.  He has received accommodations in those contexts in the past.  <u>See</u> <u>supra</u> at 4-7.  He has also self-accommodated in the areas of reading.  He reported that in medical school "for the most part, we use Power Point.  And this was very helpful to me the first and second year, because there was so much information for me  . . . . [i]n medical school you don't really have to be in classes, thankfully, so I pretty much used that time to study."  <u>See</u> M. Ex. 7 at 67:16-68:1.  He has also indicated how these substantial limitations have affected his life outside of the context of school. <u>See</u> <u>supra</u> at 15-16.  The only issue Mr. Cockburn brings before this Court is his need for accommodations in the context of "taking a timed test" because the Defendant is the first entity in 13 years to refuse to accept Mr. Cockburn's limitations.  Further, Mr. Cockburn's medical school has readily provided him the accommodations he needs either directly or through its institutional procedures.  That is, the medical school does not require regular class attendance which provides Mr. Cockburn the additional time he needs to read and study.

**III.**   **There Remains A Genuine Issue Of Material Fact Because Significant Evidence Indicates That Mr. Cockburn Is Substantially Limited In The Major Life Activities Of Reading And Learning**

There remains a genuine issue as to material facts in dispute in this case.  During his deposition, Dr. Culotta indicated that he disagreed with Dr. Sparks's and Dr. Zecker's conclusions regarding Mr. Cockburn's diagnosis with a Reading Disorder and with ADHD.  See M. Ex. 8 at 173:11, 174:7-11.  Dr. Culotta also disagreed with Dr. Zecker regarding the effect of Mr. Cockburn's diagnosed disabilities.  See id. at 174:20 ("I have a number of disagreements").  Dr. Culotta has also stated that he believes it is not appropriate to render an opinion on the presence or effects of a diagnosed disability without "laying eyes on" the person who has been diagnosed.  See Culotta Affidavit at 3.  Neither of the Defendant's expert witnesses have met Mr. Cockburn.  As a result, there remains a genuine issue as to the degree to which Mr. Cockburn's diagnosed disabilities limits the major life activities of reading and learning, and as to the credibility of and weight which should be afforded to Dr. Sparks's and Dr. Zecker's determination of Mr. Cockburn's limitation in the major life activities of reading and learning.

The question of whether an impairment substantially limits major life activities is a question of fact, for the trier of fact.  See Holt v. Grand Lake Mental Health Ctr., 443 F.3d 762, 765 n. 1 (10th Cir. 2006).  The Defendant has narrowed the focus of that inquiry to whether or not Mr. Cockburn is "substantially limited in his ability to read or learn as compared to the average person in the general population[.]"  See NBME Memorandum at 12.  As documented herein, and in the Defendant's Memorandum, there is a substantial disagreement between the Defendnat's experts Dr. Zecker and Dr. Sparks, and the Plaintiff's expert Dr. Culotta, as to what group best represents the average person in the general population.  There is also a substantial, and a genuine issue of material fact, as to the meaning of the facts on the record as they represent

Mr. Cockburn's historical substantial limitations in major life activities. "Determining both how well the average person in the general population performs any given major life activity and whether the plaintiff has proven he is unable to perform or is significantly restricted in performing a major life activity involves weighing evidence and assessing credibility of witnesses[.]" *Bristol v. Bd. of County Comm'rs of Clear Creek*, 281 F.3d 1148, 1158 (10th Cir. 2002). As a result, there remain genuine issues of material fact in this case, and summary judgment is in appropriate.

<u>CONCLUSION</u>

The Plaintiff respectfully requests that this Court dismiss the Defendant's Motion for Summary Judgment for failing to show that there is no genuine issue of material fact.

RESPECTFULLY SUBMITTED,

 /s/ Wayne D. Steedman
Wayne D. Steedman, Esq.
Federal Bar No. 09474
Callegary & Steedman, P.A.
201 N. Charles St., Suite 1402
Baltimore, MD 21201
(410) 576-7606
wayne@callegarysteedman.com
Attorney for Defendants

 /s/ James F. Silver
James F. Silver, Esq.
Federal Bar No. 28571
Callegary & Steedman, P.A.
201 N. Charles Street, Ste. 1402
Baltimore, Maryland 21201
410-576-7606
james@callegarysteedman.com
Attorney for the Plaintiff

/s/ Judith A. Gran
Judith A. Gran, Esq.
Federal Bar No. 40134
Reisman Carolla Gran LLP
19 Chestnut Street
Haddonfield, New Jersey 08033
(856) 354-0061
jgran@reismancarolla.com
Attorney for the Plaintiff

DATED:  February 14, 2011

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed electronically and is available for

viewing and downloading from the ECF system. Counsel of record forth Defendant were served

through the Court's electronic case filing system.

/s/ James F. Silver