# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN HARRISON COCKBURN, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | CIVIL ACTION No. 10-1407-JS |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S TRIAL MEMORANDUM

## I.     NATURE OF THE ACTION

This is an action brought pursuant to the Americans with Disabilities Act ("ADA"). Plaintiff Stephen Cockburn ("Mr. Cockburn") alleges that Defendant National Board of Medical Examiners ("NBME") violated the ADA by failing to provide him with extra testing time on the United States Medical Licensing Examination ("USMLE").  Mr. Cockburn claims to be entitled to more testing time than other examinees because he has been diagnosed as having a learning disability and an Attention-Deficit/Hyperactivity Disorder ("ADHD").

NBME maintains that (1) the documentation submitted by Mr. Cockburn in support of his accommodation request does not support either of the diagnoses; and (2) even if those diagnoses were proper, any functional limitations experienced by Mr. Cockburn do not cause "substantial limitations" in his ability to read or learn as compared to most people, so as to make him "disabled" within the meaning of the ADA.  NBME further maintains that the primary accommodation requested by Mr. Cockburn – double testing time – would not be a reasonable accommodation even if he could show that he has a properly diagnosed impairment that rises to the level of a disability for purposes of the ADA.

## II.   STATEMENT OF JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## III.   STATEMENT OF FACTS[1]

### A.   The NBME and the USMLE

NBME is a not-for-profit organization that provides assessment services for the health professions.   Together with the Federation of State Medical Boards, NBME sponsors the USMLE, a standardized examination used to evaluate applicants for medical licensure in the United States and its territories.   The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.

The USMLE Step 1 examination is a "standardized" test:

> When directions to examinees, testing conditions, and scoring procedures follow the same detailed procedures, the test is said to be standardized.  Without such standardization, the accuracy and comparability of score interpretations would be reduced.   For tests designed to assess the examinee's knowledge, skills, or abilities, standardization helps to ensure that all examinees have the same opportunity to demonstrate their competencies.

*Standards for Educational and Psychological Testing*, at 61 (1999) (published by the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education).   When testing accommodations alter the standardized manner in which an exam is ordinarily administered, the concern arises that scores from the non-standard administration may not have the same meaning as scores from standard administrations. "Comparability of scores may be compromised, and the test may … not measure the same constructs for all test takers." *Standards for Testing* at 61.

---

[1] Because the parties are submitting their trial memoranda simultaneously, NBME is including a complete statement of facts herein.

In the context of licensure and certification tests, the inappropriate provision of extra testing time or other accommodations could affect the general public to the extent that they impact the reliability of the resulting scores.  "Diploma tests and licensure tests are designed to protect the public from those who have not mastered minimum skills."  S.E. Phillips, "High Stakes Testing Accommodations:  Validity Versus Disabled Rights," *Applied Measurement in Education*, 7(2), 93-120 at 98 (1994).  When it comes to a licensing exam for professionals such as physicians, lawyers, nurses, or engineers, the public welfare is obviously affected if someone passes an exam because of an inappropriate alteration of the standard exam conditions.

In fairness to other examinees and to protect the integrity of USMLE scores, testing accommodations are available on the USMLE only for examinees who document the existence of a disability and whose impairment requires accommodations when testing.  *See generally Powell v. Nat'l Bd. of Medical Examiners*, 364 F.3d 79, 89 (2d Cir. 2004).  All accommodation requests are individually reviewed, and reasonable accommodations are provided when warranted.

Care must be taken when the accommodation of extra testing time is requested, because USMLE scores obtained with extra testing time may not be comparable to scores obtained under standard testing conditions.  There is a "speeded" element to the USMLE:

> Tests vary along a continuum in the extent to which they are 'power' or 'speeded' tests.  A purely power test measures an examinee's knowledge of the subject of the exam with no time constraints.  A purely speeded test measures the time in which an examinee can complete ministerial tasks.  The USMLE exams are primarily power tests, but they have a speeded component as well.  Some 25% of examinees have reported that they felt that they could have benefitted from more time on the examination.

*Doe v. Nat'l Bd. of Medical Examiners,* 199 F.3d 146, 151 (3d Cir. 1999); *see also Love v. Law School Admission Council*, 513 F. Supp. 2d 206, 216 n.7 (E.D. Pa. 2007) ("[T]he research

indicates that if you give someone extra time on a timed test like the GMAT or the LSAT, their score will improve whether they have a learning disability or not.").  Simply put, extra time matters.  It matters in terms of the meaning of the resulting test scores, and it matters in terms of fairness to other examinees.

### B.      Mr. Cockburn's Alleged Impairments

Mr. Cockburn claims to suffer from a Reading Disorder (a type of learning disability) and ADHD.   According to the Diagnostic and Statistical Manual-IV-TR ("DSM-IV"), which provides the authoritative diagnostic criteria for these impairments,[2] the diagnosis of a Reading Disorder (315.00) requires that "[r]eading achievement, as measured by individually administered standardized tests of reading accuracy or comprehension, is substantially below that expected given the person's chronological age, measured intelligence, and age-appropriate education" ("Criterion A") **and** that "[t]he disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills" ("Criterion B").

A diagnosis of ADHD-Predominantly Inattentive Type (314.00) requires a showing of six or more symptoms of inattention (as listed in the DSM-IV)[3] that have persisted for at least 6

---

[2] *See, e.g., United States v. Long*, 562 F.3d 325, 334 n.22 (5th Cir. 2009) (citing Fed. R. Evid. 201(b)); *Love*, 513 F. Supp. 2d at 210.

[3] The DSM-IV lists the following symptoms of inattention:
(a)      often fails to give close attention to details or makes careless mistakes in schoolwork, work, or other activities;
(b)      often has difficulty sustaining attention in tasks or play activities;
(c)      often does not seem to listen when spoken to directly;
(d)      often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions);
(e)      often has difficulty organizing tasks and activities;
(f)      often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (such as schoolwork or homework);
(g)      often loses things necessary for tasks or activities (e.g., toys, school assignments, pencils, books, or tools);

months to a degree that is maladaptive and inconsistent with the individual's developmental level.  Impairment from the symptoms must be present in *two or more settings*, such as school (or work) and home.  Some of the symptoms of inattentiveness must have been present before seven years of age.  There must be "*clear evidence* of *clinically significant impairment* in social, academic, or occupational functioning."  (Emphasis added).  "ADHD's essential feature is a persistent pattern of inattention and/or hyperactivity-impulsivity….To be diagnosed with ADHD, an individual must clearly evidence interference with developmentally appropriate social, academic, or occupational functioning."  *Price v. Nat'l Bd. of Medical Examiners*, 966 F. Supp. 419, 422 (S.D. W. Va. 1997) (citing DSM-IV).

> ### C.      Mr. Cockburn's Request for Accommodations on the USMLE

Mr. Cockburn applied for accommodations on the USMLE in April 2009.  Claiming to have a reading disability and a writing disability, he requested double the amount of testing time available to other examinees.  He did ***not*** claim to have ADHD, and he has since acknowledged that his alleged writing disability is irrelevant in the context of a computer-based, multiple-choice examination like the USMLE.  In support of his request for double testing time, Mr. Cockburn submitted personal statements; report cards and standardized test records; information from high school, college, and medical school personnel; and two psychological evaluations from David Filipowski, Ph.D. ("Dr. Filipowski").

As part of its normal process, NBME relies on independent professionals with expertise in the relevant disability to review accommodation requests and offer guidance.  Mr. Cockburn's materials were reviewed by Richard L. Sparks, Ed.D. ("Dr. Sparks"), who specializes in special education and learning disabilities.  Dr. Sparks concluded that the documentation provided did

---

(h)      is often easily distracted by extraneous stimuli;

not demonstrate that Mr. Cockburn met the DSM-IV criteria for a Reading Disorder.  Dr. Sparks noted that, although learning disabilities are lifelong conditions typically identified in elementary school, Mr. Cockburn was not diagnosed with any disability until 2005 (when Mr. Cockburn was 24 years old).  Dr. Sparks also noted that Dr. Filipowski's initial evaluation report (in 1998) did not diagnose any learning disability.  Dr. Sparks explained that there was no evidence that Mr. Cockburn met Criterion B of the DSM-IV diagnostic criteria for a reading disorder because the documentation did not show significant interference with academic achievement or activities of daily living that require reading.

NBME sent a letter to Mr. Cockburn on August 31, 2009, denying his request for accommodations.  NBME explained that the documentation he submitted, including his grades and his scores on standardized tests, did "not demonstrate impairments with respect to reading, writing or learning relative to most people in the general population."

Mr. Cockburn requested reconsideration.  In an undated letter received by NBME on October 30, 3009, Mr. Cockburn stated that a new psychologist, Dr. Culotta, had diagnosed him as having ADHD, as well as a reading disorder.  Mr. Cockburn provided NBME with copies of Dr. Culotta's psychological evaluation and report cards with teachers' comments from kindergarten through eighth grade.

NBME sent Mr. Cockburn's entire file to a second external evaluator, clinical psychologist Steven G. Zecker, Ph.D. ("Dr. Zecker"), for review.  On the ADHD diagnosis, Dr. Zecker acknowledged comments made by Mr. Cockburn's elementary school teachers regarding inattentiveness and failure to complete assignments, but he noted that Mr. Cockburn's current self-assessment of attentional functioning yielded results in normal limits.  Dr. Zecker also noted

---

(i)        is often forgetful in daily activities.

that Dr. Culotta's 2009 evaluation "contained no objective measure of attentional functioning." As for the reading disorder diagnosis, Dr. Zecker noted that nothing in Mr. Cockburn's school records suggested any difficulties in early reading, "which would have been expected given that Reading Disorder is a neurodevelopmental condition with an onset in childhood."  It appeared to Dr. Zecker that the diagnosis of a reading disorder depended extensively on Nelson Denny Reading Test (NDRT) results, although the NDRT is not recommended for diagnostic use. Moreover, even on the NDRT, Mr. Cockburn's results were in the average range, as were multiple other diagnostic reading scores.  Based on these and other factors, Dr. Zecker concluded that Mr. Cockburn's documentation did not support a need for accommodations.  By letter dated December 9, 2009, NBME denied Mr. Cockburn's request for reconsideration.

D.      **Mr. Cockburn's Background and Clinical Evaluations**

1.      **Mr. Cockburn's Academic Record**

In elementary school, Mr. Cockburn was usually a B or C student.  His report cards reflect that he always read at grade level, and his results on the Woodcock Johnson achievement test from the sixth grade show reading scores well above grade level for both vocabulary and comprehension.  Although his teachers at times expressed concern about him staying on task, they did not raise issues about his reading abilities or suggest that any screening was necessary for a reading disorder.

Mr. Cockburn's grades slipped when he transitioned to middle school (he received D's in several classes), but they improved in the seventh grade and he earned all B's and C's in the eighth grade.

Mr. Cockburn was admitted to an academically rigorous private high school and took some advanced classes.  He was primarily a B or C student, with a few A's and D's.  During

high school, Mr. Cockburn played football and ran track, played the piano, was in the band, and was in a club.

Mr. Cockburn did not receive any academic accommodations until the end of tenth grade. He was then allowed extra time on classroom tests, even though Dr. Filipowski's 1998 evaluation had concluded that Mr. Cockburn did not meet the diagnositic criteria for a learning disability and had also ruled out any attention disorders.

Mr. Cockburn attended North Carolina Central University (NCCU).  He majored in biology and minored in chemistry, and graduated *magna cum laude* in four years with a GPA of 3.46.  He was in the Academic Club and tutored other students.  He participated in a biology honors society.  In addition to his coursework at NCCU, Mr. Cockburn studied Japanese at Duke University.

Mr. Cockburn did not formally request any accommodations in college.  He alleges that certain of his professors allowed him extra time on tests and quizzes, but relevant records subpoenaed from NCCU contained only an email from one professor stating that he allowed Mr. Cockburn extra time on tests in two courses – but without requesting documentation that Mr. Cockburn qualified for extra time.  Mr. Cockburn did not receive any other accommodations in college, such as a reader for classes or homework or assistance in taking notes during lectures.

Mr. Cockburn took a post-graduate biochemistry class at the University of North Carolina and earned a B+, which placed him in the top 15% of the class.  Mr. Cockburn was working at the time, and his instructor noted:  "[B]iochemistry is daunting for any student, but my course covers two semesters of biochemistry in 5 weeks.  Stephen did a fine job of balancing his studies and professional life.... He demonstrated the ability to rapidly learn difficult subjects and integrate them into a broader intellectual framework."

At Howard University Medical School, Mr. Cockburn has received extended time on examinations and a quiet testing room. Even in this challenging academic environment, Mr. Cockburn does not need any accommodations to read his course materials, do his homework, prepare for classes, or to study for exams.

### 2. Mr. Cockburn's Performance on Standardized Tests

The USMLE is a standardized test. It is therefore instructive to look at Mr. Cockburn's performance on other standardized tests. He has consistently performed in the average range or better, even when testing without extra testing time or other accommodations.

Mr. Cockburn took the California Achievement Test (CAT) in the third, fourth, fifth, and sixth grades. His reading scores on these tests, taken *without* accommodations, were better than 68, 46, 81, and 84 percent, respectively, of a national sample of same-grade students. In all of these years, his reading scores were in the average range and above.

Mr. Cockburn took state-wide, standardized end-of-grade tests after the sixth, seventh and eighth grades. His reading scores on these tests, taken *without* accommodations, were better than 39, 69, and 70 percent, respectively, of same-grade students.

Mr. Cockburn took the PSAT examination without accommodations when he was a junior in high school. He scored in the 44th percentile, well within the average range, on the verbal section of the exam. He also took the ACT Assessment (used for college admissions) without accommodations during his junior year. His score of 22 on the reading portion was around the 59th percentile – well above average.

Mr. Cockburn took the SAT in high school without accommodations, scoring 490 on the verbal section, a score in the average range. He took the SAT two more times, with extra testing time. His total scores on the verbal section of these tests were 510 and 500, respectively –

average scores and only minor increases over his verbal score when he tested without accommodations.

Mr. Cockburn took the Medical College Admissions Test (MCAT) four times. He tested three times without accommodations and his scores ranged from 14L to 16O. He was later granted fifty percent extra testing time and scored 24M. Mr. Cockburn has attributed his score improvement to factors other than extra testing time, explaining that he did not prepare adequately the first three times he took the MCAT, and that increased test preparation improved his scores.

### 3.     Mr. Cockburn's Work Activities

Mr. Cockburn has been employed as a pharmaceutical technician at the University of North Carolina Hospital, as a test subject monitor for AAIPharma, Inc., as a martial arts instructor, and as a car salesman (among other jobs). At UNC Hospital, he had to perform his responsibilities accurately and carefully, including distributing medications. At AAIPharma, his job was monitoring test subjects and accurately documenting relevant information. He did not request or receive accommodations in any of these work settings.

### 4.     Mr. Cockburn's Clinical Evaluations

#### a.     Dr. Filipowski

Mr. Cockburn received his first psychological evaluation in 1998, when he was a junior in high school. The evaluation was performed by Dr. Filipowski. Mr. Cockburn's diagnostic test results were all in the average range, with the exception of two subtest results. Dr. Filipowski concluded that Mr. Cockburn did not meet the formal diagnostic criteria for the presence of a learning disability. Likewise, he did not diagnose Mr. Cockburn with ADHD.

Dr. Filipowski evaluated Mr. Cockburn again in 2005, when Mr. Cockburn was 24 years old.  Mr. Cockburn told Dr. Filipowski that he wanted an evaluation to support extra testing time on the Medical College Admissions Test.  Mr. Cockburn again scored in the average range on all of the measures of reading administered by Dr. Filipowski with the exception of two subtests.  Nevertheless, Dr. Filipowski concluded that "Stephen meets the criteria for a DSM-IV Reading Disorder, 315.00," because his academic achievement measures were lower than expected "given his IQ scores and using the standard discrepancy formula."  Dr. Filipowski specifically ruled out a diagnosis of ADHD, writing:   "An analysis of the inattention, impulsivity and vigilance measures reveals that they are all within normal limits…."

### b.      Dr. Culotta

Mr. Cockburn was evaluated by Vincent P. Culotta, Ph.D. ABN ("Dr. Culotta"), a neuropsychologist and clinical psychologist, in 2009.  Mr. Cockburn sought out this evaluation to support his request for accommodations on the USMLE.  Mr. Cockburn's diagnostic test results for intelligence (WAIS-IV) and achievement (WJ-III) were all in the average range.  Mr. Cockburn's scores on the Nelson Denny Reading Test were also in the average range, when compared to the proper pooled standardization sample.  Mr. Cockburn scored below average on only two subtests, measuring executive functioning skills – the Rey Complex Figure Test and the Trailmaking Test.  His self-report of current ADHD symptoms was in the normal range on the Barkley Current ADHD Symptoms Self-Report Scales.  Nevertheless, Dr. Culotta diagnosed Mr. Cockburn with ADHD-Predominantly Inattentive Type and a Reading Disorder.

### 5.      Mr. Cockburn's Current Functioning.

In his deposition, Mr. Cockburn acknowledged that he does not have the functional limitations that are necessary to support an ADHD diagnosis.  He is focused when people talk to

him.  He gets along well with others.  He follows through on instructions at work and in medical school.  He is focused when interacting with patients.  He pays attention to detail and is careful. He did not make careless mistakes in medical school, and he stayed focused for extended periods of time when working as a lab technician.  Mr. Cockburn does not believe that his ability to practice medicine will be affected by any of his claimed impairments.

## III.   LEGAL ARGUMENT

### A.   Legal Standard

To be disabled under the ADA, a person must have a "physical or mental impairment that substantially limits one or more major life activities...."  42 U.S.C. § 12102(2)(A).  It is Mr. Cockburn's burden to prove by a preponderance of the evidence that he is disabled.  *See, e.g., Jayatilaka v. Nat'l Bd. of Medical Examiners*, 2011 U.S. Dist. LEXIS 5789, at *30 (C.D. Cal. 2011); *Steere v. George Washington Univ. Sch. of Med.*, 439 F. Supp. 2d 17, 21 (D.D.C. 2006); *Argen v. New York State Bd. of Law Examiners*, 860 F. Supp. 84, 87 (W.D.N.Y. 1994).  He cannot meet that burden.

### B.   Mr. Cockburn Has Not Been Properly Diagnosed With A Learning Disability Or ADHD.

#### 1.   Learning Disability (Reading Disorder)

Although he concluded in 1998 that Mr. Cockburn does not have a learning disability, Dr. Filipowski diagnosed Mr. Cockburn with a learning disability in 2005, when Mr. Cockburn came to him to get a report that would support a request for extra time on the MCAT exam.  And Dr. Culotta diagnosed Mr. Cockburn with a learning disability in 2009, when Mr. Cockburn came to Dr. Culotta to get supporting documentation for a request for extra time on the USMLE Step 1 examination.  Both Dr. Filipowski's and Dr. Culotta's diagnoses, however, depended solely on the "discrepancy model," a diagnostic model that has been widely discredited.  As

noted in a U.S. Senate Report, "[t]here is no evidence that the IQ-achievement discrepancy formula can be applied in a consistent and educationally meaningful (i.e., reliable and valid) manner."[4]  Indeed, researchers have noted that an "astute diagnostician can qualify between 50% and 80% of a random sample of the population as having a learning disability" using discrepancy-based diagnostic models.[5]

Mr. Cockburn's own expert, Dr. Culotta, has written articles that note the unreliability of the discrepancy model.  *See* "Neuropsychological Assessment and Advances in Neuroscience," *The Maryland Psychologist*, Vol. 47, Issue 4, at 10, 17 ("Discrepancy models [IQ v. Achievement] have been used for years as a basis for defining dyslexia and other learning disorders.  Numerous studies have questioned the validity and utility of such models as they are atheoretical and offer little information regarding etiology, prognosis, or outcome.").  And support for the alleged "discrepancy" between Mr. Cockburn's IQ and his performance on diagnostic assessments was lacking in any event.  Dr. Culotta provided a Reading Disorder diagnosis even though Mr. Cockburn performed at the ***average or better*** level on ***all*** of the diagnostic reading tests administered by Dr. Culotta.  Mr. Cockburn's results simply showed that, like all of us, he has relative strengths and weaknesses, which is not enough to support a

---

[4] See U.S. Senate Report 185, 108th Cong., 1st Sess. (Nov. 3, 2003) (discussing problems with the discrepancy model in the context of proposed amendments to the Individuals with Disabilities in Education Act).

[5] J. Brackett & A. McPherson, "Learning Disabilities Diagnosis in Postsecondary Students: A Comparison of Discrepancy-Based Models," *Adults with Learning Disabilities: Theoretical and Practical Perspectives*, at 70 (1996); *see also* S. Dombrowski, C. Reynolds & R. Kamphaus, "After the Demise of the Discrepancy:  Proposed Learning Disabilities Diagnostic Criteria," *Professional Psychology: Research and Practice,* Vol. 35, No. 4, 364, 366 (2004) ("[T]he discrepancy model represents an assessment heuristic that appears to lack validity and reliability. Research indicates that it cannot distinguish those who have LD from those who do not in actual diagnostic practice….  Even though it lacks diagnostic validity, it is still used ubiquitously but in an idiosyncratic and perhaps even haphazard fashion."*).*

learning disability diagnosis.  Having an "uneven profile" does not automatically mean that an individual has a learning disability.

Dr. Filipowski and Dr. Culotta also supported their reading disorder diagnoses on results from the Nelson Denny Reading Test (NDRT).  The NDRT, however, is not intended to be used for diagnostic purposes – a fact which the NDRT test publisher makes clear and that Dr. Culotta acknowledges.

The learning disability diagnoses of Drs. Filipowski and Culotta were also flawed because neither evaluator addressed whether Mr. Cockburn meets Criterion B of the DSM-IV, that is, whether "the disturbance . . . significantly interferes with academic achievement or activities of daily living that require reading skills."  Both Criterion A and Criterion B must be present for a valid diagnosis.

Mr. Cockburn does not meet Criterion B.  Any problems that Mr. Cockburn experienced with reading did not "significantly interfere" with his academic achievement.  He read on grade level and passed all of his language arts/English classes each school year prior to receiving any accommodations.  There is no indication in any of his school records that Mr. Cockburn was experiencing problems with reading.  He also scored in the average to above-average range on the reading portions of all the standardized tests he took in primary and secondary school without accommodations.  He graduated *magna cum laude* from college, where the only accommodations he allegedly received were "informal accommodations" of extended time on certain tests and quizzes, and he successfully completed the first two years of medical school while receiving no accommodations other than extended time on tests.  There also is no evidence that Mr. Cockburn experienced any difficulty in reading with respect to his activities of daily living.  Mr. Cockburn was not properly diagnosed with a reading disorder.

2. **ADHD**

Dr. Filipowski did not diagnose Mr. Cockburn with ADHD in either of his evaluations. Indeed, Dr. Filipowski tested Mr. Cockburn for issues of attention and concentration in 2005, and found that "[a]n analysis of the inattention, impulsivity and vigilance measures reveals that they are all within normal limits suggesting that if any attentional difficulties are present they do not fit any classic or typical patterns of attention problems."

Mr. Cockburn was first diagnosed with ADHD by Dr. Culotta in 2009. Dr. Culotta's evaluation, however, was incomplete and unsupported. First, Dr. Culotta looked past the fact that Mr. Cockburn's own self-report on the Barkley's Current and Childhood ADHD Symptoms Self-Report Scales did not show a clinically significant elevation based on his current symptoms. Second, Dr. Culotta did not administer any objective tests of inattention to support his diagnosis.[6] Third, Dr. Culotta only evaluated whether Mr. Cockburn's alleged symptoms of ADHD impacted him in one setting – school. A proper diagnosis of ADHD, however, requires clear evidence of *clinically significant impairment* from the symptoms *in two or more settings* – for example, school and home. There is no evidence in the record that Mr. Cockburn experienced any impairment outside of the school setting. Quite the contrary, Mr. Cockburn appears to be a focused and careful individual with good interpersonal relationships and a solid work history. And even in the school setting, the evidence does not show that Mr. Cockburn experienced "clinically significant impairment." Although some of Mr. Cockburn's teachers noted problems with day-dreaming and staying on task early in his school career, these problems were never severe enough to interfere with his academic progress or warrant diagnostic screening at the time, and they seem to have resolved, particularly once Mr. Cockburn reached

---

[6] When Dr. Filipowski administered such tests, the results were in the normal range.

college and medical school.  Dr. Culotta's ADHD diagnosis cannot withstand scrutiny in light of this evidence.  *Compare Steere*, 439 F. Supp. 2d at 23-24 (declining to accept plaintiff's expert's ADHD diagnosis due to, *inter alia*, lack of corroborating evidence and inappropriate diagnostic tools); *Baer v. Nat'l Bd. of Medical Examiners,* 392 F. Supp. 2d 42, 46 (D. Mass. 2005)("At this stage, it seems the ADHD diagnosis is suspect:  It has surfaced only very late in the series of evaluations of the plaintiff occurring over many years, and it is not made in conformity with the generally accepted standards of the American Psychiatric Association's Diagnostic and Statistical Manual, Fourth Edition (DSM-IV).").

### C.     Plaintiff Is Not "Disabled" Within The Meaning Of The ADA.

Even if Mr. Cockburn met the applicable criteria for a diagnosis of a learning disorder or ADHD (and he does not), his claimed impairments have not resulted in a substantial limitation in the major life activities of reading or learning.  Therefore, he is not disabled within the meaning of the ADA and his claim fails as a matter of law.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 108 (3d Cir. 1996) ("an impairment, standing alone, is not necessarily a disability as contemplated by the ADA"); *Singh v. George Wash. Univ. Med. School,* 597 F. Supp. 2d 89, 97 (D.D.C. 2009) ("a mere diagnosis of a learning disability...does not establish 'disability' under the ADA absent sufficient corroborative evidence from the patient's own experiences").

To be disabled within the meaning of the ADA, Mr. Cockburn must be substantially limited in his ability to read or learn as compared to the average person in the general population, *Kelly*, 94 F.3d at 105, not as compared to other medical school students, *see Singh v. George Washington Univ. Med. School,* 508 F.3d 1097, 1103 (D.C. Cir. 2007).  The cases make clear that, as a matter of law, individuals who read and learn as well as or better than the average

person in the general population are not disabled within the meaning of the ADA.[7]  *See, e.g., Wong v. Regents of the Univ. of California,* 410 F.3d 1052 (9th Cir. 2005); *Costello v. Mitchell Public Sch. Dist. 79*, 266 F.3d 916, 923-24 (8th Cir. 2001) (affirming summary judgment where plaintiff had average grades, advanced to the next grade each year, and was working toward her G.E.D.); *Kamrowski v. Morrison Mgmt. Specialist*, 2010 U.S. Dist. LEXIS 103290,*23-29 (S.D.N.Y. 2010) ("Plaintiff has failed to raise a genuine issue of material fact regarding whether her dyslexia or attention deficit disorder substantially impaired a major life activity, including her abilit[y] to read"); *Butler v. Bloomington Pub. Schools*, 2010 U.S. Dist. LEXIS 10517, *11-13 (D. Minn. 2010) (plaintiff who "graduated from high school and vocational schools" was not substantially limited in learning as a matter of law); *Marshall v. Sisters of the Holy Family*, 399 F. Supp. 2d 597, 603 -04 (E.D. Pa. 2005) (student with ADHD was not substantially limited in learning or other major life activities where he was very successful in school); *Spychalsky v. Sullivan*, No. 01-0958, 2003 U.S. Dist. LEXIS 15704 (E.D.N.Y. Aug. 29, 2003), *aff'd*, 2004 U.S. App. LEXIS 10246 (2d Cir. May 25, 2004); *Dorn v. Potter*, 191 F. Supp. 2d 612, 623 (W.D. Pa. 2002) ("plaintiff has failed to show that his alleged learning disability substantially limits a major life activity, including the activity of learning itself."); *Pazer v. New York State Bd. of Law Examiners*, 849 F. Supp. 284, 287 (S.D.N.Y. 1994) (rejecting argument that disparity between IQ and achievement compels conclusion that someone is disabled, where the disparity in

---

[7] The ADA was amended as of January 1, 2009, by the ADA Amendments Act ("ADAAA"). The ADAAA responded to a series of Supreme Court cases involving employees with physical disabilities and is intended to result in more individuals being covered by the ADA.  However, under the ADAAA, a plaintiff must still show that he or she has a "substantial" limitation in a major life activity, and the existence of such a limitation is still determined by comparing the plaintiff's abilities to the abilities of the average person in the general population.

achievement could be due to other factors such as "stress, nervousness, cautiousness and lack of motivation").

For example, in *Hopkins v. St. Joseph's Creative Beginning*, 2003 U.S. Dist. LEXIS 21033 (E.D. Pa. 2003), the plaintiff alleged that she suffered from learning disabilities that substantially limited her ability to read, learn, and work.  Her psychological evaluation stated that plaintiff scored in the 18th percentile for Broad Reading and the 6th percentile for Reading Comprehension, and her reading comprehension skills were at a fifth grade level, *id.* at *12, but her evaluation did not suggest that she was "substantially impaired in any activity except taking difficult college courses," *id.* at *13.  Noting that the plaintiff was working towards a college degree and had an extensive employment history, *id.* at *13-14, the court found that plaintiff did not have "a substantial impairment as compared to the average person" in the areas of reading and learning, *id.* at *12, and granted summary judgment to the defendant.

Similarly, in *Brief v. Albert Einstein Coll. of Med.*, 2010 U.S. Dist. LEXIS 55302 (S.D.N.Y. 2010), the court granted summary judgment on an ADA claim asserted by a student who had been diagnosed with ADHD by two professionals.  As here, the plaintiff pointed to "instances in his life where he has been distracted," as well as "diagnostic tests" on which he "performed below the average person for his age group."  *Id.* at *12-14.  The court concluded, as a matter of law, that the evidence did not show a substantial limitation in learning or thinking so as to establish a disability under the ADA.

Mr. Cockburn is similar to the plaintiffs in *Hopkins* and *Brief*.  His diagnostic evaluations show that he is not substantially limited in his ability to read as compared to most people.[8]  And

---

[8] *See also Allegheny Health, Educ. & Res. Found. v. Kirkland*, 321 B.R. 776, 798 (W.D. Pa. 2005) (noting that three psycho-educational reports "graded [plaintiff's] various learning-related

his academic records show that he has been able to read and learn well enough to proceed successfully through a rigorous high school, college, and medical school, and to perform in the average range or better on standardized tests. "[A] student who learns as well as the average student does not have an impairment that substantially limits the major life activity of learning." *Centennial School Dist. v. Phil L.*, 2010 U.S. Dist. LEXIS 29041, *22 n.5 (E.D. Pa. 2010).

Extensive reading is necessary in college and medical school outside the context of test taking, yet Mr. Cockburn had no accommodations in those contexts. Mr. Cockburn requested accommodations only to take tests. But any limitations that he might have in this narrow context are not substantial and do not constitute a disability. *See McGuinness v. Univ. of New Mexico Sch. of Med.*, 170 F.3d 974, 980 (10th Cir. 1998) ("An impairment limited to specific stressful situations, such as the mathematics and chemistry exams which trigger Mr. McGuinness' anxiety, is not a disability...."); *Singh*, 597 F. Supp. 2d at 95 ("Had [plaintiff] the ADA-defined disability that she claims to have, her achievement should have been more consistently limited.... It would not be enough to prove that she is substantially limited in...test-taking."); *cf. Ristrom v. Asbestos Workers Local 34,* 370 F.3d 763, 770 (8th Cir. 2004) ("The inability to pass a few highly specialized courses does not indicate an inability to learn under the ADA."). "The specific task of taking timed tests...is not the kind of 'major life activity' protected under the ADA." *Baer*, 392 F. Supp. 2d at 47.

---

abilities at between low average and superior…and since 'average, or even slightly below average, is not disabled for purposes of the ADA,'...such reports constitute substantial evidence that, whatever her affliction, it did not operate to restrict her ability to learn in comparison to the average person in the general population.") (internal citation omitted) (summary judgment for defendant); *Brown v. Univ. of Cincinatti*, 2005 U.S. Dist. LEXIS 40798, at *31-32 (S.D. Ohio 2005) ("[N]ot every individual who scores below average or low-average on this particular neuropsychological battery can be deemed to be disabled…. [A]s plaintiff's situation

As a matter of law, Mr. Cockburn cannot show that he is "substantially limited" in the major life activities of reading or learning.  *See, e.g., Love*, 513 F. Supp. 2d at 228 ("Given all of the evidence presented, including Plaintiff's test scores, clinical evaluations, educational history, and his reported ability to function in both academic and professional environments, we are not persuaded that Plaintiff has a disability as defined under the ADA.") (entering judgment in favor of LSAC following bench trial); *Steere*, 439 F. Supp. 2d at 25-26 (finding that plaintiff failed to show that his "low scores on certain tests" were a result of ADHD and failed to show that he suffered from a learning disability, and entering judgment in favor of defendant following bench trial); *Singh*, 597 F. Supp. 2d at 95 ("Based on the evidence presented at trial, this Court does not find that plaintiff has a disability as defined by the ADA and case law. This conclusion is compelled by the academic success she has enjoyed throughout her life, including her strength from a very young age in areas that require reading and comprehension under time pressure, such as reading and general coursework.  Had she the ADA-defined disability that she claims to have, her achievement should have been more consistently limited."); *Argen*, 860 F. Supp. at 91 (entering judgment for Law Examiners following bench trial, crediting testimony and objective standards used by defendant's expert).

Because Mr. Cockburn is not disabled within the meaning of the ADA, it was entirely appropriate for NBME to deny his request for testing accommodations on the USMLE:

> [I]t is clear that [the National Board] followed its standard procedure when it determined that appellant was not entitled to a test accommodation.  Its procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination.  As

demonstrates, an individual can [still] succeed academically through at least the college level….") (summary judgment granted for defendant).

administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it.

*Powell v. Nat'l Bd. of Med. Examiners,* 364 F.3d 79, 88-89 (2d Cir. 2004) (affirming summary judgment for defendants).

### D.     Mr. Cockburn Is Not Entitled To A Double Time Extension

Finally, even assuming that Mr. Cockburn could show that he is disabled within the meaning of the ADA, he cannot meet his burden of showing that double time is a reasonable accommodation on the USMLE.  It is Mr. Cockburn's burden to make such a showing.  *See Jayatilaka*, 2011 U.S. Dist. LEXIS 5789, at *36-37.  Mr. Cockburn's expert witness, Dr. Culotta, has recommended double time as an appropriate accommodation for Mr. Cockburn, but this recommendation was due, in part, to Dr. Culotta's unsupported belief that the USMLE was not a "speeded" examination.  Dr. Culotta based his opinion on the speededness of the USMLE solely on information provided to him by Mr. Cockburn.  The USMLE does have a "speeded" element.  Thus, any extended time accommodation provided on the examination must be carefully considered so that the examinee is not receiving an undue benefit that is not being afforded to other examinees.  Mr. Cockburn received one and one-half the standard amount of testing time to complete the MCAT, the most recent standardized test he has taken and a test covering similar subject matter.  This was sufficient time for him to earn scores that gained him admission to medical school.  If the Court concludes that Mr. Cockburn is entitled to extended time on the USMLE, Mr. Cockburn should only be given time and one-half to complete the test.

## IV.     WITNESSES NBME WILL CALL AT TRIAL

Peter Katsufrakis, M.D.
Vice President, Assessment Programs
National Board of Medical Examiners
3750 Market Street

Philadelphia, PA 19104-3102

Catherine Farmer, Psy.D.
Director, Disability Services and ADA Compliance Officer, Testing Programs
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

Richard L. Sparks, Ed.D.
College of Mount St. Joseph
Department of Graduate Education
5701 Delhi Pike
Cincinnati, OH 45233-1670

Steven G. Zecker, Ph.D.
The Francis Searle Building
2240 Campus Drive #2-331
Evanston, IL 60208-3560

## V.      SCHEDULE OF EXHIBITS TO BE OFFERED AT TRIAL

*See* Exhibit A hereto.

NBME reserves the right to rely at trial on (1) any exhibits on Plaintiff's exhibit list, (2)

any additional exhibits that may be added to the exhibit list between now and the time of trial

with Plaintiff's consent, (3) exhibits used solely for impeachment purposes, and (4)

demonstrative aids.

## VI.     LENGTH OF TRIAL

NBME expects trial to last 2-3 days.

Dated:  February 23, 2011

Respectfully submitted,


  /s/ Robert A. Burgoyne
Robert A. Burgoyne
Caroline M. Mew
Fulbright & Jaworski L.L.P.
801 Pennsylvania Avenue, NW
Washington, DC  20004-2623
Telephone: (202) 662-0200
Fax:  (202) 662-4643
rburgoyne@fulbright.com
cmew@fulbright.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been filed electronically and is available for viewing and downloading from the ECF system.  Counsel of record for plaintiff were served through the Court's electronic case filing system.


<u>  /s/ Robert A. Burgoyne            </u>