# In The Matter Of:

*STEPHEN HARRISON COCKBURN*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS, ET AL.*

*RICHARD SPARKS - Vol. 1*
*December 16, 2010*



**MERRILL LAD**

1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax:202.861.3425

EXHIBIT

D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - x

STEPHEN HARRISON COCKBURN,      :

    Plaintiff                   :

v.                              :  Civil Action

NATIONAL BOARD OF MEDICAL       :  No. 10-1407

EXAMINERS, et al,               :

    Defendants                  :

- - - - - - - - - - - - - - - x

Deposition of RICHARD SPARKS

Washington, D.C.

Thursday, December 16, 2010

9:00 a.m.

Job No.: 1-190710

Pages 1 through 142

Reported by:  Marilyn Feldman, RPR

RICHARD SPARKS - 12/16/2010

Page 2

1   Deposition of RICHARD SPARKS, held at the
2  offices of:
3
4
5        FULBRIGHT & JAWORSKI LLP
6        801 Pennsylvania Avenue, NW
7        Suite 500
8        Washington, D.C. 20004-2623
9
10
11    Pursuant to agreement, before Marilyn Feldman,
12  Registered Professional Reporter and Notary Public
13  in and for the District of Columbia.
14
15
16
17
18
19
20
21
22

Page 4

1              CONTENTS
2   EXAMINATION OF RICHARD SPARKS          PAGE
3     By Mr. Steedman            5, 138
4     By Ms. Mew                 135
5
6              EXHIBITS
7         (Retained by counsel.)
8   PLAINTIFF'S DEPOSITION EXHIBIT          PAGE
9   1 Curriculum vitae            6
10  2 Letter to Farmer, 7/21/09        35
11  3 Application to take USMLE          39
12  4 Focus/Concern             50
13  5 Ravenscroft School college admission
14    test record               71
15  6 Evaluation by Dr. Filipowski, 1998     87
16  7 Evaluation by Dr. Filipowski, 2005     87
17  8 Addendum                93
18  9 AMCAS application report, 2007        105
19  10 Letter from Farmer to Cockburn      109
20  11 Letter from Fulbright firm to Farmer   110
21  12 Neurosych evaluation          124
22

Page 3

1        APPEARANCES
2   ON BEHALF OF PLAINTIFF:
3        WAYNE D. STEEDMAN, ESQUIRE
4        JIM SILVER, ESQUIRE
5        CALLEGARY & STEEDMAN PA
6        201 N. Charles Street
7        Suite 1402
8        Baltimore, MD 21201
9        410.576.7606
10
11  ON BEHALF OF DEFENDANTS:
12        CAROLYN M. MEW, ESQUIRE
13        FULBRIGHT & JAWORSKI LLP
14        801 Pennsylvania Avenue, NW
15        Suite 500
16        Washington, D.C. 20004-2623
17        202.662.0200
18
19
20
21
22

Page 5

1          PROCEEDINGS
2          RICHARD SPARKS
3   having been duly sworn, testified as follows:
4      EXAMINATION BY COUNSEL FOR PLAINTIFF
5   BY MR. STEEDMAN:
6      Q    Good morning, Dr. Sparks.
7      A    Good morning.
8      Q    Dr. Sparks, I understand you have been
9   through a few depositions in your time; is that
10  correct?
11     A    A few.
12     Q    So you are familiar with the routine here.
13     A    Yes.
14     Q    If you need a break at any time, just let
15  me know, we can take a break at any time.
16     A    All right.
17     Q    If you have any questions based on my
18  questions which you are not clear about the
19  question, certainly feel free to ask me for any
20  clarification that you need.
21         Is there any reason that you are not able
22  to testify accurately and coherently today?

2  (Pages 2 to 5)

RICHARD SPARKS - 12/16/2010

Page 6

1    A    No.
2    Q    Taking any medications that would affect
3  your ability to answer questions today?
4    A    No.
5         MS. MEW:  Make sure he finishes his
6  question.  You are talking over him already.
7         THE WITNESS:  All right.
8  BY MR. STEEDMAN:
9    Q    You also want to use words.  It's easy to
10  nod and shake your head but it makes it easier for
11  her if you answer verbally and not nod your head or
12  shake your head.
13    A    Okay.
14         (Deposition Exhibit P-1 was marked for
15  identification and was retained by counsel.)
16    Q    We have marked this document as P-1.  Is
17  this a true and accurate copy of your vita?
18    A    Yes, it looks as though it is.
19    Q    Does it appear to be up to date?
20    A    Let me make sure I have all my
21  publications.  Yes, it looks as though it is up to
22  date.

Page 7

1    Q    For the record, there is a total of 42
2  pages in this document; is that correct?
3    A    Yes.
4    Q    Now on the first page you have several
5  addresses listed.  Are all of those addresses still
6  accurate and current?
7    A    Yes.
8    Q    Under higher education you have written
9  there Ed.D.  What does that stand for?
10    A    Doctor of education, in my case special
11  education.
12    Q    How is a doctor of education different
13  than someone who has a doctorate in psychology?
14    A    A doctorate in psychology versus
15  education, usually we study some similar things but
16  also some different things.
17    Q    What would be the difference?  Just for
18  clarification, what would be the primary focus of
19  someone getting an Ed.D. as opposed to someone
20  getting a Ph.D. in psychology?
21    A    The primary difference, at least the way
22  it was explained to me when I did it, is that Ed.D.s

Page 8

1  also focus on teaching in the classroom.
2    Q    How about in terms of training with regard
3  to testing, whether psychological testing or
4  educational testing?
5    A    In my training the difference was if I had
6  been majoring in psychology, in my case school
7  psychology, I would also have been trained to give
8  the WISC or the WAIS intelligence test as well as
9  what they call affective types of tests, depression
10  or things like that.
11    Q    So training in those tests was not a part
12  of your doctoral program?
13    A    In those tests, no.
14    Q    Have you received any training in those
15  tests since you obtained your doctorate degree?
16    A    No formal training, no.
17    Q    Just for clarification, that is the WAIS
18  did you say?
19    A    The WAIS would be the adult version, the
20  WISC would be the child's version.
21    Q    And then you said affective, such as like
22  a Rorschach?

Page 9

1    A    Yes, yes.
2    Q    Okay.  In your master's program you have
3  an M.Ed.  Sir, is that an master's of education?
4    A    Correct.
5    Q    Did you receive any training in any of the
6  tests, the ways, the WISC, or the affective test in
7  that program?
8    A    No.
9    Q    You have a BS in political science,
10  correct?
11    A    Correct.
12    Q    I assume you didn't get any training in
13  those tests in political science?
14    A    Correct.
15    Q    Probably would have been helpful.
16    A    Yes.
17    Q    I see you are a professor at the College
18  of Mount St. Josephs.  So do you teach courses
19  there?
20    A    Yes.
21    Q    What courses are you currently teaching?
22    A    Currently I'm teaching phonics and

RICHARD SPARKS - 12/16/2010

Page 10

1  linguistics, that's the name of the course. I just
2  finished with two sections of research and
3  statistics.
4     Q    When you say you just finished, this
5  semester or --
6     A    This semester.
7     Q    So the first semester is over?
8     A    Yes, the first semester is over.
9     Q    **Research and statistics?**
10    A    Research and statistics.
11    Q    When you say research and statistics, what
12 field is that particular course in, education?
13    A    General course, not related to any
14 particular field. Foundations of reading --
15    Q    I am trying to get a sense of what you
16 have taught in the most recently completed semester.
17    A    Yes, foundations of reading, just finished
18 that.
19    Q    Okay.
20    A    And although I didn't teach it last
21 semester, I also teach educational assessment. Let
22 me think, have I taught anything else? Oh, I'll be

Page 11

1  teaching advanced phonics and linguistics also.
2  Those are the primary courses I teach.
3     Q    Okay. Are these at the undergraduate
4  level or at the graduate level or both?
5     A    Both.
6     Q    Which ones are undergraduate? I can go
7  through the ones you said.
8     A    All of them are at the undergraduate -- I
9  apologize, two of them are not undergraduate,
10 research and statistics --
11    Q    That would be graduate?
12    A    That would be graduate -- and advanced
13 phonics and linguistics.
14    Q    Is research and statistics two courses or
15 one course?
16    A    One course, just a couple of sections.
17    Q    Now you also note that you have a private
18 practice. What is the nature of your private
19 practice?
20    A    I evaluate children, adolescents, adults,
21 consult with agencies such as the board, do
22 seminars, workshops.

Page 12

1     Q    Anything else?
2     A    Those are the primary activities.
3     Q    Now the evaluations that you do, are these
4  psychological evaluations, educational evaluations?
5     A    They are called psychoeducational
6  evaluations.
7     Q    Do you do any psychological tests when you
8  do these evaluations?
9     A    Not of the type that I mentioned before.
10    Q    When you say not of the type, are there
11 some type of psychological tests that you do?
12    A    Yes.
13    Q    What would those be?
14    A    My training permits me to do a test called
15 Woodcock-Johnson cognitive abilities test. I can
16 also do language testing with language evaluations,
17 not speech but language evaluations.
18    Q    Can you give me an example?
19    A    The test of language competence would be
20 one example.
21    Q    Are there any others?
22    A    There's a long name. I'll just give you

Page 13

1  the acronym, CELF-4.
2     Q    What does that stand for?
3     A    Clinical evaluation of language
4  fundamentals, I believe.
5     Q    Any others?
6     A    I guess the Peabody Picture Evaluation
7  Test which is a vocabulary test would be a language
8  test.
9     Q    Any others?
10    A    Not language, no.
11    Q    So the psychological tests would be -- you
12 mentioned the Woodcock-Johnson cognitive abilities
13 test?
14    A    Yes.
15    Q    Any other psychological test that you
16 give?
17    A    Not really.
18    Q    Then language evaluation, test of language
19 competence, the CELF or CELF-4, and then the PPVT.
20 So psychological, language. What is the rest of the
21 battery?
22    A    Do you want the names of the tests?

4  (Pages 10 to 13)

RICHARD SPARKS - 12/16/2010

Page 14

1    **Q    First could you classify them?  Are they**
2    **educational?**
3    A    Educational and achievement, yes.
4    **Q    Could you give me a list of those?**
5    A    Other than the PPVT which I mentioned --
6    **Q    Okay.**
7    A    -- I would give the Woodcock-Johnson III,
8    the WJ-3 achievement in this case battery, the
9    Woodcock reading mastery test, the revised of
10   course, the test of written spelling, test of
11   written language.  From time to time I'll give,
12   although rarely, I'll give the WRAT, wide range
13   achievement test, from time to time, again adults,
14   perhaps high school, the Nelson-Denny.
15   **Q    Nelson-Denny reading test?**
16   A    Reading test, right.  Let me think if
17   there's anything -- oh, the Lindamood test.
18   **Q    Is that a test of language?**
19   A    That's a test of phonemic or phonological
20   awareness.  I am trying to think if there is any
21   other test that I give.  That's the primary battery.
22   **Q    Okay.  Are you licensed to perform these**

Page 15

1    **tests?**
2    A    Don't have to be in the state of Ohio.
3    **Q    There is no requirement?**
4    A    No requirement.
5    **Q    How do you classify yourself?  You are not**
6    **a psychologist?**
7    A    No.  Educational consultant.
8    **Q    So what, if any, requirements are there in**
9    **Ohio for someone to be able to call themselves an**
10   **educational consultant and perform the type of**
11   **assessments that you do?**
12   A    None to my knowledge.
13   **Q    Could you turn to page 41 of your CV.  I'm**
14   **just going to drop down to the bottom part where it**
15   **says 1980 to current private practice.**
16   A    Um-hmm.
17   **Q    So you have been doing evaluations for 30**
18   **years, correct?**
19   A    In private practice.
20   **Q    In private practice.  And 100 plus**
21   **evaluations each year.  Has that been every year for**
22   **the last 30 years?**

Page 16

1    A    On average, except when the economy is
2    bad.
3    **Q    How about this past year, how many do you**
4    **think you have done this past year, 2010?**
5    A    I'm going to say probably 75.
6    **Q    Probably won't do another 25 from now**
7    **until the end of the year is up?**
8    A    I doubt it.
9    **Q    When you do your assessments, do you**
10   **administer all of the tests yourself or do you have**
11   **an assistant who does that?**
12   A    I administer all of the tests myself.
13   **Q    When you write your report, is it written**
14   **exclusively by you or do you have --**
15   A    Yes, exclusively by me.
16   **Q    Do you type it up yourself or do you have**
17   **a secretary?**
18   A    No.  I have a secretary.
19   **Q    So your secretary types it up?**
20   A    Yes.
21   **Q    Other than your secretary, no one else has**
22   **any involvement with the completion of that**

Page 17

1    **assessment in your report?**
2    A    No.
3    **Q    When someone comes to you for an**
4    **assessment, what type of information are you seeking**
5    **from them before you start your assessment?**
6    A    If it's a school-aged child and sometimes
7    even an individual who is an undergraduate in
8    college, I would do an interview, history, request
9    all of the individual's records, school records, any
10   previous testing that might have been conducted, any
11   medical history that might be pertinent or records
12   that might be pertinent.  If the person has had
13   special education services, IEPs, MFEs, multi-factor
14   evaluations.  School records could include with high
15   school students or college students SAT and PSAT
16   scores.  Transcripts also, I would get those too.
17   And then the interview itself is conducted.
18   **Q    Say that again?**
19   A    The interview itself is conducted with all
20   of those records present.
21   **Q    How important is it to get the history**
22   **that you talked about?  I assume when you talk about**

5  (Pages 14 to 17)

RICHARD SPARKS - 12/16/2010

Page 18

1  the history you are trying to get a sense of the
2  difficulties or problems that the individual has had
3  or is having. Is that what you are seeking?
4     A   Yes.
5     Q   How important is it to have that
6  information before you do your assessment?
7     A   It's very important.
8     Q   I would assume the same would be true with
9  the school records, having the school records. Are
10 they very important, knowing that information before
11 you start your assessment?
12    A   Important -- yes, important.
13    Q   Turning back to page 41 of your CV,
14 towards the bottom of the page it says, "for several
15 years I have evaluated adults with the Ohio
16 Rehabilitation Services Commission in southwest
17 Ohio" and it goes on to say you evaluate adults who
18 are referred to determine whether they qualify for
19 classification as learning disabled. How long have
20 you been doing that?
21    A   I am going to say probably about 15 years
22 maybe -- maybe 20. I'd have to go back in my

Page 19

1  records. I'll say 15 to be safe.
2     Q   How many assessments approximately per
3  year would you do for them?
4     A   On average I'd say probably 20. It's more
5  in some years than others.
6     Q   I assume these are people who are seeking
7  some sort of benefits from Ohio Rehabilitation
8  Services Commission; is that accurate?
9     A   Benefits -- more services than benefits.
10    Q   Okay. What types of services would they
11 typically be seeking?
12    A   They might be seeking training for
13 employment or just be seeking assistance with some
14 type of technology aide, something like that. But
15 mostly it's services in my case.
16    Q   When you say assistance with some type of
17 technology, is it they are seeking to be eligible to
18 receive some sort of technology?
19    A   Yes, that's a much better way of saying
20 it.
21    Q   So when they come to you, these adults
22 have been previously determined as having

Page 20

1  disabilities, or are you being asked to qualify them
2  for being disabled?
3     A   Some of them have been previously
4  identified, some have not. But when I evaluate
5  them, I am being asked to determine whether they do
6  meet the criteria for being qualified as disabled or
7  if they continue to meet the criteria.
8     Q   I see. Looking at page 42, you evaluate
9  adults who are referred to determine whether they
10 qualify for classification learning disabled. Is it
11 always specifically just to determine whether they
12 are learning disabled?
13    A   No, not all of the time.
14    Q   What would be some of the other things
15 that you are being asked to evaluate them for?
16    A   With adults?
17    Q   I assume all of these are adults, aren't
18 they?
19    A   Oh, with rehab services, yes.
20    Q   Specifically with Ohio Rehab --
21    A   I simply might be asked to determine
22 whether they should return to school. They may have

Page 21

1  a high school diploma, for example. They want to go
2  back to school, community college or even a four
3  year degree, and what the rehab counselor wants to
4  know is whether they have the skills to return to
5  school.
6     Q   Why would a rehab counselor want to know
7  that? Is it they are seeking tuition payment from
8  Ohio Rehab Services?
9     A   They may be but not necessarily. I don't
10 get involved in that. My job is just to give the
11 counselor some feedback on their skills.
12    Q   So if the counselor is trying to figure
13 out whether somebody should return to college -- I'm
14 just not clear -- why would the Ohio Rehabilitation
15 Services Commission get involved with somebody
16 whether they go to college or not?
17    A   They may be seeking some kind of service
18 from rehab services.
19    Q   I see.
20    A   I just don't get involved in that part.
21    Q   Okay.
22    A   My part is just to do the testing.

6  (Pages 18 to 21)

RICHARD SPARKS - 12/16/2010

Page 22

1    Q    So they may be seeking some sort of
2    technology to help them when they go back to
3    college --
4    A    Perhaps.
5    Q    -- that they would want the Ohio Rehab
6    Commission to provide them; is that a possibility?
7    A    Possibility.
8    Q    You say you do about 20 evaluations per
9    year for Ohio Rehab Services?
10   A    On the average.
11   Q    In what percentage do you find that the
12   individual is classified as learning disabled?
13   A    I never really thought about that.
14   Q    Would you think it would be more than
15   half?
16   A    No.
17   Q    Less than half?
18   A    Less than half.
19   Q    So less than half of the people who are
20   referred to you by Ohio Rehabilitation Services you
21   find are qualified as learning disabled?
22   A    Say it one more time.

Page 23

1    Q    Less than half the people who are referred
2    to you by the Ohio Rehab Services Commission you
3    determine are learning disabled, less than half?
4    A    Correct.
5    Q    I assume that when you make that
6    determination it's based on the assessments using
7    the tests that you mentioned earlier?
8    A    Yes, in addition to records that may have
9    been provided to me which we talked about before.
10   Q    Okay.  Now you have served you say here
11   for the last four years as a disability consultant
12   for the National Board of Medical Examiners.  So
13   would that be since 2006?
14   A    Maybe 5 but probably 6.  I'd have to look
15   at my evaluations.
16   Q    So what are your duties as a consultant to
17   the National Board of Medical Examiners?
18   A    Simply receive a file and write a review.
19   Q    How many files do you receive per year
20   from NBME?
21   A    Again I'd have to guess.  I'm going to say
22   between 20 and 25.

Page 24

1    Q    Do you have a contract with NBME to do
2    these reviews?
3    A    Yes.
4    Q    Can you tell me the terms of the contract?
5    A    I'm not sure what you mean by the terms of
6    the contract.
7    Q    Well, obviously you are getting paid to do
8    this, correct?
9    A    Correct.
10   Q    What are you paid?
11   A    Am I permitted to answer that (to Ms.
12   Mew)?
13      MS. MEW:  Yes.
14      THE WITNESS:  $150 per hour.
15   BY MR. STEEDMAN:
16   Q    Is there a limit on the number of hours
17   that you are allowed to bill for a review?
18   A    They have never limited me, no.
19   Q    How long does it typically take you to do
20   a review?
21   A    I'd say on average between 3.5 and 4
22   hours.

Page 25

1    Q    Has it ever taken you longer?
2    A    Yes.
3    Q    What would be the longest one that you can
4    recall?
5    A    7, maybe 8 hours.
6    Q    What was different about that one?
7    A    It was much more material, history, in the
8    file to review.
9    Q    Bigger file.
10   A    Bigger file.
11   Q    When the file is sent to you, is there any
12   discussion between you and NBMA or any
13   representative at NBMA?
14   A    No.
15   Q    So how is it that the file gets sent to
16   you?  You just get it in the mail and then you work
17   on it, or do they contact you in advance to say we'd
18   like to send you a file, do you have time to review
19   it?
20   A    It's electronic.  Simply if I'm available,
21   they send me a file.
22   Q    How do they know you are available?

7  (Pages 22 to 25)

RICHARD SPARKS - 12/16/2010

1    A    They ask us quarterly I think -- I think
2  quarterly they ask us about our availability.
3    Q    What is the nature of that inquiry?  Do
4  they say how many can you review this quarter?
5    A    No.  They just say are you available and
6  if you are not available, what dates are you not
7  available.
8    Q    I see.  So when you say quarterly, is it
9  the beginning of each quarter?
10   A    I just got one a week or two ago for
11 January, February, March, so probably a couple of
12 weeks before the quarter.  That's my guess.
13   Q    And the nature of that inquiry is they are
14 saying between January, February, and March are you
15 available and if there are any blocks of time you
16 are not available, please let us know; is that
17 basically it?
18   A    Basically.
19   Q    Okay.  So you are doing 20 to 25 per year
20 for NBMA reviews?
21   A    On average.  Maybe closer to 20.  Again it
22 depends on the year.

1    Q    Okay.  So we are taking maybe 5 or 6 per
2  quarter; does that sound about right?
3    A    I'd say 4 to 5.
4    Q    4 to 5?
5    A    Yes.
6    Q    This may be a difficult question but what
7  percent of your total income per year would you say
8  you get from NBMA?
9    A    Oh, gosh.  Again I have never thought
10 about it.  5 to 10 percent maybe.  It's hard to say.
11 I'd have to look at it.  Probably closer to 5
12 percent.
13   Q    In a typical year say when you do 20 to 25
14 assessments, about how much money would you say you
15 get from NBMA?
16   A    On average, I don't know, 8,000, 8500,
17 9,000 maybe.
18   Q    When you appear for a deposition such as
19 this today, is your rate still the same, $150 per
20 hour?
21   A    No.
22   Q    What is your rate for appearing for a

1  deposition?
2    A    It's $2,000 per day.
3    Q    How about if you testify in the trial?
4    A    I think it's the same, though I'm not
5  sure.
6    Q    Is this all contained in the contract that
7  you have with NBMA?
8    A    Correct.
9    Q    Is this a contract that you signed at the
10 very start of your engagement with NBMA or is this a
11 contract that you have to renew each year?
12   A    Renew each year.
13   Q    When do you renew it?
14   A    I think generally either in December or
15 right at the beginning of each year.
16   Q    In December or January?
17   A    Yes.
18   Q    Have the terms of your contract changed
19 over the years since you first started?
20   A    They have increased the hourly rate.
21   Q    Now the hourly rate, is that something
22 that they offer and you accept, or is it something

1  that you say this is what I want and they say --
2    A    They offer, I accept.
3    Q    And that $2,000 per day for deposition or
4  trial, the same sort of thing, they offer and you
5  accept?
6    A    Correct.
7    Q    Do you have a sense of how many
8  depositions you have done specifically in cases
9  involving the NBMA?
10   A    This is the second.
11   Q    The second in the four years that you
12 have --
13   A    Um-hmm, yes.
14   Q    Did the other case go to trial?
15   A    Yes.
16   Q    So you have testified in one trial?
17   A    I didn't have to testify.
18   Q    Okay, you didn't testify.
19   A    Didn't have to.
20   Q    Do you recall the outcome of that case?
21   A    The case was -- I don't know what the
22 proper term is -- dismissed.  I don't know if that's

8  (Pages 26 to 29)

RICHARD SPARKS - 12/16/2010

Page 30

1  the right term or not.
2  Q    That's why you didn't have to testify in
3  the case, it never actually went to trial?
4  A    Well, it did but after the plaintiff
5  presented his case and his witnesses testified, NBMA
6  moved for dismissal. Again I'm not sure if
7  dismissal is the right word --
8  Q    Right.
9  A    -- but the case was dismissed.
10 Q    Do you recall the name of that case?
11 A    Can I --
12      MS. MEW: Yes.
13      THE WITNESS: Jenkins.
14 BY MR. STEEDMAN:
15 Q    Do you know whether the plaintiff Jenkins
16 in that case, whether they appealed that decision?
17 A    No.
18 Q    You don't know?
19 A    I don't know.
20 Q    In Jenkins it was the same sort of issue
21 of an individual wanting accommodations, extended
22 time on the USMLE step 1; is that correct?

Page 31

1  A    Yes.
2  Q    So of the cases that you get from the
3  NBMA, are all of those cases in which an individual
4  is asking for extended time as one of the
5  accommodations they are seeking?
6  A    Yes.
7  Q    Can you tell me over the many years that
8  you have been consulting for NBMA in how many you
9  recommended extended time?
10      MS. MEW: Object to form. I think he said
11 4 years.
12      MR. STEEDMAN: What did I say?
13      MS. MEW: 8.
14      MR. STEEDMAN: My apologies.
15 BY MR. STEEDMAN:
16 Q    Over the period of time that you have been
17 a consultant for NBMA, what percent would you say
18 you have approved or agreed to an extended time?
19 A    I can give you a number.
20 Q    Okay.
21 A    Two.
22 Q    So two out of possibly a hundred

Page 32

1  referrals?
2  A    Probably not that many, but yes, two.
3  Q    Maybe 80?
4  A    Maybe 80.
5  Q    In terms of the extended time, how much
6  extended time did you recommend?
7  A    I forget what they were requesting. It
8  would have either been time and a half or double
9  time.
10 Q    So you don't recall?
11 A    No.
12 Q    Do you recall what was different about
13 those two cases compared to the other however many
14 that you did not recommend extended time for?
15 A    They had a substantial limitation.
16 Q    Whereas the other people did not?
17 A    Correct.
18 Q    What about their history or testing led
19 you to the conclusion that they had a substantial
20 limitation as opposed to the others who you said
21 were not?
22 A    In both cases they had an early history of

Page 33

1  a substantial limitation and the testing across
2  several years, including the current testing,
3  indicated that they had a substantial limitation.
4  Q    Do you recall whether there are any
5  specific tests that you found most compelling in
6  making that determination?
7  A    In those cases?
8  Q    Yes.
9  A    No.
10 Q    Do you recall whether the Woodcock-Johnson
11 III test of achievement was one of the tests?
12 A    Not in those cases, I don't remember.
13 Q    Was the Nelson-Denny reading test?
14 A    I don't know.
15 Q    Did NBMA accept your recommendation, to
16 the best of your knowledge, for the extended time?
17 A    I don't know.
18 Q    Do you know whether NBMA has ever gone
19 ahead and offered extended time to someone when you
20 said they were not entitled to extend the time?
21 A    I don't know.
22 Q    So once you submit your review, your

9  (Pages 30 to 33)

RICHARD SPARKS - 12/16/2010

Page 34

1  letter, you don't have any further contact with NBMA
2  about that case unless it's litigated?
3     A    That's correct, no, I don't.
4     Q    Do you have a sense of what percentage of
5  the individuals who you have reviewed, whose files
6  you have reviewed were requesting 100 percent
7  extended time?
8           MS. MEW: Object to form. Which
9  individuals, for NBMA?
10          MR. STEEDMAN: Right. Thank you.
11  BY MR. STEEDMAN:
12    Q    Of the referrals you received from NBMA,
13  what percentage of those were individuals asking for
14  100 percent of extended time?
15    A    I don't know.
16    Q    Is that kind of rare in your experience
17  when you review a request from NBMA for extended
18  time that someone is asking for 100 percent?
19    A    Again I don't know. It's not a statistic
20  that I calculate or keep in my head.
21    Q    Let me give you a document that we are
22  going to mark as plaintiff's 2.

Page 35

1          (Deposition Exhibit P-2 was marked for
2  identification and was retained by counsel.)
3  BY MR. STEEDMAN:
4     Q    If you would take a look at the pages
5  there. Is this a true and accurate copy of the
6  letter that you sent to NBME, specifically Katherine
7  Farmer, in response to the referral that you
8  received from NBME regarding Steven Cockburn?
9     A    It looks like it is, yes.
10    Q    If you would go to the cover page, at the
11  top you see there's some dates up there and above
12  the July 21, 2009 it says date of sign. Do you see
13  that?
14    A    Yes.
15    Q    So is that when you first received this
16  referral?
17    A    I would imagine, though it would seem to
18  me that might refer to also when Dr. Farmer assigned
19  it, gave it to her assistant who sent it to me, so I
20  might have gotten it that day. So it was that day
21  or the next.
22    Q    Do you know how you were chosen as opposed

Page 36

1  to someone else to do a review?
2     A    No.
3     Q    So do you recall when you received this
4  referral?
5     A    Only by the date.
6     Q    You assumed you received it on July 21,
7  2009?
8     A    I assume.
9     Q    Then the next date over above it says due
10  date, July 28, 2009. So is it typical that you are
11  given a referral and then a due date is specified
12  that you have to complete your review and have it
13  back by that date?
14    A    Yes.
15    Q    What would happen if you got this and
16  couldn't meet that due date for some reason, maybe
17  you are ill, maybe something has happened that would
18  prevent you from completing the review, what would
19  happen in that situation?
20    A    I don't know. I don't think it has ever
21  happened.
22    Q    Never happened to you, okay. If you look

Page 37

1  over into the right of that same line, see where it
2  says documents and under it it says view docs?
3     A    Yes.
4     Q    What does that refer to?
5     A    It refers to I think you click on the link
6  and all the documents that have been submitted come
7  up.
8     Q    And how about contact?
9     A    I don't know, I have never used it. I
10  assume it means contact the board but I don't know.
11    Q    So the next line down says results
12  submitted on July 24, 2009.
13    A    Yes.
14    Q    Is that accurate to the best of your
15  knowledge?
16    A    I would imagine.
17    Q    If you go over to the first page of your
18  actual letter, you have the date July 23, 2009. So
19  is it accurate to say that you had completed your
20  review and submitted your letter on that date?
21    A    Probably submitted it the next day if the
22  date on the letter is the 23rd.

10  (Pages 34 to 37)

RICHARD SPARKS - 12/16/2010

Page 38

1    Q    If you would go back to the cover page I
2  see where it says case review hours 3.5. Did you
3  write that in?
4    A    It appears on the screen and you just type
5  in the number.
6    Q    So other than this cover to your letter
7  and your letter, did you have any other contact or
8  communication of any sort, whether it was by phone,
9  e-mail, text messages, twitter, smoke signals with
10  NBME regarding Stephen Cockburn?
11   A    Not that I can recall.
12   Q    Is this the only letter that you have
13  written regarding Stephen Cockburn?
14   A    Yes.
15   Q    So if we go to page 1 of your letter, on
16  the first page you have listed all the materials you
17  reviewed in making your determination about whether
18  Stephen Cockburn qualified for accommodations. Is
19  this a complete list of everything that you
20  reviewed?
21   A    Yes.
22   Q    Did you have any other information

Page 39

1  whatsoever regarding Stephen Cockburn other than
2  what's listed here?
3    A    No.
4        (Deposition Exhibit P-3 was marked for
5  identification and was retained by counsel.)
6  BY MR. STEEDMAN:
7    Q    Now I have just handed you a document and
8  that is Stephen Cockburn's application to take the
9  USMLE. There are two packets of information there
10  and if you turn to the second one -- first let me
11  ask you, have you seen this previously?
12   A    I would imagine it was the application
13  that I was sent when I was sent the documents.
14   Q    Okay. Now that is a statement made by
15  Stephen Cockburn, is that accurate?
16   A    Yes.
17   Q    Do you recall reviewing that?
18   A    Yes.
19   Q    Do you know why this statement was sent?
20   A    I'm not sure I understand the question.
21   Q    Do you know why Stephen Cockburn wrote
22  this?

Page 40

1    A    In my experience, every applicant includes
2  a personal statement.
3    Q    It's part of the application process?
4    A    In my experience.
5    Q    That would be specifically for somebody
6  who is seeking accommodations; is that correct?
7    A    In the files that I have reviewed.
8    Q    Did this document give you any information
9  that Stephen's history of having a disability was
10  Stephen's history of having a disability?
11   A    Ask the question again.
12   Q    Sure. In reviewing this -- I'll
13  rephrase -- Stephen talks about some of the
14  experiences he has had and the difficulties he has
15  experienced in school. Was this valuable historical
16  information to you in determining whether Stephen
17  qualifies for a disability in need of
18  accommodations?
19   A    I'd say yes.
20   Q    Are you familiar with Dr. Zecker?
21   A    Yes.
22   Q    How do you know him?

Page 41

1    A    We see each other once a year at the NBME
2  consultants meeting.
3    Q    What consultants?
4    A    Via the consulting meeting that we have.
5    Q    Is that a meeting sponsored by NBME?
6    A    Yes.
7    Q    What happens at that meeting?
8    A    Basically we generally receive updates I
9  guess, if you will, on rules and regulations of the
10  ADA and how they apply to our work.
11   Q    Do you know how many consultants NBME has?
12   A    No, I don't know the number.
13   Q    So when you go to these meetings, is it a
14  small room or a large room?
15   A    Probably a conference room, probably twice
16  the size of this room.
17   Q    Would a fair estimate of the number of
18  consultant be maybe 20?
19   A    I don't know the number. Not everyone
20  comes of course.
21   Q    So this is not a required meeting that you
22  need to attend in order to --

11  (Pages 38 to 41)

RICHARD SPARKS - 12/16/2010

Page 42

1  A  Not to my knowledge.
2  Q  **Let me just finish my question. This is**
3  **not a required meeting in order to stay on NBME's**
4  **list of consultants?**
5  A  Not to my knowledge.
6  Q  **How long does the meeting typically last?**
7  A  One day.
8  Q  **Is it all day?**
9  A  9:00 to 4:00.
10 Q  **Do you pay your own travel expenses?**
11 A  No.
12 Q  **NBME pays your travel expenses?**
13 A  Yes.
14 Q  **So they pay for your airfare?**
15 A  Yes.
16 Q  **Hotel?**
17 A  Yes.
18 Q  **Do you rent a car?**
19 A  No.
20 Q  **Meals?**
21 A  Yes.
22 Q  **When they pay these expenses for you, do**

Page 43

1  **you fly first-class?**
2  A  No.
3  Q  **They are not that generous?**
4  A  No.
5  Q  **Where is the meeting?**
6  A  Philadelphia.
7  Q  **So when you see Dr. Zecker, do you discuss**
8  **any of the cases that you have reviewed?**
9  A  No.
10 Q  **Does he ever discuss any of the cases he**
11 **has reviewed with you?**
12 A  No.
13 Q  **Not even in general without mentioning an**
14 **individual's name?**
15 A  Not to my knowledge.
16 Q  **What do you do for lunch during this**
17 **conference?**
18 A  Provided by the board at their facility.
19 Q  **Do you all kind of sit in a dining room**
20 **together or conference room together and have lunch?**
21 A  Yes.
22 Q  **Is there a presentation going on or is**

Page 44

1  there time for all of you to just relax and talk
2  among yourselves?
3  A  Relax and talk.
4  Q  **Do you typically at that time talk to Dr.**
5  **Zecker?**
6  A  I have.
7  Q  **I mean is he one of the people that you**
8  tend to talk to more than say some of the other
9  consultants?
10 A  No.
11 Q  **When you have talked with him during these**
12 times where there is not a presentation going on,
13 what are the kinds of things that you guys talk
14 about?
15 A  Ice hockey.
16 Q  **So he's an ice hockey fan also?**
17 A  Yes.
18 Q  **Who does he root for?**
19 A  I'm not sure. I imagine the Blackhawks.
20 Q  **Who do you root for?**
21 A  The Red Wings.
22 Q  **Have you ever discussed Stephen Cockburn's**

Page 45

1  case with Dr. Zecker?
2  A  No.
3  Q  **Were you aware that Dr. Zecker also is a**
4  reviewer of this case?
5  A  Yes.
6  Q  **How did you become aware of that, that he**
7  was a reviewer?
8  A  I think -- I'm not sure. I think I may
9  have been told he was testifying after me but I
10 don't remember who -- I don't remember.
11 Q  **When was the last NBME consultants meeting**
12 that you attended?
13 A  Last year, first week of December maybe.
14 Q  **Is that when it's typically held, at the**
15 beginning of December?
16 A  End of the year usually.
17 Q  **And Dr. Zecker was there?**
18 A  I think so. I'm not sure.
19 Q  **Have you discussed your review of Stephen**
20 Cockburn's referral with anyone other than the
21 attorneys?
22 A  No.

12  (Pages 42 to 45)

RICHARD SPARKS - 12/16/2010

Page 46

1   Q   Have you ever discussed it with Dr.
2   Farmer, Katherine Farmer?
3   A   No.
4   Q   In terms of the attorneys, when did you
5   discuss it with the attorneys? When were you first
6   contacted that you may be a witness in this case?
7   A   Oh, that's two different questions. Why
8   don't you ask it again.
9   Q   All right. When were you first contacted
10  that you might be a witness in this case?
11  A   I believe I was alerted late October early
12  November that I might be a witness, have to give a
13  deposition.
14  Q   Who contacted you?
15  A   I think it was Suzanne Williams.
16  Q   Who is Suzanne Williams?
17  A   One of the attorneys for the board.
18  Q   Is she an attorney with this law firm or
19  is she an in-house counsel for --
20  A   The board, medical examination.
21  Q   Once she contacted you, what did she tell
22  you about this case?

Page 47

1        MS. MEW: I object to the question. You
2   are asking about privileged communications about the
3   case, communication between the attorney and the
4   witness.
5        MR. STEEDMAN: Your position is that
6   Dr. Sparks is an employee of NBME?
7        MS. MEW: No, but under the federal rules
8   as just amended, the communications between an
9   expert witness and counsel are covered under the
10  privilege protection provision.
11       MR. STEEDMAN: Okay. I'll just state for
12  the record I'm not accepting that as the objection.
13  I assume you are directing Dr. Sparks not to answer
14  the question.
15       MS. MEW: Yes.
16       MR. STEEDMAN: I will ask the court to
17  rule then on that.
18  BY MR. STEEDMAN:
19  Q   Let's go back to your letter. Turn if you
20  would to page 2 of your letter. At the top
21  paragraph you say based on the documentation that
22  Stephen does not meet the criteria for reading

Page 48

1   disorder or writing disorder, correct?
2   A   Correct.
3   Q   I think we have established that your
4   entire opinion was based on the documents that you
5   had listed on the first page of your letter,
6   correct?
7   A   I wrote my review based on all of that
8   evidence, yes, all of that documentation.
9   Q   Because there wasn't any communication
10  with anyone else outside?
11  A   Right.
12  Q   So you note in your report on the same
13  page that there was no evidence presented which
14  shows he exhibits severe problems with reading or
15  writing at any point in his elementary and secondary
16  education years. Do you see that, second paragraph,
17  second sentence?
18  A   I see it.
19  Q   You did not have any school record going
20  back to elementary school or middle school, did you?
21  A   No.
22  Q   That would have been helpful information

Page 49

1   to you in making the determination, correct?
2   A   Yes.
3   Q   Because history is an important part of
4   assessing whether or not someone has a disability?
5   A   Yes.
6   Q   When you say severe problems, can you
7   define that for me?
8   A   Below average performance.
9   Q   I also would ask you to define below
10  average performance. What does that mean?
11  A   What I look for are below average
12  standardized test scores and if I have school
13  records, I look for below average grades.
14  Q   When you say below average standardized
15  test scores, is there a particular range that you
16  are thinking of?
17  A   Yes.
18  Q   What would that be?
19  A   Below one standard deviation from the
20  mean.
21  Q   What percentile does one standard
22  deviation mean?

13  (Pages 46 to 49)

RICHARD SPARKS - 12/16/2010

Page 50

1    A    50 to 60 percent.
2         (Deposition Exhibit P-4 was marked for
3    identification and was retained by counsel.)
4    BY MR. STEEDMAN:
5    Q    I have just handed you a document the
6    title of which I believe is focus/concern.  Do you
7    see that?
8    A    Yes.
9    Q    Have you seen this document previously?
10   A    Yes.
11   Q    And you reviewed this as a part of the
12   packet of documents you received from the NBME?
13   A    When?
14   Q    When you were reviewing Stephen's file to
15   write your letter.
16   A    No, I did not have this document when I
17   did my initial review -- or my review I should say.
18   Q    When did you first see this document?
19   A    I can't give you an exact date but I'm
20   going to say two to three weeks ago.
21   Q    So you have had a chance to review this
22   document?

Page 51

1    A    Yes.
2    Q    Is there anything in this document that is
3    of value to you in assessing whether or not Stephen
4    Cockburn had a history of a disability?
5    A    Yes.
6    Q    What would you point to?
7    A    I would point to the CAT scores on page 2
8    and his grades on page 2.
9    Q    Sorry?
10   A    I just want to make sure I answer your
11   question completely here.  And in addition, the
12   comments that were made throughout the document.
13   Q    Let's start with the CAT scores on page 2.
14   Now the subtest, let's start with reading.  1990 had
15   a score of 60.  What does that mean?
16   A    It means that he was at the 60th
17   percentile.
18   Q    So these are percentiles?
19   A    Correct.
20   Q    Then in '91 he was at the 48th percentile.
21   A    Correct.
22   Q    And '92, 69th percentile.

Page 52

1    A    Correct.
2    Q    Any significance of these -- seems like he
3    had a significant drop from 1990 to 1991. Any
4    significance that you attach to that?
5    A    Not at all, nothing.
6    Q    So it's not relevant that he had a 12
7    point drop in the percentile from '90 to '91?
8    A    No.
9    Q    Is it because it's not statistically
10   significant?
11   A    I didn't run a statistical test on it, but
12   I would imagine it is not statistically significant.
13   Q    Is it also because both his scores are
14   still in the average range?
15   A    Yes.
16   Q    When we talk about percentiles, what is
17   the average range?
18   A    The average range?
19   Q    Yes.
20   A    Minus 1 to plus 1 standard deviation.
21   Q    What does that come out to?
22   A    So 15th or 16th, 84th, 85th.

Page 53

1    Q    So someone would have to be below the 16th
2    or 15th percentile in order for them to be below
3    average; is that correct?
4    A    Yes.
5    Q    And that average range you said from the
6    15th or 16th up to the 84th or 85th, what percentage
7    of the population falls within that average range?
8    A    If you take away 50 on this end and 50 on
9    that end, it would be about I guess 69 percent or
10   somewhere around there, 68 percent.
11   Q    When you are comparing an individual with
12   most people, are you saying that in order for them
13   to have significant difficulty with a task in
14   comparison to most people, are you looking at it in
15   terms of that person would have to be below the 15th
16   or 16th percentile, at or below?
17   A    You are going to have to be more precise
18   with the question.  It's much too broad.
19   Q    I'll come back to that.  So the CAT scores
20   you mentioned and there were other tests.  What were
21   the other tests that you mentioned?
22   A    I didn't mention other tests.  I mentioned

14  (Pages 50 to 53)

Page 54

1   his grades.
2       Q   So the grades for third, fourth, and
3   fifth, would you agree, appear to be for the most
4   part average?
5       A   They are average.
6       Q   Looks like music was his best subject.
7   Let's go to the first page. You said also the
8   comments you thought were relevant. What specific
9   comments did you think were of relevance?
10      A   It wasn't a specific comment. It was the
11  fact that as I read the comments I didn't see
12  reference to severe difficulties with reading.
13      Q   The purpose that's identified of this
14  screening was -- see where it says purpose?
15      A   Yes.
16      Q   -- to discuss with -- would you read that,
17  please?
18      A   "To discuss with mom Stephen's lack of
19  progress and to offer suggestions on ways to
20  improve."
21      Q   And then the next line, "comments on
22  conference," would you read that?

Page 55

1       A   "The mom felt she could take care of the
2   problem."
3       Q   So that was apparently in a parent
4   conference that took place on October 15, 1992. Do
5   you see that?
6       A   I don't see the date -- oh, there it is,
7   yes.
8       Q   And then there appears to be, if you look
9   down the letter, still looking at Roman I, letter B,
10  second contact attempt. Do you see that?
11      A   Yes.
12      Q   And the date there is December 15, 1993?
13      A   Yes.
14      Q   And you checked off school conference.
15  Could you read into the record what it says about
16  the purpose of that?
17      A   "To discuss with dad Stephen's lack of
18  follow through following the conference with mom."
19      Q   And then the next line?
20      A   "The homework sheet was going to be
21  enforced" and parens "according to the parent."
22      Q   To the left in the margin there do you see

Page 56

1   there is something handwritten in there?
2       A   Yes.
3       Q   Could you read that for the record?
4       A   "Several more conferences have taken
5   place."
6       Q   Do you attach any significance to the fact
7   that there had been -- we don't know how many
8   conferences but we know at least two and probably
9   more than two given that comment there -- any
10  significance to the fact that there had been several
11  conferences regarding Stephen and what appears to be
12  his difficulty in school?
13      A   Could you be more specific with regard to
14  significance?
15      Q   Say that again.
16      A   Be more specific with respect to
17  significance.
18      Q   You are asking me?
19      A   Yes.
20      Q   When you see something like that, does it
21  raise any concerns for you as someone who is a
22  trained educator?

Page 57

1       A   Only with his overall performance in
2   school. That would be it.
3       Q   So when you say overall performance, you
4   are referring to his grades?
5       A   Could be anything.
6       Q   What else would it be?
7       A   Behavior.
8       Q   Were there any indications of anything
9   that you have seen that Stephen was a behavior
10  problem?
11      A   Not a behavior problem.
12      Q   I mean if we look down towards the bottom
13  here, it has classroom observation, D. Morgan, it's
14  unclear as to the date but it looks like it might
15  have been January '93.
16      A   Perhaps.
17      Q   And he was observed in health class and
18  PE. Does that look right?
19      A   That's what it looks like.
20      Q   So under the student behaviors, could you
21  just read into the record which ones are checked?
22      A   Easily distracted, trouble finding place,

RICHARD SPARKS - 12/16/2010

Page 58

1  disorganized work habits, careless, doesn't complete
2  tasks, contributes to class discussion, short
3  attention span, neat appearance, daydreams.
4      Q    Do you know what grade Stephen was in at
5  this time?
6      A    What was this, '92?
7      Q    '93 I believe.
8      A    I'm not sure. I could guesstimate.
9      Q    I mean at the top it does say grade 6.
10     A    There it is, yes, grade 6.
11     Q    I guess it's the '92-'93 school year.
12     A    Yes.
13     Q    At the bottom it says additional comments
14  if any and I know that's hard to read but could you
15  try to read that into the record, please.
16     A    Looks like Stephen was constantly
17  distracted from the class by the artwork he was
18  drawing. His assignment was incomplete but he did
19  try to complete it while the class did the
20  assignment.
21     Q    So when you see comments like that based
22  on an observation, does it indicate anything to you

Page 59

1  with regard to whether this is a student who might
2  have a disability?
3      A    No.
4      Q    Does it raise any suspicions on your part
5  that there might be something going on with this
6  young man and that there should be further
7  evaluation or assessment?
8      A    If that's all I have, no.
9      Q    So if a parent came to you with this
10  information and saying that this is the feedback we
11  are getting from the school and you know this whole
12  thing -- I'll withdraw that question for the moment
13  so we can have a chance to look at the whole
14  document.
15          Here they have a list of intervention
16  strategies on the third page. Do you see where it
17  says that at Roman V at the top?
18     A    Yes.
19     Q    It identifies areas of concern, if you
20  could read that.
21     A    Areas of concern, lack of organization,
22  lack of focused attention.

Page 60

1      Q    So here it looks like they identified some
2  things that they tried, some interventions and you
3  know praise and attention was tried and the box
4  checked off no change. Does that indicate to you
5  that it didn't work?
6      A    Here we go. Yes. I would imagine if
7  there's no change.
8      Q    Also modified instruction, looks like they
9  checked out the box under erratic.
10     A    Yes.
11     Q    Do you know what that means?
12     A    Sometimes it works and sometimes it
13  doesn't perhaps.
14     Q    No. 3, it says modified environment and it
15  looks like they checked off no change. Do you know
16  what they did to modify his environment?
17     A    Not specifically.
18     Q    Further down it says he had a peer tutor?
19     A    Yes.
20     Q    And checked off is erratic. Any idea what
21  that refers to?
22     A    Perhaps the same as I said before,

Page 61

1  sometimes it works and sometimes it doesn't but I
2  don't really know what they meant.
3      Q    And then a change in curriculum and the
4  check is under erratic as well.
5      A    Yes.
6      Q    So we don't know to what extent --
7      A    No.
8      Q    Now towards the bottom -- this is where it
9  gets tricky -- it says after the use of the above
10  strategies does inappropriate behavior still appear
11  to interfere consistently and specifically with the
12  child's learning process, and they checked off yes.
13  Do you see that?
14     A    Yes.
15     Q    If yes, please comment on the following
16  and then the first one is duration of behavior. Are
17  you able to read what is handwritten in there?
18     A    It's very difficult. I can make out a few
19  words.
20     Q    Why don't you just read to us what you
21  can. I understand it's tough to read.
22     A    Looks like Stephen's good intentions of

16  (Pages 58 to 61)

RICHARD SPARKS -- 12/16/2010

Page 62

1  having his perhaps required assignments and then
2  from then on I really can't make out a word. Looks
3  like maybe the word usually is in there, materials
4  might be in there, but that's it.
5      **Q    Okay. How about where it says frequency**
6  **of behavior, can you make out any of the words**
7  **written there?**
8      A    Looks like consistently unprepared and
9  without the necessary tools maybe.
10     **Q    How about the next one, intensity of**
11 **behavior?**
12     A    I can see Stephen doesn't seem to
13 comprehend what is expected but rather that -- looks
14 like gotten maybe good at lying about what he has
15 quote forgotten to do. Parents have been I guess
16 appalled at some of the excuses he has given us for
17 not having his work.
18     **Q    Let's go to the next page, page 4. Under**
19 **comments if you could just read what's handwritten**
20 **there.**
21     A    Conference with parents, in parens it
22 looks like Mrs. Miller and I guess Hicks perhaps --

Page 63

1  suggest that parents may wish to pursue family
2  counseling.
3      **Q    Looking at just this information that we**
4  **have here -- actually let's look at the whole**
5  **document because we have two more pages. It looks**
6  **like there was an audiology referral. Do you see**
7  **that?**
8      A    Yes.
9      **Q    Do you know what the outcome of this was?**
10     A    I don't really have -- can't see it so I
11 don't know.
12     **Q    Let's go to the next page. Here we have**
13 **language arts. What would you assume when you look**
14 **at this as to who had completed this?**
15         MS. MEW: Object to form. Asking for
16 assumptions.
17     A    I would guess his teachers.
18     **Q    Based on your experience, is this the kind**
19 **of thing that a teacher would typically complete?**
20     A    Yes.
21     **Q    Next to passing tests, look like it says**
22 **yes; would you agree?**

Page 64

1      A    Yes.
2      **Q    Passing quizzes, no, correct?**
3      A    Yes.
4      **Q    How about completing class work?**
5      A    No.
6      **Q    Completing homework?**
7      A    No.
8      **Q    And then the comments?**
9      A    Often seems to be off task, unprepared and
10 daydreaming.
11     **Q    And math, looks like passing tests and**
12 **quizzes they have one comment for both. Do you know**
13 **what that says?**
14     A    Looks like only a few.
15     **Q    Completing class work?**
16     A    No.
17     **Q    Completing homework?**
18     A    No.
19     **Q    Then there is a bracket after both those**
20 **nos. Can you read what's there?**
21     A    Assignments are sometimes the wrong
22 assignment.

Page 65

1      **Q    How about the next one down, comments for**
2  **behavior?**
3      A    Off task, not prepared.
4      **Q    The next one, science, passing tests, if**
5  **you would read that.**
6      A    A few, he either does well or doesn't do
7  well at all.
8      **Q    And quizzes?**
9      A    Well, quizzes was no.
10     **Q    Completing class work and homework?**
11     A    No.
12     **Q    What is written there?**
13     A    Misplaces assignment, does not put name on
14 paper.
15     **Q    And comments for behavior?**
16     A    Not on task, daydreams, not something.
17     **Q    Does that look like "prepared" to you?**
18     A    Perhaps. Seems lost or confused. Seems
19 sick or like he doesn't feel well.
20     **Q    And the next one down, social studies,**
21 **passing tests and quizzes?**
22     A    Rarely, only one or two a quarter.

17  (Pages 62 to 65)

Page 66

1   **Q   Then completing class work and completing**
2   **homework?**
3   A   No.
4   **Q   And the bracket next to it?**
5   A   Many times assignment may be attempted but
6   not done in something -- or something.
7   **Q   Is the last word "manner"?**
8   A   Can't tell. Oh, the last word, yes,
9   manner.
10  **Q   Comment, behavior?**
11  A   Not on task, daydreams.
12  **Q   And health at the bottom, passing tests,**
13  **passing quizzes.**
14  A   No.
15  **Q   Completing class work.**
16  A   I have to stay on him and ask for it many
17  times.
18  **Q   That covers looks like the homework also.**
19  A   Yes, just continues.
20  **Q   Comments for behavior?**
21  A   Not on task, wants to pay attention to
22  other people.

Page 67

1   **Q   And the reason for referral, I know some**
2   **of that is cut off unfortunately in the copying but**
3   **if you could say what you can read.**
4   A   Stephen isn't meeting success I guess with
5   his work. He seems to be much more capable of
6   something his performance shows -- I guess than his
7   performance shows. He has a very difficult time
8   organizing his work and thoughts.
9   **Q   Thank you for your patience in going**
10  **through that. Would you agree that's a lot of**
11  **information about how he was performing at this**
12  **moment in time when he was in 6th grade?**
13  A   Yes.
14  **Q   If parents came to you with this document**
15  **and presented it to you and said do you think he**
16  **should be evaluated, do you think that there is**
17  **something going on for which we should evaluate him,**
18  **what would your response be?**
19  A   I would say if you want him evaluated,
20  I'll evaluate him.
21  **Q   If they said well, we are asking for your**
22  **recommendation not based on what we want but based**

Page 68

1   on what you think, is there something here that we
2   should be concerned about that we should have him
3   evaluated for?
4   A   I would honestly tell a parent that given
5   his academic performance that I see in the document
6   that you probably don't want an educational
7   evaluation because his performance is average, you
8   may want some other type of evaluation but you don't
9   want an education evaluation.
10  **Q   And if the parent said hypothetically what**
11  **type of evaluation would you recommend?**
12  A   I would say based here on what I see in
13  this document, that you probably want him to see a
14  child psychologist or have an evaluation related to
15  the behaviors that are described in the report.
16  **Q   Do these behaviors indicate anything to**
17  **you in terms of whether he might be ADHD?**
18  A   I'm not an expert in that so --
19  **Q   Okay. So you don't know even as an expert**
20  **in -- do you consider yourself an expert in the**
21  **field of education?**
22  A   Education, special education and

Page 69

1   education, yes.
2   **Q   So even as an expert in the field of**
3   **education or special education, you do not see**
4   **anything here that you would say gee, you should go**
5   **see somebody who is an expert in ADHD to determine**
6   **whether or not he might have ADHD?**
7   A   Well, that's why I would say child
8   psychologist.
9   **Q   The child psychologist could determine**
10  **whether or not and make a diagnosis of ADHD?**
11  A   They would be better able to do that, yes.
12  **Q   Let's go back to your letter. Well, let's**
13  take a break at this time.
14      (Off the record 10:30-10:35 a.m.)
15  BY MR. STEEDMAN:
16  **Q   Actually I meant to ask you one more**
17  **question having to do with your compensation. When**
18  **did you arrive for this deposition?**
19  A   Yesterday afternoon, early afternoon.
20  **Q   I didn't know whether it was yesterday or**
21  **this morning or a couple of days before. You said**
22  **that you are being paid $2,000 a day, so that would**

18  (Pages 66 to 69)

RICHARD SPARKS - 12/16/2010

| Page 70 |
|---|
| 1  be -- are you being paid for two days then, two full |
| 2  days? |
| 3      A    I don't think they pay me for a full day |
| 4  yesterday.  I'd have so look that up. |
| 5      Q    So they paid you for part of a day? |
| 6      A    Part of a day. |
| 7      Q    Plus expenses? |
| 8      A    Yes. |
| 9      Q    If you would turn to your letter, please. |
| 10     A    Okay. |
| 11     Q    Let's look at page 2 of your letter. |
| 12  Looking now at the section where it says Stephen did |
| 13  not receive accommodations for the 9th and 10th |
| 14  grades, why did you feel that that was significant? |
| 15     A    The evidence that I had or the |
| 16  documentation I should say that I had at the time |
| 17  appeared to me to indicate that he hadn't received |
| 18  accommodation in those grades, so it was important |
| 19  to me to determine what his performance was without |
| 20  accommodations. |
| 21     Q    If he had received accommodations during |
| 22  those two grades, would that have influenced you one |

| Page 71 |
|---|
| 1  way or the other as to whether he was an individual |
| 2  with a history of disability? |
| 3      A    No. |
| 4      Q    Further down you note that Stephen |
| 5  received a score in the average range on the reading |
| 6  section of the PSAT. |
| 7      A    Yes. |
| 8          (Deposition Exhibit P-5 was marked for |
| 9  identification and was attached to the transcript.) |
| 10  BY MR. STEEDMAN: |
| 11     Q    For the record, is this the document that |
| 12  you identified when you identified the scores in |
| 13  your letter here? |
| 14     A    It looks like it. |
| 15     Q    So if we look at this document, again the |
| 16  top of this document is called Ravenscroft School |
| 17  and it has the Ravenscroft School address and then |
| 18  college admissions test record; is that correct? |
| 19     A    Yes. |
| 20     Q    Stephen's name is listed.  Looks like the |
| 21  first set of scores is from the PSAT? |
| 22     A    Yes. |

| Page 72 |
|---|
| 1      Q    You note he was at the 44th percentile in |
| 2  the verbal section of the PSAT, correct? |
| 3      A    Correct. |
| 4      Q    What is that indicative of? |
| 5      A    He's in the average range. |
| 6      Q    On the writing section where it says |
| 7  writing skills, it says he was at the 6th |
| 8  percentile, you note that in your report as well. |
| 9      A    Yes. |
| 10     Q    What is that indicative of? |
| 11     A    Below average range. |
| 12     Q    How far below average would that be? |
| 13     A    Probably half a standard deviation. |
| 14     Q    Half a standard deviation? |
| 15     A    Below the below.  I'm going to say 1.5, |
| 16  1.6. |
| 17     Q    Below the mean? |
| 18     A    Below the mean, yes. |
| 19     Q    What would the standard deviations be? |
| 20     A    In percentile? |
| 21     Q    Yes. |
| 22     A    About second. |

| Page 73 |
|---|
| 1      Q    Keeping that same document, let's look at |
| 2  the ACT scores. |
| 3      A    Yes. |
| 4      Q    You note in your report that his composite |
| 5  score on the ACT was in the average range, 26th |
| 6  percentile.  I'm trying to figure out where that |
| 7  26th percentile came from. |
| 8      A    It's right below the composite score. |
| 9      Q    So that's -- hard to read -- like the |
| 10  total score in terms of percentile? |
| 11     A    Yes. |
| 12     Q    So Stephen was at the 26th percentile |
| 13  compared to the other people who took this test; is |
| 14  that correct? |
| 15     A    Yes. |
| 16     Q    When we say somebody is at a particular |
| 17  percentile such as this one, the 26th percentile, |
| 18  what specifically does that mean? |
| 19     A    He's compared to the people who took that |
| 20  particular test. |
| 21     Q    Does it mean he did better than 26 percent |
| 22  of the people that took that test? |

19  (Pages 70 to 73)

Page 74

1    A    25 percent.
2    Q    Better than 25 percent?
3    A    Yes.
4    Q    On the other hand, it would mean that 84
5    percent of the people did better than him -- sorry,
6    74 percent?
7    A    Yes.
8    Q    Now you say he achieved a stronger score
9    in the reading section when compared to a select
10   population on this measure. What did you mean by
11   select population?
12   A    ACT tests students who are college bound.
13   They don't test everyone.
14   Q    So if a student who is a poor student
15   having poor grades, would that person not be allowed
16   to take the ACT?
17   A    No.
18   Q    So it's basically anybody who wants to
19   take the ACT who fills out the application and pays
20   the fee, they can take it?
21   A    As far as I know.
22   Q    I was just trying to get clarification

Page 75

1    because you said ACT only evaluates people who are
2    college bound, but it may be someone who for all
3    intents and purposes based on their grades may not
4    look --
5    A    I should say generally who are college
6    bound.
7    Q    Okay. Then you looked at the SAT scores
8    and you compared those. You noted that he achieved
9    in the average range on both the verbal and math in
10   the March '98 administration of the test when
11   compared to a select population. So once again when
12   you say select population, are you referring to
13   college bound students?
14   A    Yes.
15   Q    In your experience, do you know to what
16   extent high schools encourage their students to take
17   the SATs?
18   A    No. It probably varies from high school
19   to high school would be my guess.
20   Q    So your statement in the report was that
21   490 and 440 are the average range test scores for
22   verbal and math respectively?

Page 76

1    A    Yes.
2    Q    What is the average range for verbal on
3    the SAT?
4    A    Good question. It varies a bit from year
5    to year. I don't know the exact range. It's
6    probably I'm going to guess around 400 to 600, maybe
7    a little bit lower than 400 and a little bit above
8    600.
9    Q    How about for math?
10   A    It would be similar.
11   Q    They are pretty much 400 to 600 --
12   A    It would vary but it's somewhere around
13   there. If I had a table in front of me, I could
14   come up with the numbers.
15   Q    So when Stephen took the test again in
16   November of '98 and March of '99, is it accurate to
17   state that he took it with accommodations?
18   A    To the best of my knowledge, he took it
19   with accommodations in November of '98 and March
20   of '99.
21   Q    That's what that asterisk means?
22   A    That I don't know without the complete

Page 77

1    record in front of me.
2    Q    I don't think you mentioned his SAT scores
3    on the second and third administration of the test
4    in your report, did you?
5    A    I don't believe I do note that.
6    Q    Is there a reason you didn't refer to
7    that?
8    A    Because he took them with accommodations.
9    Q    So in assessing whether or not he needs
10   accommodations, you don't take into account whether
11   a student previously received accommodations?
12   A    You are going to have to ask that a
13   different way. I'm not sure what you mean.
14   Q    When you are making a determination about
15   a request for accommodations, is it important or
16   does it factor in at all to your decision whether or
17   not a student had previously received accommodations
18   on a standardized test?
19   A    Not a determination of the disability.
20   Q    Okay. So if we turn to page 3 of your
21   report, you say he was not fully diagnosed with a
22   disability until he was 24 years old and you say

20   (Pages 74 to 77)

RICHARD SPARKS - 12/16/2010

Page 78

1  disabilities are typically identified in elementary
2  school, i.e., it is a developmental disability. So
3  if a student is not identified or if an individual
4  is not identified with having a disability in
5  elementary school, does that rule out a later
6  diagnosis of a disability?
7      A   No.
8      Q   Would it rule out a later diagnosis of
9  ADHD?
10     A   I won't speculate because I'm not an
11  expert in ADHD.
12     Q   So if a student is not identified in
13  elementary school with a learning disability yet
14  they do have in fact have a learning disability,
15  what would explain them not being diagnosed in
16  elementary school when as you note it's a
17  developmental disability?
18     A   Generally they don't have a substantial
19  limitation at that time.
20     Q   So would it be that they were not disabled
21  at that time?
22     A   I wouldn't say that. I would say they

Page 79

1  didn't meet whatever criteria were being used.
2      Q   So would you agree that it's possible for
3  somebody to not be diagnosed with a disability in
4  elementary school but be diagnosed say as an adult
5  and still have a substantial limitation in their
6  ability to perform say reading or something like
7  that?
8      A   Say it one more time.
9      Q   Okay. Someone who has not been diagnosed
10  prior to being an adult, is it still possible for
11  that person to be accurately diagnosed with a
12  learning disability in adulthood?
13     A   Not really in my experience. It happens
14  infrequently if ever.
15     Q   So not being diagnosed before adulthood is
16  in your opinion a rule-out for being -- not being
17  diagnosed as having a learning disability in
18  elementary years is a rule-out for being diagnosed
19  as an adult with a disability? When I say rule out,
20  meaning that it can't happen.
21     A   I don't want to say rule out. What I
22  would have to see in documentation would be evidence

Page 80

1  of a substantial limitation or meeting whatever
2  criteria were being utilized at the time for a
3  learning disability back in elementary school,
4  middle school, I would have to see that type of
5  evidence.
6      Q   What form would that type of evidence
7  take?
8      A   It would be primarily looking at the
9  things that we have already said, looking at a
10  student's history, their elementary school records,
11  especially standardized testing that had been
12  completed during that period of time.
13     Q   In terms of history, what would you have
14  to see in order -- I'm talking about somebody who
15  has not received a formal diagnosis of learning
16  disability -- what type of history would you have to
17  see for you to be convinced that that person had a
18  learning disability but maybe had not been
19  diagnosed?
20     A   I would like to see something like we
21  reviewed before, the focus in screening, and I would
22  want to see multiple references to severe problems

Page 81

1  with reading.
2      Q   Okay. Now have you ever taught in a
3  public school setting?
4      A   Yes.
5      Q   What did you teach?
6      A   Taught severe behavior disorders and kids
7  with -- although it wasn't called a learning
8  disability class, kids with learning disabilities.
9      Q   When was that?
10     A   '74 through '77.
11     Q   This was in a public school setting?
12     A   Public.
13     Q   Did these children have IEPs?
14     A   My last year of teaching was the first
15  year of the law. So in the first years there was no
16  formal but in my last year we had to write IEPs.
17     Q   I apologize, I didn't mean it to be a
18  trick question. I wasn't thinking about the date
19  when IEPs came online. Did any of these kids have
20  learning disabilities?
21     A   Some of them had been classified as having
22  a learning disability but their primary problem was

21  (Pages 78 to 81)

RICHARD SPARKS - 12/16/2010

Page 82

1  behavior, which is why they were in our program.
2  **Q    In your experience -- I know it goes back**
3  **a few years -- but talking about your teaching**
4  **experience, can you think of any kids who may have**
5  **had a learning disability that was not diagnosed?**
6  A    In my teaching?
7  **Q    Well, in your experience when you were**
8  **teaching, yes.**
9  A    No. I think the ones that had learning
10 disabilities had been diagnosed.
11 **Q    How about in the 30 years you have been an**
12 **educational consultant, have you ever encountered**
13 **anyone who probably should have been diagnosed with**
14 **a learning disability but had just gotten missed by**
15 **the school system?**
16 A    In the old days.
17 **Q    Can you define the old days for me?**
18 A    Pre I'd say 1980. After that probably
19 every now and then, but rare.
20 **Q    So since 1980 schools in your experience**
21 **typically do not miss kids who have learning**
22 **disabilities, they evaluate them and diagnose them?**

Page 83

1  A    I would say more often than not. I'm
2  certainly not going to say every because that would
3  be silly.
4  **Q    Sure. I'm just focusing on your**
5  **experience.**
6  A    Yes.
7  **Q    And again going back to your experience,**
8  **since say 1980, have there been any cases that you**
9  **can think of where you are doing an evaluation where**
10 **it looks to you like the school really missed this**
11 **kid, they have a learning disability that they**
12 **failed to diagnose?**
13 A    Yes, yes.
14 **Q    How many approximately?**
15 A    I have no idea. Not many.
16 **Q    Not many. Less than 10, more than 10?**
17 A    I have no idea. I am not even going to
18 speculate.
19 **Q    That would be a complete guess on your**
20 **part?**
21 A    Complete guess.
22 **Q    But it has happened.**

Page 84

1  A    It has happened.
2  **Q    And you don't know anything about the**
3  **elementary school that Stephen Cockburn attended?**
4  A    No.
5  **Q    When we talk about looking at the past,**
6  **someone who has not been diagnosed or maybe somebody**
7  **who has been diagnosed with a learning disability,**
8  **how important are the teacher comments with regard**
9  **to helping to make that diagnosis?**
10 A    Important but not overly so. What
11 teachers tend to do is describe behaviors that are
12 helpful.
13 **Q    What would be more important, standard**
14 **test scores?**
15 A    In determining a disability?
16 **Q    Yes.**
17 A    Yes.
18 **Q    And grades in the classroom?**
19 A    Grades are not used to determine a
20 disability. They are just part of the overall
21 picture.
22 **Q    So passing grades would not necessarily**

Page 85

1  **mean that a student does not have a learning**
2  **disability?**
3  A    Oh, no, no.
4  **Q    So the thing that you would look at most**
5  **intensively would be standardized test scores?**
6  A    Yes, to determine whether or not the
7  standardized test scores are consistent with the
8  history.
9  **Q    That's what you would give the greatest**
10 **weight to, the standardized test scores?**
11 A    In the determination of the disability.
12 **Q    Ever have a case where the standardized**
13 **test scores did not indicate to you the existence of**
14 **a disability but there was just overwhelming**
15 **evidence of another sort to you that indicated yes,**
16 **this person does have a disability?**
17 A    You need to be specific about disability.
18 **Q    Learning disability, say a reading**
19 **disorder.**
20 A    No.
21 **Q    Do you know whether Stephen ever had any**
22 **failing grades in his educational career?**

22  (Pages 82 to 85)

Page 86

1    A   I think there were two years, if I
2  remember correctly -- I can't remember if it was 6th
3  and 7th grade, I can't remember the years, where he
4  did seem to have some difficulty, yes.
5    Q   Now you note that he did have
6  accommodations in the 11th and 12th grades. Do you
7  know why he received accommodations during those two
8  years?
9    A   No.
10    Q   Are you aware whether Stephen received
11  accommodations in college and in medical school?
12    A   I understand that he has.
13    Q   That's not mentioned in your report. Is
14  there a reason you don't mention that in your
15  report?
16    A   It wasn't a part of determining whether he
17  had a disability.
18    Q   So the fact he was receiving
19  accommodations, he received them in college and in
20  medical school, that's not a diagnostic element that
21  you take into consideration?
22    A   No.

Page 87

1    Q   On page 3 in the second paragraph --
2    A   Yes.
3    Q   -- you talk about Dr. Filipowski's
4  evaluation of Stephen. I am going to hand you two
5  documents. One is an evaluation done by
6  Dr. Filipowski in 1998 of Stephen and the second one
7  is an evaluation done by Dr. Filipowski in 2005. We
8  will mark these.
9       (Plaintiff's Exhibits P-6 and P-7 were
10  marked for identification and were retained by
11  counsel.)
12  BY MR. STEEDMAN:
13    Q   Are you familiar with these two documents?
14    A   Yes.
15    Q   And you reviewed both of these
16  evaluations?
17    A   Yes.
18    Q   So you don't really make much mention of
19  the evaluation that was done in 1998, I don't see
20  much reference to it other than the fact you said in
21  the beginning it was one of the documents you
22  reviewed.

Page 88

1    A   No, on page 3 I make reference to it in
2  the first paragraph kind of in the middle.
3    Q   Oh, I'm sorry. Right. Looking at the
4  first paragraph, you noted that Dr. Filipowski in
5  his 2005 evaluation diagnosed Stephen with a reading
6  disability but not a writing disability. Will you
7  turn to the 2005 evaluation. If you will go to page
8  7 of that evaluation and the paragraph under summary
9  and recommendations, first paragraph.
10    A   Yes.
11    Q   If you could look down to two-thirds,
12  little over half away down, the sentence starting
13  with "in general, Stephen's academic achievement
14  measures were well below the level of expected given
15  his IQ scores..."
16    A   Yes.
17    Q   "...and using the standard discrepancy
18  formula he can be qualified for learning disabled in
19  the areas of reading and written language." How do
20  you in terms of your letter state that
21  Dr. Filipowski did not identify Stephen with a
22  writing disability?

Page 89

1    A   He didn't give him the diagnosis of
2  disorder of written expression, the DSM diagnosis.
3    Q   Because he only did it for the reading
4  disorder, that's the only one that in your opinion
5  should be considered?
6    A   If he doesn't give him a diagnosis, yes.
7    Q   Even though he says he can be qualified
8  for learning disabled in the areas of reading and
9  written language?
10    A   That's correct.
11    Q   If we look at the second paragraph on page
12  3 of your letter and there you are talking about the
13  2005 evaluation, you mentioned the aptitude
14  achievement discrepancy. Would you define what that
15  is?
16    A   Aptitude achievement discrepancy is
17  generally defined as a difference in test scores
18  between one's IQ and one's academic achievement on
19  standardized testing measures.
20    Q   Is it of any value diagnostically?
21    A   Diagnostically for --
22    Q   Of a learning disability.

RICHARD SPARKS - 12/16/2010

Page 90

1   A   No.
2   Q   So the difference between somebody's
3   cognitive ability and their achievement on an
4   educational assessment such as like a Woodcock Jones
5   is irrelevant?
6   A   For the diagnosis of the learning
7   disability.
8   Q   In the second paragraph, the diagnosis of
9   learning disability using this procedure has been
10  shown to be invalid, Stephen achieved in the average
11  range on timed standardized measures of reading when
12  he was compared to his age level peers, could you
13  tell me what standardized measures of reading you
14  are referring to?
15  A   All of the ones that are listed there with
16  the exception of I don't believe word attack has a
17  time limit, the word attack subtest. Reading
18  vocabulary, I'm not sure whether that has, that's
19  not a test that typically I give in my battery -- or
20  subtest I should say. But the rest of them all have
21  a time component.
22  Q   So the Woodcock-Johnson is an

Page 91

1   assessment -- the WJ-III is an assessment that you
2   generally give?
3   A   Yes.
4   Q   So the broad reading, that is a timed
5   test?
6   A   It is comprised of three subtests, all of
7   which are timed.
8   Q   Which are the three subtests?
9   A   Word identification, reading fluency, and
10  passage comprehension.
11  Q   How about the basic reading skills?
12  A   I believe basic reading skills is composed
13  of word ID and word attack, if I remember correctly.
14  So word ID would be timed, word attack is not.
15  Q   Word attack is not?
16  A   I don't believe word attack subtest is
17  timed. It's a subtest for the larger battery.
18  Q   And you mentioned the reading
19  comprehension cluster, I guess all of those are
20  referring --
21  A   Yes.
22  Q   Broad reading, basic reading skills,

Page 92

1   reading comprehension cluster. What comprises that
2   cluster?
3   A   I believe reading comprehension cluster is
4   comprised of reading vocabulary and passage
5   comprehension, although I don't want to say with 100
6   percent certainty but I believe that's true.
7   Q   I believe you said the reading vocabulary,
8   you are not sure whether that was timed.
9   A   Am not sure.
10  Q   How about passage comprehension, is that
11  timed?
12  A   Yes, it is.
13  Q   Now you state that Stephen achieved in the
14  average range of the Nelson-Denny reading
15  comprehension subtest and you said that the standard
16  score was -- you identified the standard score as
17  194 and total test standard score is 211.
18  A   Um-hmm.
19  Q   And in the above average range in the
20  vocabulary subtest in which the standard score was
21  227. Turn if you would to Dr. Filipowski's 2005
22  assessment and to the Nelson-Denny scores.

Page 93

1   A   Okay.
2   Q   Those are listed on page 5 of his report,
3   correct?
4   A   Correct.
5   Q   Help me understand this. On the reading
6   comprehension it says the percentile was 6th on Dr.
7   Filipowski's report.
8   A   Yes.
9   Q   I thought I understood you to say that the
10  average range only goes down to the 15th or 16th
11  percentile.
12  A   That's correct.
13  Q   So how is it he was in the average range
14  on reading comprehension for the Wilson Denny?
15  A   You are looking at two different scores.
16  Q   All right. Well, where did you get the
17  194?
18  A   What he did later, and I don't seem to
19  have that letter here --
20  Q   Addendum?
21  A   Yes.
22      (Deposition Exhibit P-8 was marked for

24  (Pages 90 to 93)

RICHARD SPARKS - 12/16/2010

Page 94

1  identification and was retained by counsel.)
2  BY MR. STEEDMAN:
3      Q     Looking at the addendum, P-8, the scaled
4  score of 194 on comprehension, that's in the average
5  range?
6      A    Yes, it is.
7      Q     Maybe you can explain this to me, how you
8  can have a score of comprehension in the 6th
9  percentile looking at the data that Dr. Filipowski
10  did in his 2008 report and yet be in the average
11  range for the scaled score. Isn't that scaled score
12  derived from the raw score?
13     A     The scale score is derived from the raw
14  score and the percentile rank is derived from the
15  raw score. But the scale score is comparing the
16  individual to one set of norms. The percentile
17  range is comparing the individual to another set of
18  norms. There are two different norm groups.
19     Q     Who is the percentile group compared to?
20     A     As I said in my report, those are grade
21  based percentile range. I believe he was being
22  compared at that time to students who had graduated

Page 95

1  from college or were in their senior year of
2  college.
3      Q     If we turn to page 4, starts out with the
4  problem of the testing report conducted by Dr.
5  Filipowski. Is that what you are referring to?
6      A    Yes.
7      Q     It says the use of grade based norm is
8  inappropriate for comparison purposes. What should
9  have been used?
10     A     What should be used -- to determine
11  whether the person has a substantial limitation
12  according to the average person's standard, you have
13  to use age based norms.
14     Q     The Nelson-Denny has age based norms?
15     A     I am not going to defend the Nelson-Denny.
16  The Nelson-Denny uses scaled scores that one uses to
17  compare everyone who took that test. You don't
18  compare someone when you are doing something
19  diagnostically to the grade based norms.
20     Q     So the scaled score is based on the
21  universe of individuals who take the Nelson-Denny,
22  whereas the percentile that Dr. Filipowski used was

Page 96

1  based on the individuals who were in their senior
2  year of college I believe?
3      A    Yes, or had graduated from college.
4      Q     Is that an accurate statement?
5      A     I don't know if I would use -- the only
6  reason I would hesitate to say yes -- I would say
7  yes to the grade based part of the question. The
8  other one I'm not sure. You would probably have to
9  ask the test authors about the universal question.
10  I'm not quite sure whether that's the right word.
11     Q     Help me understand it then. How does
12  someone get the scaled score on a Nelson-Denny, how
13  is that derived?
14     A     From the raw score.
15     Q     From the raw score?
16     A     Right.
17     Q     Is the raw score compared to the raw score
18  of other individuals of the same age to get the
19  scaled score?
20     A     I don't think so, but again the
21  Nelson-Denny is a very -- it's not a very good test.
22     Q     It's not a very good test?

Page 97

1      A     No. It's explained in the manual but it's
2  explained poorly.
3      Q     But it is a test that you use
4  diagnostically?
5      A     No, I don't use it diagnostically.
6      Q     How do you use it?
7      A     Screening.
8      Q     I am just trying to get a better
9  understanding of the scaled score, how we get this.
10     A     I understand.
11     Q     If you are trying to get a scaled score,
12  walk me through the steps you take once you have got
13  the raw score of the test. What steps do you then
14  take to get that scaled score?
15     A     I turn to page whatever of the manual and
16  look at the scaled score that corresponds to the raw
17  score and that's the scaled score.
18     Q     Does the scaled score -- is age factored
19  into it?
20     A     I don't want to answer because I don't
21  know.
22     Q     So would it mean that anybody getting a

Merrill LAD

RICHARD SPARKS - 12/16/2010

Page 98

1  raw score -- I think Dr. Filipowski said that he had
2  123 words per minute.
3     A   Yes.
4     Q   So does that mean that anybody who got 123
5  words per minute on the Nelson-Denny reading test
6  would have a scaled score of -- the scaled score
7  that Dr. Filipowski got?
8     A   Yes, the answer would be yes.
9     Q   Regardless of their age?
10    A   Yes.
11    Q   And what age range does the
12 Nelson-Denny -- is it known for?
13    A   I believe it goes down to 9th grade and up
14 to college graduates. There are some special for
15 law enforcement but I have never had occasion to use
16 it.
17    Q   So 9th grade could be as young as 13?
18    A   Probably 14.
19    Q   Okay, 14. Then up through adult, correct?
20    A   Yes.
21    Q   So a 14 year old who gets a raw score of
22 123 words per minute is going to have the same

Page 99

1  scaled score as a college senior who reads at 123
2  words per minute?
3     A   I believe so.
4     Q   At the bottom of page 3 and continuing on
5  page 4 you note Stephen achieved in the below
6  average range on the Nelson-Denny reading rate,
7  however his reading rate did not hinder his
8  performance on the vocabulary and comprehension
9  subtest, both of which are timed. You are sure both
10 of those are timed?
11    A   I know both of those are timed.
12    Q   You are basing that on the scaled scores,
13 that statement?
14    A   Yes.
15    Q   When you say -- is it ipsative?
16    A   Ipsative.
17    Q   -- analysis should not be conducted with
18 subtest scores nor should the results of subtest
19 analysis be used to make diagnostic decisions, you
20 are basically saying, if I understand, that don't
21 focus too much attention or place too much weight on
22 a couple of subtests; is that accurate?

Page 100

1     A   Saying you shouldn't.
2     Q   That you should not.
3     A   Should not.
4     Q   If you have consistent measures of an
5  individual reading at a rate that is below average
6  hypothetically, even if they were able to read words
7  such as speaking of word attack, but if they read at
8  a very slow rate consistently over a long period of
9  time, is that indicative of any type of reading
10 disability?
11    A   No, not by itself.
12    Q   So the reading slowly alone does not in
13 itself -- in and of itself indicate a reading
14 disability, it would have to be paired with what
15 else?
16    A   You would have to look at other measures
17 of reading, word identification, word attack and
18 reading comprehension.
19    Q   Now you noted that the reading fluency,
20 going back to the top of page 4, there was a
21 standard score of 80 which is more than a standard
22 deviation below the mean; is that correct?

Page 101

1     A   That's correct.
2     Q   Which means that was below average. Is
3  that standard score of 80 consistent with the
4  reading rate that was found on the Nelson-Denny?
5     A   The scaled score on the Nelson-Denny, the
6  scaled score?
7     Q   Let's set that aside for a second and I'll
8  ask that next.
9     A   Okay.
10    Q   But with regard to the rate, setting aside
11 the scaled score that Dr. Filipowski got for
12 Stephen.
13    A   I'm not sure what you are asking.
14    Q   He had 123 words per minute which Dr.
15 Filipowski said fell in the 2nd percentile when
16 compared to people who have graduated or are in the
17 senior year of college.
18    A   Sorry, are you asking me to compare 2nd
19 percentile to 80?
20    Q   Yes.
21    A   Is that what you are asking me to compare?
22    Q   Yes.

26  (Pages 98 to 101)

RICHARD SPARKS - 12/16/2010

Page 102

1    A   I am comparing apples and oranges. I
2    can't do that.
3    Q   The two are so far apart that you would
4    not be able --
5    A   That's not what I mean. Reading fluency
6    is based upon age peers, the score. The 2nd
7    percentile is based upon grade peers. I can't
8    compare an apple to an orange.
9    Q   I see. Do you know what grade level the
10   2nd percentile is on the Nelson-Denny?
11   A   I have no idea.
12   Q   If you look at page 5 of 2005, the
13   Filipowski evaluation, you see he does actually
14   identify -- well, he doesn't say for the reading,
15   does he, he says for vocab and comprehension? If
16   somebody has a verbal IQ of 127 and a reading rate
17   that's at the 2nd percentile and 9th percentile,
18   that wouldn't mean anything in your analysis,
19   correct?
20   A   No.
21   Q   Do you have any reason to question the
22   accuracy of the scores that Dr. Filipowski obtained

Page 103

1    when he assessed Stephen?
2    A   No. The only one I questioned was the
3    Nelson-Denny, as I said in my review.
4    Q   I mean do you know Dr. Filipowski?
5    A   No.
6    Q   Do you know his reputation?
7    A   No.
8    Q   Did you look up any information about him?
9    A   No.
10   Q   Do you have any reason to question his
11   integrity or his competence?
12   A   No.
13   Q   You note in the second paragraph of page 4
14   of your report, towards the bottom of that
15   paragraph, last sentence, you note that there's no
16   documentation relating to showing that Stephen was
17   having difficulty with the couple of jobs that he
18   had, one as a pharmacy technician and the other in a
19   contract position with a pharmaceutical company.
20   Did you have any information about his work history?
21   A   No.
22   Q   Or his work performance?

Page 104

1    A   No. I just noted there was no
2    documentation.
3    Q   When you receive these referrals from
4    NBME, do you ever ask for additional documentation
5    saying that you know I need more to make a final
6    determination?
7    A   I have once or twice.
8    Q   Do you recall under what circumstances you
9    asked for additional information?
10   A   No.
11   Q   Turning to Dr. Filipowski's 2005
12   evaluation of Stephen, would you just look at the
13   first page there.
14   A   Okay.
15   Q   I believe you have already testified that
16   the Wechsler Adult Intelligence Scale third edition
17   is not a test that you administer; is that correct?
18   A   That's correct.
19   Q   And you don't have any training on that
20   test?
21   A   No.
22   Q   But you do the Woodcock-Johnson?

Page 105

1    A   Yes.
2    Q   And the Wechsler Memory Scale, do you do
3    that one?
4    A   No.
5    Q   And you don't have any training on that?
6    A   Yes.
7    Q   You do use the Nelson-Denny reading test,
8    correct?
9    A   I have.
10   Q   How about the Connors Continuous
11   Performance Test second edition?
12   A   No.
13   Q   And you have no training in that?
14   A   No.
15      (Deposition Exhibit P-9 was marked for
16   identification and was retained by counsel.)
17   BY MR. STEEDMAN:
18   Q   I hand you another document, P-9. This is
19   the AMCAS application report 2007 entering class.
20   Do you see that?
21   A   Yes.
22   Q   Have you seen this document previously?

27 (Pages 102 to 105)

RICHARD SPARKS - 12/16/2010

Page 106

1     A   I can't recall. I may have but I can't
2   recall. I'd have to go back to my letter, I don't
3   know if I said that or not.
4     Q   It's a part of the application packet that
5   Stephen submitted --
6     A   I may have seen it. I saw a copy of his
7   AMCAS application report so it's likely this was a
8   part of it.
9     Q   If you look down to the bottom of the
10  table where it has the MCAT test scores, do you see
11  that?
12    A   Yes.
13    Q   Do you recall reviewing these test scores?
14    A   I remember seeing them, yes.
15    Q   Do you know the significance of the
16  scores?
17    A   Sorry?
18    Q   The significance. For example, if you go
19  over to the right side of the table where it says
20  total and you have the first one 24M, do you know
21  what that means?
22    A   24, if I'm interpreting correctly, the 24

Page 107

1   is the combination of the verbal plus physical plus
2   biological. The M indicates what he received on his
3   essay.
4     Q   Do you know whether that's a good score or
5   a bad score or a mediocre score?
6     A   Not without the percentile chart in front
7   of me, I can't say.
8     Q   Do you know how the MCAT test is used by
9   medical schools?
10    A   They are simply required to get into
11  medical school.
12    Q   You'll note that if you look at the test
13  dates on the left side of the table, there are four
14  dates listed, the most recent being April 2006, the
15  earliest was April 2003, then August of 2003, then
16  August of 2004, and then, as I said, the most recent
17  April 2006. His total score, if we go over to that
18  right side of the table again, went 14, then 16, 14,
19  then 24. Do you have any understanding of what may
20  have led to Stephen improving his score from a 14 in
21  August of 2004 to a 24 in April 2006?
22    A   My recollection is that he took the test

Page 108

1   the first three times without accommodations and the
2   fourth time with.
3     Q   Based on your experience as an expert in
4   education, special education I guess and other areas
5   as well -- we'll get to that in a moment -- do you
6   have an opinion as to whether or not the
7   accommodations accounted for the change in that
8   score?
9     A   The only thing I would say would be the
10  first three times when he took it without
11  accommodations the scores were very consistent. The
12  fourth time it was not consistent, so my guess would
13  be that it probably had something to do with it.
14    Q   Are you aware of any research that has
15  been conducted that studies the effect of extended
16  time on standardized test comparing learning
17  disabled students to nondisabled students?
18    A   I read those reports from time to time.
19  I'm not an expert on them, no.
20    Q   Do you recall whether the reports indicate
21  one way or the other whether extended time has any
22  more beneficial impact for learning disabled

Page 109

1   students as compared to say nondisabled students who
2   get the same extended time?
3     A   That's not what I read in the literature.
4     Q   What do you read in the literature?
5     A   That all students benefit from extended
6   time.
7     Q   Do they benefit equally?
8     A   In some studies they have. In others they
9   haven't.
10        (Deposition Exhibit P-10 was marked for
11  identification and was retained by counsel.)
12  BY MR. STEEDMAN:
13    Q   Have you seen this document previously?
14    A   Yes.
15    Q   Would you just identify that document for
16  the record, please.
17    A   Just what it is?
18    Q   Yes.
19    A   I believe it's the letter from Dr. Farmer
20  on NBME letterhead to Stephen.
21    Q   When you say you have seen it previously,
22  when did you see it?

28   (Pages 106 to 109)

RICHARD SPARKS - 12/16/2010

Page 110

1  A   When I received the updated file, two,
2  three weeks ago.
3  Q   Was this a file you received from the NBME
4  attorneys?
5  A   Yes, I believe.
6  Q   Is that letter consistent with your
7  findings and recommendations based on your review of
8  Stephen's application for accommodations?
9  A   Yes.
10  Q   Did Dr. Farmer talk with you at all about
11  this letter before she sent it?
12  A   No.
13  Q   And the first time you saw it you said was
14  just a few weeks ago?
15  A   Yes.
16      (Deposition Exhibit P-11 was marked for
17  identification and was retained by counsel.)
18  BY MR. STEEDMAN:
19  Q   I hand you what we have marked exhibit 11.
20  Have you seen this previously?
21  A   Yes.
22  Q   Would you identify the document, please.

Page 111

1  A   Looks like a letter from your law firm to
2  Cathy Farmer at NBME.
3  Q   Have you reviewed this letter?
4  A   Yes.
5  Q   Was any of that new information for you?
6  A   The only things in there that were new
7  were things that I had not reviewed -- seen in my
8  first review of the documentation. So anything that
9  I had not seen in my first review would have been
10  new.
11  Q   So there was reference in that letter to
12  Stephen's elementary school record, his middle
13  school record, which you had not seen previously?
14  A   Correct.
15  Q   Did that have any influence on you one way
16  or another regarding your opinion on whether Stephen
17  qualified for accommodations?
18  A   No.
19  Q   There was also another evaluation that was
20  referenced that you had not seen because it was done
21  after you did your review. That was a
22  neuropsychological evaluation done by Dr. Culotta.

Page 112

1  First let me ask you have you seen that evaluation.
2  A   Yes.
3  Q   Was there anything contained in that
4  evaluation that has influenced your opinion in this
5  case?
6  A   No.
7  Q   Is there any reason that you can think of
8  that Stephen Cockburn could not be a successful
9  physician if he graduates from medical school?
10  A   I would have no idea.
11  Q   So would your answer be no, you cannot
12  think of any reason?
13  A   No.
14  Q   Is there any reason that you can think of
15  that he could not graduate from med school?
16  A   Again I would have no idea.
17  Q   So the answer to that would be no?
18  A   I guess.
19  Q   Who are the premier researchers in the
20  field of learning disabilities?
21  A   Depends on the --
22  Q   The area?

Page 113

1  A   -- the area.
2  Q   What about reading?
3  A   Reading, Keith Stanovich, Linda Siegel,
4  Keith Rayner, Charles Perfetti. I'm blanking on his
5  name and I don't know why, I shouldn't be -- I'll
6  say Barbara Foorman, F-o-o-r-m-a-n, and her
7  colleague whose name is escaping me, I don't know
8  why. Those would be a lot of the biggies. I mean
9  there's dozens of them. Those are some of the
10  biggies.
11  Q   Is Sally Chavitz one of them?
12  A   Yes, I guess.
13  Q   Do you know what is the intended purpose
14  of the USMLE step 1?
15  A   Not specifically. I think it's a general
16  medical knowledge but not specifically.
17  Q   So your understanding is that it is to
18  test the individual's medical knowledge, what they
19  have been able to attain through their first two
20  years of medical school?
21  A   Yes. Again I don't want to be specific
22  but yes, I think it's just general medical

29  (Pages 110 to 113)

RICHARD SPARKS - 12/16/2010

Page 114

1  knowledge.
2     Q    Do you know how that test is used?
3     A    No.
4     Q    Are you a reviewer for any other testing
5  services?
6     A    No.
7     Q    In the case where you were deposed
8  relating to NBME denial for accommodations, was it
9  your position that the individual was not entitled
10 to accommodations?
11    A    Yes.
12    Q    Was it your position that the person was
13 not disabled?
14    A    Yes.
15    Q    Have you testified in any other cases
16 involving requests for accommodations that did not
17 involve NBME?
18    A    I have testified in other cases. I don't
19 know if it was specifically related -- it was
20 tangentially related to accommodations, but not
21 specifically about accommodations.
22    Q    Can you tell me which side you testified

Page 115

1  on behalf of?
2     A    I was an expert witness for Boston
3  University in the Gutenberg case.
4     Q    What was the nature of your testimony?
5     A    Mine was specifically related to my
6  research in second languages.
7     Q    Did you testify that the individual who
8  was seeking accommodations was not entitled --
9     A    Well, it wasn't, it was not related to
10 seeking accommodations.
11    Q    What was that related to?
12    A    My testimony was specifically related to
13 evidence as to whether individuals with learning
14 disabilities could or could not pass foreign
15 language courses and fulfill the foreign language
16 requirement.
17    Q    What was your general position on that?
18    A    My research indicates that they can.
19    Q    Which of the specific DSM-IV criteria for
20 reading disorder does Stephen Cockburn not meet?
21    A    His meeting criterion A varies depending
22 on the evaluation, and he does not meet criterion B.

Page 116

1     Q    Is it your position that Stephen Cockburn
2  can finish the USMLE step 1 under standardized
3  testing conditions?
4     A    I have no idea.
5     Q    Do you have an opinion as to whether he
6  would be able to complete the USMLE step 1 exam if
7  he were to be given 50 percent additional time?
8     A    I have no idea.
9     Q    Do you know of any reason why he could not
10 finish under the standard time USMLE?
11    A    Again I have no idea.
12    Q    Would your answer be the same again if he
13 was given extended time of 50 percent?
14    A    Yes, I have no idea. I wouldn't know.
15    Q    Have you ever met Stephen Cockburn?
16    A    No, I have not.
17    Q    Ever talk to him on the phone?
18    A    No.
19    Q    Ever communicated with him in any way?
20    A    No.
21    Q    E-mail, letters?
22    A    No.

Page 117

1     Q    You have never observed him taking a test
2  or in a classroom?
3     A    No.
4     Q    Talk to any of his teachers?
5     A    No.
6     Q    No communications with any of his
7  teachers?
8     A    No.
9     Q    I assume you have never talked to his
10 parents; is that correct?
11    A    No.
12    Q    Or had any other types of communications
13 with his parents?
14    A    No.
15    Q    Have you had any communications with
16 anyone else who knows or has had contact with
17 Stephen Cockburn?
18    A    No.
19    Q    So it's fair to say that your opinion is
20 based entirely on a review of the evidence that was
21 given to you to review by NBME; is that correct?
22    A    Yes.

30  (Pages 114 to 117)

RICHARD SPARKS - 12/16/2010

Page 118

1    **Q     Is it fair to say you have actually no**
2    **direct knowledge of Stephen Cockburn?**
3        A    Only through the documentation.
4    **Q     What does it say in terms of best**
5    **practices when we are talking about evaluating a**
6    **student for a learning disability with regard to is**
7    **it best practice to be able to diagnose somebody**
8    **without ever having laid eyes on them?**
9        A    I don't know if it's best practices but it
10   can be done.
11   **Q     You do it frequently?**
12       A    Yes.
13   **Q     Somewhere on the order of 80 to 100 times**
14   **as year, correct?**
15       A    Yes.
16   **Q     How about when you work for the Ohio**
17   **commission, you actually see the individual then; is**
18   **that correct?**
19       A    In most cases. Every now and then they
20   will ask me to review a file.
21   **Q     When they ask you to review a file, are**
22   **they asking you to do that without ever seeing the**

Page 119

1    **individual yourself?**
2        A    Yes.
3    **Q     Is there any information that you did not**
4    **have when you did your assessment of Stephen**
5    **Cockburn's request for accommodations that you would**
6    **like to have had?**
7        A    We are talking about my first review,
8    not --
9    **Q     Yes.**
10       A    I would have liked to have had the school
11   records.
12   **Q     Anything else?**
13       A    Well, anything else that was included in
14   that. There was a form, I think it was adult intake
15   form, and there was a form that Stephen had filled
16   out, several pages I believe, for Dr. Filipowski
17   where it was like a questionnaire. It would have
18   been nice to have that too.
19   **Q     Anything else?**
20       A    No, that's probably it.
21   **Q     So at what age or grade would a child have**
22   **to be identified as having a learning disability in**

Page 120

1    **order for you to conclude that that child has had a**
2    **history of learning disabilities?**
3        A    Early on in school, primary, certainly by
4    middle school, but primary years are when reading
5    disabilities present themselves in most cases, yes.
6    **Q     Now do you believe that people with**
7    **disabilities are often discriminated against?**
8        A    When I was growing up, yes. Now, often,
9    no, not nearly as often as when I was growing up.
10   I'm an old man.
11   **Q     So today you don't see disabilities as**
12   **being an area in which people with disabilities are**
13   **say not employed because of their disability?**
14       A    Yes, they are but not as frequently.
15   **Q     How about in college admissions, do you**
16   **know anything about that?**
17       A    Ask your --
18   **Q     Whether there is any discrimination**
19   **against people with disabilities when it comes to**
20   **college admission.**
21       A    Not for my college.
22   **Q     Have you read any research or studies on**

Page 121

1    **that, talking about college admissions?**
2        A    Oh, I have seen some research on it but
3    it's not necessarily related to discrimination in
4    acceptance to college.
5    **Q     What research have you read?**
6        A    Just simply what's put out in journals
7    like College Personnel and Journal of Learning
8    Disabilities, and every now and then I'll get an
9    article to review, but I don't read very much of
10   that research, it's not something that I look at on
11   an ongoing basis.
12   **Q     What is the most reliable indicator of a**
13   **reading disorder?**
14       A    Standardized testing measures of primarily
15   chronological processing and that indicates severe
16   deficits in word recognition and decoding which then
17   causes difficulties in reading comprehension.
18   **Q     If an individual hypothetically has slow**
19   **reading that they fall let's say around the 2nd**
20   **percentile when it comes to reading fluency, reading**
21   **speed, that that would not qualify that individual**
22   **as someone with a disability in reading?**

31  (Pages 118 to 121)

RICHARD SPARKS - 12/16/2010

Page 122

1   A   That score alone? Ask the question again
2   so I can answer the right question.
3   Q   That score alone, if they were very slow
4   in reading, in the 2nd percentile, between the
5   second and 10th percentile, when it comes to reading
6   speed, reading fluency, that alone would that
7   constitute a disability in reading?
8   A   No.
9   Q   And because of that that person would not
10  be entitled to accommodations because they are not
11  disabled under your definition?
12  A   They wouldn't have a substantial
13  limitation in reading, that's correct.
14  Q   So do you know what areas that you are
15  going to be qualified as an expert in this
16  proceeding if it goes to trial?
17  A   I have no idea.
18  Q   You have already said you are an expert in
19  special education, correct?
20  A   Correct.
21  Q   Are you an expert in learning
22  disabilities?

Page 123

1   A   Yes.
2   Q   Are you an expert in educational testing?
3   A   Yes.
4   Q   But not in psychological testing?
5   A   No.
6   Q   And you are not knowledgeable about
7   neuropsychology?
8   A   Neuropsychological testing? No.
9   Q   How did you go about preparing for this
10  deposition today?
11  A   Read the file that was sent to me, reread
12  my review and talked with the law firm here,
13  Fulbright.
14  Q   Okay.  Are there any documents that you
15  reviewed that were not identified in your letter of
16  documents reviewed as well as what I gave you here
17  today, are there any other documents that you
18  reviewed that we have not discussed today?
19  A   Well, we haven't discussed everything that
20  was sent to me by the board, but that's what I
21  reviewed.
22  Q   Okay.

Page 124

1   A   I didn't go outside and seek anything, no.
2   Q   So can you identify for me what other
3   documents you reviewed that we have not --
4   A   I don't have the file in front of me.
5   Some of the things that you have given to me today,
6   the letter from NBME to Stephen, the new testing
7   that had been completed by --
8   Q   Dr. Culotta?
9   A   Yes, Culotta -- the school records that we
10  referred to and that included the focus of
11  screening.  Oh, and your letter.
12  Q   So did you review Stephen's grades from --
13  well, teacher reports from the elementary school?
14  A   The ones that were included in the file.
15  Q   And his grade reports from middle school?
16  A   Yes.
17  Q   You did review Dr. Culotta's
18  neuropsychological evaluation; is that correct?
19  A   Yes.
20      (Deposition Exhibit P-12 was marked for
21  identification and was retained by counsel.)
22  BY MR. STEEDMAN:

Page 125

1   Q   Does this appear to be to the extent you
2   can determine an accurate copy of the
3   neuropsychological evaluation that you reviewed?
4   A   It appears to be.
5   Q   Let's look on the first page and see where
6   it says diagnostic formulation.  You have already
7   said that you are not an expert in ADHD, so are you
8   able to give an opinion one way or the other whether
9   you agree -- actually tell me whether or not you
10  agree with that diagnosis.
11  A   I have no idea.
12  Q   But the next one, reading disorder, do you
13  agree or disagree with that diagnosis?
14  A   I disagree with that diagnosis.
15  Q   Looking at the procedures that are listed
16  above the diagnostic formulation, can you just
17  identify for me which assessments that you are
18  trained and knowledgeable of?  When I say
19  knowledgeable, I don't mean just that you have seen
20  the name before but that you have actually
21  administered it and trained on it.
22  A   Woodcock-Johnson III test of achievement,

32  (Pages 122 to 125)

Page 126

1  Nelson-Denny. No other tests.
2      MS. MEW: I'm going to object after the
3  fact. You asked two questions, procedures trained
4  and trained in and procedures knowledgeable of.
5      Q   Is there a difference in your opinion in
6  being knowledgeable and being trained in?
7      A   Sure.
8      Q   What is your --
9      A   Training means you went to school and
10 received postgraduate training. Knowledgeable means
11 that you know of the test, you know what it tests,
12 you know how it tests, you may even be able to give
13 the test because it doesn't require specific
14 training.
15     Q   So other than the three you identified --
16 I think you identified Woodcock-Johnson,
17 Nelson-Denny -- actually it was just those two,
18 correct?
19     A   Just those two.
20     Q   Other than those two, are you
21 knowledgeable of any of the others?
22     A   The WAIS of course, WAIS-IV. No.

Page 127

1      Q   Okay. The WAIS, tell me the basis of your
2  knowledge of the WAIS.
3      A   It has been given to numerous clients whom
4  I have tested. It has been given by associates of
5  mine in my practice. It's very similar to the
6  WAIS-III and the WAIS-IV. So I know the subtests
7  and what they do and what they measure and how they
8  are scored.
9      Q   You have never administered it yourself?
10     A   No.
11     Q   Is that because you are required to have
12 some specific training or licensure in order to
13 administer the WAIS in Ohio?
14     A   The way I understand it, it's licensure.
15     Q   In reviewing this report, let me first ask
16 you is there any part of the report with which you
17 disagree?
18     A   The diagnosis and the Nelson-Denny, parts
19 of the Nelson-Denny interpretation, but we have
20 already covered that.
21     Q   Anything else?
22     A   No.

Page 128

1      Q   Do you have any reason to question the
2  accuracy of the test scores that Dr. Culotta and Ms.
3  Paresky (ph), who also signed off on this, obtained
4  in their evaluation of Stephen?
5      A   Well, on the Nelson-Denny, obviously the
6  percentile ranks are accurate based on the grade
7  percentiles. The SS on the bottom of page 12 at 75
8  should be a 175. And the SSEs, I don't know where
9  he obtained those.
10     Q   Do you know what the SSE stands for?
11     A   I imagine standard score equivalent.
12     Q   Looking at the standard score equivalents,
13 are they all below average?
14     A   Yes, they are, based on the percentile
15 ranks.
16     Q   And your criticism of the interpretation,
17 Dr. Culotta's interpretation of the Nelson-Denny, is
18 that he based his scores on norms of individuals who
19 are either seniors or college graduates --
20     A   Grade based.
21     Q   -- as opposed to -- I am still trying to
22 figure out what to call them, what do you call them?

Page 129

1      A   The scaled scores.
2      Q   The scaled scores, okay. If you look at
3  page 11 of the report, Dr. Culotta's report,
4  basically the second table down where it says
5  subtest scores the reading fluency.
6      A   Yes.
7      Q   SS, does that stand for standard score?
8      A   Yes.
9      Q   And the next column over is percentiles,
10 correct?
11     A   Yes.
12     Q   So that's a 12?
13     A   Yes.
14     Q   What does AE stand for?
15     A   Age equivalents.
16     Q   So that 10:6, what does that mean?
17     A   10 years and 6 months.
18     Q   And the GE, what does that mean?
19     A   Grade equivalent.
20     Q   And 5.1 would mean what?
21     A   5th grade first month.
22     Q   So reading fluency for Mr. Cockburn at the

33  (Pages 126 to 129)

RICHARD SPARKS – 12/16/2010

Page 130

1 time this test was administered would you agree was
2 below average based -- even comparing to the general
3 population?
4    A    It's below average based on his score,
5 yes.
6    Q    And at the time that he took this
7 evaluation he was in his second year of medical
8 school?
9    A    I think.
10   Q    If you look at the first page, I don't
11 want to mislead you.
12   A    Yes, second year.
13   Q    So second year of medical school and his
14 reading fluency is at the 5th grade equivalent or
15 5.1 grade equivalent, correct?
16   A    According to this test.
17   Q    And an age equivalent of 10 years, 6
18 months old?
19   A    According to this test.
20   Q    And you do not consider that a significant
21 disability?
22   A    I pay no attention to age and grade

Page 131

1 equivalents because they are not used for diagnostic
2 purposes.
3    Q    What are they used for?
4    A    To show what the average person who takes
5 the test is performing like the average student --
6 sorry, that a person who takes the test is
7 performing like the average person in the 5th grade
8 or in this case at the 10-1/2 year. They are not
9 used for diagnosis.
10   Q    So in summary, looking at Dr. Culotta's
11 report, the only areas that you disagree with are
12 his diagnosis of a reading disorder, correct?
13   A    Correct.
14   Q    His interpretation of the Nelson-Denny and
15 reliance on grade based norms as opposed to scaled
16 scores, correct?
17   A    Yes, and the SSEs.
18   Q    And the SSEs, okay. What is your
19 disagreement with that?
20   A    I don't know where he got them.
21   Q    Okay.
22   A    They are not to my knowledge in the test

Page 132

1 packet.
2    Q    And that's it then?
3    A    Well, I don't have any expertise in the
4 other tests so I can't agree or disagree.
5    Q    And you are not a neuropsychologist?
6    A    No.
7    Q    And you are not trained in the field of
8 neuropsychology?
9    A    No.
10   Q    So in terms of even evaluating this test
11 and saying whether or not it provides conclusive
12 evidence of a learning disability, would you say
13 that you are not qualified to do that?
14   A    You'll have to restate that question.
15   Q    Okay. Well, are you qualified to review a
16 neuropsychological evaluation and determine whether
17 or not it provides accurate valid information
18 that -- let me try again. Are you qualified to
19 review a neuropsychological evaluation?
20   A    Yes, if it includes achievement testing.
21   Q    But if the findings are based on a whole
22 battery of assessments with which you are not

Page 133

1 familiar, does that impact your qualification to
2 render an opinion as to the accuracy of the tests?
3    A    Not in relation to reading disorder it
4 doesn't.
5    Q    You don't think any of these additional
6 assessments have anything to do with reading
7 disorder?
8    A    Well, I can say anything but no, they are
9 not used to diagnose a reading disorder, no.
10        MR. STEEDMAN: I think that's all I have.
11 Thank you, Dr. Sparks.
12        THE WITNESS: Thank you.
13        MR. STEEDMAN: We managed to get you out
14 of here in time to get your flight.
15        MS. MEW: I do want to go back to the
16 instruction I gave you earlier not to testify to
17 your discussions with NBME's counsel. I will
18 qualify that if you want to ask him additional
19 questions, you certainly may. You may testify to
20 facts and information that were given to you and
21 upon which you based your opinion. So if you would
22 like to go back and ask your questions.

34 (Pages 130 to 133)

RICHARD SPARKS - 12/16/2010

Page 134

1  BY MR. STEEDMAN:
2    Q   Dr. Sparks, when the attorney from NBME
3  contacted you -- can you remind me of her name?
4    A   Suzanne Williams.
5    Q   When she contacted you about this case,
6  did she tell you anything about why this case was
7  being filed?
8    A   Is that okay (to Ms. Mew)?
9        MS. MEW:  Just for the record, I'll repeat
10  my instruction to you.  I'm instructing you not to
11  respond to the extent that you would reveal mental
12  impressions of Ms. Williams anything other than
13  facts and information that you relied upon in
14  forming your opinion in the case.
15       THE WITNESS:  Okay.  No.
16  BY MR. STEEDMAN:
17    Q   Did she tell you that Dr. Zecker had also
18  done a review of Stephen's request for
19  accommodations?
20    A   Again I can't remember whether it was her
21  or whether I learned it through (indicating Ms.
22  Mew).  I can't remember.

Page 135

1    Q   Are you aware that NBME has offered
2  Stephen 50 percent additional time when taking the
3  USMLE step 1?
4    A   No.
5    Q   Is it your position that even though NBME
6  has made that offer, Stephen remains not entitled to
7  it?
8    A   He doesn't meet -- he doesn't have a
9  substantial limitation nor does he meet the
10  criteria, no, he does not.
11       MS. STEEDMAN:  That's all I have.
12       MS. MEW:  If you will give me just a
13  minute, I want you to make your flight too, but I
14  may have a few questions.
15       (Discussion off the record.)
16       EXAMINATION BY COUNSEL FOR DEFENDANTS
17  BY MS. MEW:
18    Q   I just have a couple of questions on
19  redirect.  We looked previously at Mr. Cockburn's
20  MCAT scores and Mr. Steedman noted an improvement in
21  scores over a two-year period.  Do you remember the
22  document or would you like to take it back out

Page 136

1  again?
2    A   I'll see it just in case you have a
3  question about it.
4    Q   Here it is.
5    A   Okay.
6    Q   Again is it correct that there's about a
7  two-year timespan between the August 2004 scores and
8  the April 2006 scores?
9    A   Close --
10       MR. STEEDMAN:  Objection, leading and the
11  document speaks for itself.
12    Q   Do you know one way or the other,
13  Dr. Sparks, what, if anything, Mr. Cockburn did to
14  prepare for the MCAT in that two-year period?
15    A   I don't recall reading anything.
16    Q   So you do not know if there are any other
17  factors that may have influenced the increase in
18  scores separate and apart from having
19  accommodations?
20    A   I don't recall anything.
21    Q   But you do not know one way or the other;
22  is that correct?

Page 137

1    A   I don't know one way or the other.
2    Q   I just want to clarify.  You were asked
3  earlier whether new information that you reviewed
4  such as the earlier grade report, teacher report,
5  had any influence on your opinion in this matter and
6  I just want to clarify because I think your response
7  is no, no influence.  Having reviewed those
8  materials, are they consistent with the opinions
9  that you have already formed in this matter as
10  expressed in your letter to Cathy Farmer?
11    A   Yes.
12    Q   Are you prepared to testify at trial with
13  regard to that information?
14    A   Yes.
15    Q   The same with regard to Dr. Culotta's
16  report, is there anything in there inconsistent with
17  what you previously reported to Dr. Farmer?
18    A   Nothing inconsistent.
19    Q   Are you prepared to testify at trial with
20  regard to the report?
21    A   Yes.
22    Q   This is just a question.  On Plaintiff's

35  (Pages 134 to 137)

Page 138

1   Exhibit 12, on the procedures you looked at, I want
2   to check this Wechsler Memory Scale 4th edition. Is
3   that anything you have information about?
4       A   No.
5           MS. MEW:  No more questions.
6           MR. STEEDMAN:  I have one more question.
7       FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
8   BY MR. STEEDMAN:
9       Q   Is it fair to say that the focus of your
10  research has been on learning disabilities as they
11  relate to foreign languages?
12      A   A part of it.  I do a lot of research on a
13  lot of different topics but some of my research has
14  been on that topic, yes.
15      Q   When I look at your vita, it appeared to
16  me that 90 percent of the articles have to do with
17  learning disabilities and language, foreign
18  language.
19      A   Oh, no.
20      Q   No?
21      A   Probably about 90 percent have to do with
22  foreign language, yes, but a small part of that --

Page 139

1       Q   But not always foreign language?
2       A   Oh, no, not at all.
3           MS. MEW:  He'll review later.
4           (Signature not having been waived, the
5   deposition of RICHARD SPARKS was concluded at 12:05
6   p.m.)
7                   * * *
8
9
10          ACKNOWLEDGMENT OF DEPONENT
11          I, RICHARD SPARKS, do hereby acknowledge I
12  have read and examined the foregoing testimony, and
13  the same is a true, correct and complete
14  transcription of the testimony given by me, and any
15  corrections appear in the attached errata sheet
16  signed by me.
17
18  _____
19  Date          RICHARD SPARKS
20
21
22

Page 140

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Marilyn J. Feldman, Registered Professional
3   Reporter, the officer before whom the foregoing
4   proceedings were taken, do hereby certify that the
5   foregoing transcript is a true and correct record of
6   the proceedings; that said proceedings were taken by
7   me stenographically and thereafter reduced to
8   computerized transcription under my supervision; and
9   that I am neither counsel for, related to, nor
10  employed by any of the parties to this case and have
11  no interest, financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13  and affixed my notarial seal this 23rd day of
14  December 2010.
15  My commission expires:
16  December 14, 2011
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR
21  THE DISTRICT OF COLUMBIA
22

Page 141

1       E R R A T A   S H E E T
2       IN RE:  Cockburn v. NBME
3   RETURN BY: _____
4   PAGE  LINE   CORRECTION AND REASON
5   ____  ____   _____
6   ____  ____   _____
7   ____  ____   _____
8   ____  ____   _____
9   ____  ____   _____
10  ____  ____   _____
11  ____  ____   _____
12  ____  ____   _____
13  ____  ____   _____
14  ____  ____   _____
15  ____  ____   _____
16  ____  ____   _____
17  ____  ____   _____
18  ____  ____   _____
19  ____  ____   _____
20  ____  ____   _____
21  ____  ____   _____
22  (DATE)        (SIGNATURE)

36  (Pages 138 to 141)